# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 626 | **DATE** | 10/18/2002 |
| **CASE TITLE** | EOLAS TECHNOLOGIES, ET AL vs. MICROSOFT CORP. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing held and continued to 11/19/2002 at 10:00 A.M...

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Motion (222-1) is granted/denied in part. Motion (227-1) is granted. Motion (229-1) is granted. Motion (231-1) is granted. Motion (244-1) is denied. Motion (245-1) is denied. Redacted documents to be produced by 11/4/02 for in camera inspection. Motion (248-1) is denied without prejudice. Motion (263-1) is denied. Motion (264-1) is denied. Motion (265-1) is denied. Motion (300-1) is denied. Motion (303-1) is denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| ✓ | Notified counsel by telephone. | OCT 21 2002 | date docketed | | 373 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| DW | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

EOLAS TECHNOLOGIES
INCORPORATED,

    and

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA,

    Plaintiffs,

        v.

MICROSOFT CORPORATION,

    Defendant.

No. 99 C 0626
Judge James B. Zagel

**DOCKETED**
OCT 2 1 2002



## MEMORANDUM OPINION AND ORDER

INTRODUCTION

    This is an action for patent infringement arising under 35 U.S.C. § 101 *et seq.* for

damages and injunctive relief pursuant to 35 U.S.C. § 271 *et seq.* Plaintiffs have accused

defendant, Microsoft Corporation ("Microsoft"), of manufacturing, using, selling, offering for

sale and/or distributing computer programs that infringe the claims of U.S. Letters Patent

5,838,906 ("'906 patent").[1] Essentially, plaintiffs allege that certain aspects of Microsoft's

Internet Explorer ("IE") infringe the '906 patent, and consequently, they accuse Microsoft

products which integrate or incorporate IE. In response to plaintiffs' complaint, Microsoft has

filed a counterclaim of inequitable conduct based upon the allegedly fraudulent suppression of

---

[1] The 906 Patent is titled "Distributed Hypermedia Method for Automatically Invoking External
Application Providing Interaction and Display of Embedded Objects Within a Hypermedia Document," and it was
duly and legally issued on November 22, 1994, to the University of California, as assignee of the 906 Patent's
inventors, Dr. Doyle, David C. Martin, and Cheong S. Ang. Subsequently, the University of California granted
plaintiff Eolas Corporation ("Eolas") an exclusive license for the 906 Patent.

material information by the lead inventor of the '906 patent, Dr. Michael Doyle, against which

plaintiffs have moved for summary judgment and for which Microsoft has moved for an early

bench trial. Microsoft has also filed motions for summary judgment againt plaintiffs' claims

regarding support for applets, support for ActiveX controls, and the object display function, and

there are a number of motions relating to discovery and pleadings that have also been pending.

In this opinion, I address all of these motions.


## SUMMARY JUDGMENT MOTIONS

*Legal Standard*

According to Fed. R. Civ. P. 56(c), summary judgment is appropriate when there are no

genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

For the purpose of all summary judgment motions brought forth in this case, I am to believe the

facts as alleged by the non-moving party and draw all justifiable inferences in that party's favor.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).


## Inequitable Conduct

Microsoft alleges that Dr. Doyle intentionally withheld from the Patent and Trademark

Office ("PTO") information regarding a web browser, ViolaWWW, created by Pei-Yuan Wei

that had the capability to display interactive objects embedded in a Web page. Microsoft also

alleges that Dr. Doyle knowingly made false representations to the PTO that he had demonstrated

his invention to the Netscape founders and engineers from Sun Microsystems. Plaintiffs have

moved for summary judgment here, contesting the materiality of the information in Dr. Doyle's

possession and arguing that even if the statements Dr. Doyle made to the PTO regarding demonstrations to Netscape founders and Sun Microsystems engineers are false, Dr. Doyle made those statements believing in good faith that they were true.

*Failure to Disclose*

With regard to withholding material information, Microsoft alleges the following:

During the four year period in which the '906 patent application was pending in the Patent and Trademark Office ("PTO")–and in some cases even before the patent application was filed–Doyle, among other things:

- had information from Wei that Wei's Viola browser had the capability to embed interactive program objects in documents transmitted over the World-Wide Web, knew that Wei claimed (multiple times) that this Viola capability predated Doyle's date of invention, and received from Wei a recitation of supporting details substantiating those claims;
- was told by leaders in the World-Wide Web community, months before he filed his patent application, that Wei's Viola had the ability to embed program objects in web pages;
- had information from Wei that "[d]efinitely by May 8, 1993"–some seventeen months before Doyle filed the '906 patent application and before any date of invention claimed by Doyle–Wei had demonstrated to others in the industry the browser capability that Doyle claimed as his own "invention" (Doyle later publicly misstated, more than once, Wei's statement about prior demonstrations);
- had information from Wei that "interactive apps 'specifically' on the web, ie [sic] applets in-lined into HTML documents etc., and with bi-directional communications" existed in Viola as early as late 1992 or early 1993;
- used the link Wei provided to visit Wei's ftp site (which Wei invited anyone to use) and accessed over a dozen pages of information about the Viola browser;
- downloaded a paper Wei wrote in 1994 about "extensibility and plug-in components in browsers" for the Stanford Computer Forum WWW Workshop;
- knew that peers in the industry believed that he should bring Wei's work and Viola to the attention of the PTO;
- publicly announced that Java "bears a close similarity to" Viola and separately disclosed and discussed Java's supposed use of his invention as

evidence of non-obviousness in the PTO, but nevertheless failed to mention Viola to the PTO.

Doyle never disclosed any of this information to the PTO. (Footnotes omitted).

In response to these allegations, plaintiffs allege the following:

During prosecution of the '906 patent, Dr. Doyle possessed some e-mails and several articles dated in August and September 1994 related to Viola. Notably, Dr. Doyle:

- Never saw any demonstration of the purported Viola invention;
- Never saw any mention of a VOBJF tag;
- Never saw any code that used a VOBJF tag; and
- Never saw any reference that fully explained Viola.

In fact, based on the limited information which he did obtain, he believed that the Viola work came later than his work and essentially was another form of scripting. (Citations omitted).

It is undisputed that Dr. Doyle never possessed the Viola browser itself, nor any software or computer files, and it is also undisputed that Dr. Doyle and Dr. Wei corresponded about their respective browsers via email. Beyond this point, there are disputes as to what Dr. Doyle knew and exactly what the information possessed by Dr. Doyle indicated. The question ultimately boils down to whether or not Dr. Doyle breached his duty of candor to the PTO in failing to hand over the information that he did possess.

All patent applicants owe a duty of candor and good faith to the PTO, and this duty exists throughout the entire prosecution of the patent. *See* 37 C.F.R. § 1.56(a); *Semiconductor Energy Lab. v. Samsung Elec.*, 204 F.3d 1368, 1373 (Fed. Cir. 2000); *Fox Indus., Inc. v. Structural Preservation Svc., Inc.*, 922 F.2d 801, 803 (Fed. Cir. 1990). Breaching this duty may constitute inequitable conduct, which "includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent

to deceive." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed. Cir. 1998). In determining whether a failure to disclose information to the PTO rises to the level of inequitable conduct, there is a three step analysis in which the court must determine: (1) whether the withheld information or misrepresentation meets a threshold level of materiality; (2) whether a threshold level of intent has been shown by the evidence; and (3) if these thresholds are satisfied, "whether the equities warrant the conclusion that inequitable conduct occurred." *Semiconductor Energy*, 204 F.3d at 1373. Both materiality and intent must be found, and the more severe one is found to be, the less severe the other has to be. *See Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1261 (Fed. Cir. 2001); *Critikon, Inc. v . Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997). Also, because a "mere showing that art or information having some degree of materiality was not disclosed," is insufficient to establish inequitable conduct, it is the intent to act inequitably that must be shown. Thus, for a failure to disclose to constitute inequitable conduct, there must be "clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to the applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO." *FMC Corp. v. Manitowoc Co, Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987).

Following this framework, I address the materiality of the allegedly withheld information. Materiality is defined by Rule 56 of the PTO ("Rule 56"), which states the following:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> 1. It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

2.    It refutes, or is inconsistent with, a position the applicant takes in:

    I.    Opposing an argument of unpatentability relied on by the Office, or
    II.    Asserting an argument of patentability.

37 C.F.R. § 1.56(b).

There appears to be a conflict between the parties as to whether the information Dr. Doyle possessed must constitute prior art in order to be material. While plaintiffs are correct in that "work that does not qualify as 'prior art' is also not material to patentability," the question of whether Dr. Wei's work or information about it qualifies as prior art has not been answered at this point and is an issue to be resolved with validity and infringement. While the cases cited and discussed by plaintiffs indicate that something must be prior art to be material, there were either findings of prior art, or at least a finding that the evidence supported prior art or the like, in each case.[2] At this point in the case, the issue of inequitable conduct is being raised before validity and infringement, and consequently, there are no findings relating to whether ViolaWWW or information concerning it is prior art. Thus, "the test for materiality is whether a reasonable examiner would have considered the information important, not whether the information would conclusively decide the issue of patentability." *Li Second Family Ltd. Partnership v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000). *See also A.B. Dick Co. v. Burroughs Corp.*, 798

---

[2] In *Northen Telcom, Inc. v. Datapoint Corp.*, the court held that because the device in question "was not prior art, it was not material to patentability." 908 F.2d 931, 940 (Fed. Cir. 1990). Similarly, in *Environmental Designs, Ltd. v. Union Oil Company of California*, the court stated the following: "[w]ithheld information must be material, a condition we find here lacking. The disclosure not being prior art, it would have not been material to the patentability of the Beavon process." 713 F.2d 693, 698 (Fed. Cir. 1983), and in *Allied Colloids, Inc. v. American Cynamid Co.*, the court concluded that because the evidence did not support a public use bar, failure to inform the examiner about the purported bar is not material. 64 F.3d 1570, 1578 (Fed. Cir. 1995). Finally, in *Specialty Composites v. Cabot Corp.*, the court stated that "[a]ctions by the same inventor occurring within the statutory one-year grace period under 35 U.S.C. § 102(b) are not prior art which will render the inventor's work anticipated or obvious, and it is not inequitable conduct to fail to disclose such art to the [PTO] during prosecution." 845 F.2d 981, 990 n.9 (Fed. Cir. 1988),

F.2d 1392, 1397 (Fed. Cir. 1986) (stating that "the test for materiality is *not* whether there is anticipation or obviousness but, rather, what a 'reasonable examiner would consider . . . important in deciding whether to allow the application to issue as a patent'") (citation omitted). Plaintiffs assert that they recognize that whether ViolaWWW is prior art is yet to be determined and that the focus of their arguments is against materiality.

The relevant inquiry is if there exist any genuine issues of material fact with respect to whether the PTO examiner would have considered the withheld information important. Plaintiffs argue that Microsoft has only pointed to genuine issues of material fact with respect to the validity and infringement issues, and there are no such factual issues germane to the narrow issue of this motion, namely whether the information Dr. Doyle did in fact possess before and during the prosecution of the '906 patent was material. It is not surprising that in briefing this motion, plaintiffs have occasionally slipped into arguing whether or not Dr. Wei's browser constitutes prior art, since if the browser were found to not be prior art, then information discussing or describing it could not be material–the question of prior art does affect the question of materiality. Some arguments that plaintiffs have put forth rely on a finding of prior art in order to be effective. For example, plaintiffs argue that Dr. John P.J. Kelly, Microsoft's expert, pointed to software and computer files when asked what the purported invalidating Viola material was, and in light of the fact that Dr. Doyle never saw those items during the prosecution of the '906 patent, "[t]hese facts alone belie Microsoft's claims that the information Dr. Doyle possessed was material." Plaintiffs go on to assert that "[s]imply put, if any of the information in Dr. Doyle's possession was material, Mr. Kelly would be relying on it." During the deposition of Dr. Kelly, he was asked what he believed constituted prior art, not what he considered material,

-7-

so his not considering the materials in Dr. Doyle's possession prior art does not prove

immateriality. Doyle Dep. at 118, ll. 18-23. Whether Dr. Wei's invention is prior art, however,

is not for me to decide and is not at issue at this point in the case. So I must focus my inquiry on

whether the information possessed by Dr. Doyle was something the examiner should have been

told. This is a fact-intensive inquiry that cannot be resolved by the record before me because the

facts as Microsoft has pled them do raise genuine issues of disputed fact as to whether the

information in question should have been disclosed to the PTO.

The email correspondence between Dr. Doyle and Dr. Wei that comprises one of the

primary bases of Microsoft's inequitable conduct claim began on August 30, 1994. On this day,

Dr. Doyle posted an announcement on an Internet mailing list which stated that "[r]esearchers at

the U. of California have created software for embedding interactive program objects within

hypermedia documents." Dr. Doyle testified during his deposition that this announcement was,

"in a general sense," about the '906 patent. Doyle Dep. at 143, l. 17. That same day, Dr. Wei

posted a message responding to Dr. Doyle's announcement in which he stated, "I don't think this

is the first case of program objects being embedded in docs and transported over the WWW.

ViolaWWW has had this capabilities [sic] for months and months now." Dr. Doyle immediately

responded to Dr. Wei's posting and asked him, "[h]ow many months and months? We

demonstrated our technology in 1993." In response, Dr. Wei first said, "[n]ot that I wish to

content [sic] on the point of simply who's first :)," and then proceeded to state that "[d]efinitely

by May 8, 1993 we had demonstrated that plotting demo (the very one shown in the viola paper)

to visitors from a certain computer manufacturer" and that at that time, "there was a way to

embed programmable and interactive objects into HTML documents." Although Dr. Wei also

admitted in this message that he wished he had kept better records of ViolaWWW's
development, he informed Dr. Doyle that the second version of ViolaWWW could display
embedded interactive objects inside of a webpage and that an early demo of this ViolaWWW
version was shown "definitely earlier than May 93." When Dr. Doyle stated in a subsequent
message that Dr. Wei's Viola paper indicated that the browser "did not support what it calls
'embeddable program objects' until 1994," and that the '906 browser had been demonstrated in
1993 as "a fully functional volume visualization application embedded within a WWW
document," Dr. Wei responded by saying, "[w]ell, Viola's model was *demonstrated* in 1993,
*released* freely in 1994."

　　After some time, the correspondence between Dr. Doyle and Dr. Wei resumed in August
1995, when Dr. Doyle posted another announcement on a listserve in which he stated that Eolas
had "completed a licensing agreement with the University of California for the exclusive rights to
a pending patent covering the use of embedded program objects, or 'applets,' within World Wide
Web documents." Dr. Wei's response was that the "'technology which enabled Web documents
to contain fully-interactive 'inline' program objects' was existing in ViolaWWW and was
*released* to the public, and in full source code form, even back in 1993 . . . Actual
conceptualization and existence occured [sic] before '93." When Dr. Doyle informed Dr. Wei
that Dr. Wei had admitted previously that he "did NOT release or publish anything like this
before the Eolas demonstrations," Dr. Wei clarified that what he had said was that "Viola was
demonstrated in smaller settings, but before your [Dr. Doyle's] demo. The applets stuff was
demo'ed [sic] to whomever wanted to see it and had visited our office at O'Reilly & Associates
(where I [Dr. Wei] had worked at the time)."

Assuming Dr. Wei's statements to be true, this email correspondence, Microsoft argues, shows that Dr. Doyle and anyone else looking for patent protection for the subject matter of browsers with embedded interactive applications were barred for any application filed after May 1994. Dr. Doyle and his co-inventors filed the '906 patent application in October 1994, and Microsoft contends that neither ViolaWWW nor Dr. Wei was ever mentioned during the prosecution of the patent. Microsoft argues that what Dr. Wei told Dr. Doyle during their email correspondences and the ViolaWWW information that Dr. Doyle obtained after Dr. Wei directed him to an ftp site in one of his emails (the "Viola paper") are material information that should have been disclosed to the PTO. Further, Microsoft alleges that months before filing his patent application, Dr. Doyle had been told by various leaders in the World Wide Web community that Dr. Wei's browser had the capacity to embed program objects in Web pages, and Dr. Doyle had obtained articles discussing ViolaWWW written in August and September of 1994 and that this information was also material and should have been disclosed.

Ultimately, plaintiffs argue that because Dr. Doyle never had in his possession the browser itself, software, or computer files, it was impossible for Dr. Doyle to determine whether ViolaWWW might be prior art such that he would need to disclose all information he had about it to the PTO. Plaintiffs argue that based on the very limited information in Dr. Doyle's possession, he reasonably concluded that ViolaWWW did not predate his own invention and also that it could not be prior art because it operated differently. So the question becomes, how much about ViolaWWW did Dr. Doyle learn from the email correspondence with Dr. Wei, the Viola paper, information from the World Wide Web community, and the articles from August and September 1994?

With regard to the timing issues, what appears to have happened in the email correspondence between Dr. Doyle and Dr. Wei is that both men became aware of an invention that possessed a similar, if not identical, capability. At first, the conversation was friendly, as evidenced in Dr. Wei's sentiments, "[n]ot that I wish to content [sic] on the point of simply who's first :)" and "nevermind on this time thing as far as I'm concerned." However, for some reason unclear in the evidence before me, this friendly rapport broke down, and the email correspondence begins to take on a more forceful tone by both men, and by the end of the correspondence, they are clearly engaging in a tense conversation to determine whose invention was first. Plaintiffs strongly assert that the evidence clearly shows that Dr. Doyle's invention was first. However, the email correspondence does raise a factual question as to whether ViolaWWW came later–the dates asserted in these emails are only separated by a few months, and it is unclear exactly what these browsers could do on those dates and how public the demonstrations were. Although Dr. Doyle's conclusions that ViolaWWW came later and that his information was too vague and unsubstantiated to warrant handing it over to the PTO, even if erroneous, may have been reasonable conclusions to draw, this is not a question that can be resolved here.

In addition, there are factual issues regarding the similarity (or rather, obvious dissimilarity, according to plaintiffs) between Dr. Doyle's and Dr. Wei's inventions. Although Dr. Wei did state at one point during his email correspondence with Dr. Doyle that "we may be comparing apples and kiwis here," he said this early in the conversation when relations were amiable, and while this comment could be interpreted as an admission that ViolaWWW was truly different from Dr. Doyle's invention, it could just as easily be read as a magnanimous statement to avoid an unnecessary argument. Plaintiffs, in their briefing on this motion, have at

-11-

times insinuated that these browsers are fundamentally different in that ViolaWWW's basic approach is to use an interpreter to run the program objects, and Dr. Doyle's browser uses linked-in executables. However, in an email to a colleague dated March 27, 1995, Dr. Doyle noted that Java "bears a close similarity to Viola, since the 'applets' must be coded from a predefined language, downloaded, and locally interpreted," and Java was offered by Dr. Doyle to the PTO as an example of his invention. Thus, it is unclear to me whether this difference between ViolaWWW and Dr. Doyle's invention would render ViolaWWW so distinctive that information about it would be immaterial. Also, during the email correspondence between Dr. Wei and Dr. Doyle, this difference in approach, namely the use of scripting language, was discussed, and Dr. Wei's response was that "[i]t's just another way of doing it," and that nevertheless,

> [y]ou could have the viola [sic] object running entirely locally, or have the object act as a front-end to a remote back-end. There's no reason why Viola's model can't also do a client-server application (thou [sic], OK, not now quite the way you do it) . . . . Anyway, it sounds like what you have is a really defined standard interface (akin to the OLE API) where as [sic] Viola's model doesn't have a one (yet :-)--Viola uses scripting rather than a standard API for the glues.

While it is clear that these inventions are not identical, whether the differences between them, as revealed in the information Dr. Doyle possessed during the time in question, would clearly indicate that ViolaWWW could not be prior art (timing issues aside), is unclear and is a question to be resolved at trial. The record does not resolve the question of whether using an interpreter versus using a linked-in executable is such a fundamental difference that would render ViolaWWW obvious non-prior art, particularly in light of ViolaWWW's similarity to Java and Dr. Doyle's submission of Java to the PTO. While it appears undisputed that the Viola VOBJF tag, which plaintiffs characterize as "the key element now relied upon by Microsoft as encompassing the '906 invention" was not mentioned or explained in the materials Dr. Doyle

possessed, this alone does not shut the door to the discussion. It is clear from the record that what Dr. Doyle had in his possession was incomplete, and Microsoft does not seem to contest that. Rather, Microsoft argues that despite the incompleteness of the information, it was sufficient to alert Dr. Doyle of its importance to the PTO's considerations, and this is a question that must be resolved at trial. While plaintiffs are correct in asserting that "applicants are not conscripted to serve as an investigative arm of the PTO," it is also true that "one should not be able to cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art." *Newell Window Furnishings, Inc. v. Springs Window Fashions Division, Inc.*, 1999 WL 1077882, at \*38 (N.D. Ill. 1999); *FMC Corp. v. Hennessy Indus. Inc.*, 836 F.2d 521, 526 n.6 (Fed. Cir. 1987). Whether Dr. Doyle simply stayed within the bounds of his duty to the PTO or cultivated ignorance cannot be resolved by the record before me because questions of specificity and indefiniteness are fact-intensive queries dependent on a number of factors, such as common knowledge in a particular subject or product area and the individual's level of expertise, and this is often a subjective inquiry. *Compare Life Technologies*, 224 F.3d 1320, 1327 (Fed. Cir. 2000) (determining information was not material because it only revealed results, not how those results were obtained or other similar details, and thus was too vague and indefinite to discern similarity with the accused product) *with LaBounty Manufacturing, Inc. v. United States International Trade Commission*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (rejecting an argument that a party and his attorney could have reasonably decided to not disclose something that was a close call, stating that "[c]lose cases should be resolved by disclosure, not unilaterally by the applicant").

Plaintiffs point to Microsoft's treatment of Viola information in its attempt to reissue its Koppolu patent, which contains claims identical to those of the '906 patent. Specifically,

plaintiffs argue that the emails and articles and other information in Dr. Doyle's possession were never given to the examiner by Microsoft, and thus, this information could not possibly be material. However, on November 16, 1999, nearly two years prior to the final rejection of the reissue application in September 2001, Microsoft filed an "Information Disclosure Statement for Related Litigation Pursuant to MPEP §§ 144.04 and 2001.06(c)" in which Microsoft submitted a copy of its answer and counterclaim to plaintiffs' complaint and its response to the first and second sets of interrogatories, and within these documents, the information contained in the emails, articles, etc. was disclosed. The failure of Microsoft to hand over those specific documents is not as significant as plaintiffs contend, as those documents would have been repetitive in light of what Microsoft had already submitted. Consequently, I do not find this argument against the materiality of the information at issue to be compelling.

Plaintiffs also argue (albeit somewhat late in the game) that the materials in Dr. Doyle's possession indicated that ViolaWWW's basic approach was scripting, and because scripting references were in front of the examiner during the prosecution of the '906 patent, the materials are cumulative. Microsoft's response is that "[p]laintiffs refer, however, to references which either disclose a program that ran on a server computer, not the client computer, to launch a new web page or a script that was included in the text of the web page itself" and that "[n]either of these references related to embedding *external* program objects in hypermedia documents where the external program executed on a client workstation, as in Viola." The scripting references on which plaintiffs rely either refer to a program running on a server computer or to systems that do not involve the invocation of external executable applications to display an external object within a hypertext document. '906 Patent Amendment Application filed 10/17/94, at E000177,

E000179-80. Therefore, it does not appear that Dr. Doyle's materials regarding ViolaWWW's scripting approach are cumulative.

Even if Microsoft could prove materiality at this point, the inquiry is not complete, because a finding of inequitable conduct based on a failure to disclose cannot be established by "a mere showing that art or information having some degree of materiality were not disclosed." *Manitowoc*, 835 F.2d at 1415. The "materiality of an undisclosed reference does not presume an intent to deceive." *Halliburton Co. v. Schlumberger Tech.*, 925 F.2d 1435, 1442 (Fed. Cir. 1991). To meet the intent requirement, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Paragon Podiatry Laboratories, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993) (citation omitted). At the same time, intent "need not, and rarely can, be proven by direct evidence." *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989).

Microsoft argues that Dr. Doyle appreciated the materiality of the information he possessed and knew enough about the patent prosecution process to support an inference of intent to deceive. Dr. Doyle's knowledge of the patent prosecution process does not seem to be in dispute–in contrast, the implications of that knowledge are very much contested. Intimate knowledge of the patent prosecution process alone cannot give rise to an inference of intent to deceive. However, if it were to be found that the information in question was material, then it might be possible for such an inference to be made. Nonetheless, the question of materiality has yet to be determined, and until this question is answered, there remain factual issues with respect to intent as well.

Outside of the materiality inquiry, there are factual questions regarding Dr. Doyle's intent, or lack thereof, as well. Plaintiffs argue that the evidence "underscores that Dr. Doyle's conduct was characterized by good faith," and relies heavily on Dr. Doyle's attempt to learn more about ViolaWWW, his request to Dr. Wei for additional documentation, and his providing his prosecuting attorney, Charles Kreuger, with the information that he did possess. Plaintiffs argue that since the information Dr. Doyle had was clearly not prior art and clearly did not describe prior art, these actions indicate extra-good faith that Dr. Doyle was not obligated to have.

However, while Dr. Doyle's actions could be read in this way, it is equally possible to interpret his actions as evidence that at the very least, he was concerned with the potential materiality of the information in his possession. Plaintiffs' arguments seem to take somewhat conflicting views: on one hand, Dr. Doyle's information was so obviously immaterial that there was no need to investigate further and yet, Dr. Wei's alleged refusal to provide Dr. Doyle with the browser, software, and/or computer files is what justifies Dr. Doyle's conclusion that his information was immaterial because he needed this vital information. If the information in Dr. Doyle's hands at the time in question was so obviously immaterial such that it is gratuitous of Dr. Doyle to do any investigating, then why would he need to have any additional information to confirm that immateriality? Plaintiffs are in one vein arguing that Dr. Doyle is completely right in determining that his information was immaterial to the point that checking this conclusion cannot be construed as anything other than evidence of good faith, and in the other vein, plaintiffs are arguing that even if Dr. Doyle's conclusions are found erroneous, he cannot be blamed because he lacked adequate information. Perhaps Dr. Doyle is an overcautious man; however, his asking Dr. Wei when ViolaWWW could embed interactive objects and continuing

-16-

to ask questions with regard to timing suggest that the thought that Viola may be prior art at least crossed his mind, and not merely in passing.

With respect to Dr. Doyle's submission of the information to Mr. Krueger, this also could be read in opposite ways. This act could be seen as evidence of good faith and of Dr. Doyle's cautiousness to ensure that he was honoring his duty of candor, or it could be perceived as evidence that Dr. Doyle appreciated the potential materiality of that information. These conundrums cannot be resolved by the record before me. Plaintiffs suggest that because the information was not disclosed, even after it was in Mr. Krueger's hands, an inference that Mr. Krueger made a determination of immateriality can be drawn. This, however, is no more than mere speculation, and without evidence to support this inference, I cannot make it. Because the issue of intent must be determined with circumstantial evidence and will depend upon the outcome of the materiality issue, summary judgment on the issue of intent is inappropriate at this time.

*Statements Regarding Netscape and Sun Microsystems*

Microsoft alleges that Dr. Doyle made material misrepresentations regarding demonstrations to Netscape and Sun Microsystems as additional evidence of Dr. Doyle's bad faith in dealing with the PTO in general and as an additional basis for its inequitable conduct claim. When I allowed Microsoft to amend its Answer on March 9, 2001, quoting *Refac Int'l v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996), I stated that "[t]he filing of a false declaration is sufficient to state a claim for inequitable conduct, since the Federal Circuit had plainly held 'affidavits are inherently material, even if only cumulative. The affirmative act of submitting an affidavit must be construed as being intended to be relied upon.'" To find

inequitable conduct on this ground, "[a] holding of unenforceability based on the filing of a false oath requires that the oath was false, and made with knowledge of the falsity." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996) (citation omitted).

Microsoft alleges that Dr. Doyle's sworn declaration to the PTO that the "applicants initially demonstrated the first web plug-in and applet technology to founders of Netscape and engineers employed by Sun Microsystems" was not only false, but that Dr. Doyle knew that this statement was false when he made it. During his deposition, Dr. Doyle testified that the reference to the "founders of Netscape" was "generally" to "members of the Mosaic Development Team at NCSA." Doyle Dep. at 576, ll. 12-13. Microsoft asserts that Dr. Doyle later admitted that the "members of the Mosaic Development Team at NCSA" did not found Netscape. However, Dr. Doyle's testimony is that not *all* of the team members were involved in founding Netscape, and he only specified Joseph Hardin as a member of that team that definitely was not involved in founding Netscape. Plaintiffs argue that Dr. Doyle's statement regarding the "founders of Netscape" was based upon a phone conversation with Mr. Hardin during which Dr. Doyle believed Marc Andressen, who is a founder of Netscape, was listening in. Also, Mr. Hardin testified that he believed that Eric Bina, who was also a founder of Netscape, was involved in a joint project with Dr. Doyle's group at the University of California. This was a digital libraries project involving a joint research proposal to the National Science Foundation entitled "Embedded Visualization Object for Knowledge Access, Creation and Management through the World Wide Web." Plaintiffs do not allege or present evidence that Mr. Bina and Dr. Doyle actually spoke about Dr. Doyle's invention; rather, plaintiffs seem to be suggesting that I infer from the title of the research project and the contact that must have occurred between Dr. Doyle and Mr. Bina that they must have spoken about the browser. If Dr. Doyle's statement

-18-

regarding the "founders of Netscape" is untrue, was it a deliberate misrepresentation, or was it a reasonable mistake? Examining the evidence before me, I am unable to answer this question with the latter and thus must deny summary judgment.

Dr. Doyle's statement about Sun Microsystems engineers is similarly unresolvable at this point. It is Dr. Doyle's testimony that he gave a demonstration to at least two individuals from Sun Microsystems, Diane Daniels and Arthur Van Hoff, and believed that other Sun Microsystems engineers were present, although he could not identify them. However, Dr. Doyle also admitted that he "couldn't say for certain" whether Ms. Daniels or Mr. Van Hoff actually saw his demonstration, and he bases his belief in Mr. Van Hoff's presence on a picture of Mr. Van Hoff that he saw after the demonstration. Doyle Dep. at 575, l.12. Dr. Doyle asserts that when he saw Dr. Van Hoff's picture, he recalled a man at the demonstration that looked like the man in the picture, and apparently, Mr. Van Hoff is a very distinctive-looking man. While it is true that Dr. Doyle's definitive statement that he demonstrated his browser to Sun Microsystems engineers drawn from the evidence plaintiffs have provided and Dr. Doyle's own testimony seems to be a stretch, how much of a stretch is undeterminable at this point. Dr. Doyle may be at fault for nothing worse than a bad memory, but Microsoft has presented genuine issues of fact sufficient to survive summary judgment. Summary judgment on inequitable conduct is generally rare because, as in the present case, motive and intent are central to the claim, and there is rarely direct evidence of deceitful conduct. *See GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001).

<u>Motion for Early Bench Trial</u>

Microsoft requests that a separate bench trial on its inequitable conduct claim be held before a jury trial on the issues of infringement and invalidity. The defense of inequitable conduct is equitable in nature and is thus an issue for this court to decide. *See Paragon Podiatry Lab*, 984 F.2d at 1190. In requesting that this issue be decided before plaintiffs have an opportunity to argue their case before a jury, Microsoft relies primarily on the holding in *Gardco Manufacturing, Inc. v. Herst Lighting Co.*, which upheld a district court's separation of an inequitable conduct claim for a non-jury trial that was held prior to a jury trial on validity and infringement. 820 F.2d 1209, 1213 (Fed. Cir. 1987). While *Gardco* allows me to grant Microsoft's request, it does not mandate that I do so, and the decision whether to hold an early bench trial on inequitable conduct rests within my discretion. Fed. R. Civ. P. 42(b). Clearly, this discretion is significantly limited by plaintiffs' Seventh Amendment right to a jury trial. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959). The Supreme Court has held that "only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through a prior determination of equitable claims." *Id.* at 510-511. I am reluctant to organize this case in such a way that plaintiffs might be precluded from relief before they have an opportunity to present their case on the issues of validity and infringement and hence, will proceed cautiously.

In *Gardco*, the court reasoned that "a patent may be valid and yet be rendered unenforceable for misuse or inequitable conduct. Similarly, a valid patent may be (in the abstract infringed) . . . but there will be no liability to the patentee when the patent is unenforceable." *Id.* 820 F.2d at 1213. Because the district court explicitly refused to make any findings with regard to patentability of the claimed invention and infringement, the *Gardco* court found that it was

*"the conduct-of-the-applicant-in-the-PTO* issue" that was tried in the non-jury trial, which was distinct from infringement and validity issues. The *Gardco* court, while acknowledging the constitutional limitation on the district court's discretion in ordering the equitable claim to be tried first, looked to the case law and concluded that determining whether the district court abused its discretion would turn "on whether a prior trial on the issue of whether the patent is unenforceable for inequitable conduct would resolve factual issues common with factual issues reserved for jury trial." *Id.*

While the appellants in *Gardco* did not succeed in convincing the court that such commonality of factual issues between bench and jury trials exists, I am sufficiently convinced that it exists in the present case. It has become apparent in my determination of plaintiff's summary judgment motion for inequitable conduct that at least in this case, the question of materiality and whether something constitutes prior art are easily intertwined, so much that it is sometimes impossible to avoid blending them together. Not only have I encountered this difficulty, but both parties in their briefs on the inequitable conduct issue have demonstrated the same problem. Microsoft, in arguing that the information in Dr. Doyle's possession was material, has often stepped into the territory of arguing invalidity, and plaintiffs, in arguing against Microsoft's materiality contentions, have slipped into treating material information as synonymous with prior art. Clearly, there are factual determinations that will affect questions of materiality as well as prior art. Thus, I am not persuaded that the clean separation of equitable and legal claims that the *Gardco* court saw is adequately feasible in this case to justify the risk to plaintiffs' constitutional rights.

Furthermore, I do not find that holding an early bench trial serves the interests of judicial economy. Although the *Gardco* court felt that there is a difference between having two juries

-21-

review the same evidence, as opposed to having the juries decide the same essential issues, there is no doubt that the claim of inequitable conduct is "often interrelated and intertwined" with the issues of validity and infringement. *See American Hoist & Derrick, Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1363 (Fed. Cir. 1984). The *Gardco* court did not place much weight on the *American Hoist* decision partly because "the court there [did not] discuss the commonality between factual issues relating to inequitable conduct and those relating to patent infringement and validity in the context of the question now before us." *Gardco,* 820 F.2d at 1213. While Microsoft does have a valid point in that the materiality of the information possessed by Doyle and his intentions with respect to that information is a separate issue from whether that information constitutes and/or describes prior art, there will be more than "minimal duplication" of evidence. If Microsoft were to lose its inequitable conduct claim, many witnesses would have to be called back and would have to repeat testimony for a jury. Also, much of the evidence that would be presented at an early bench trial on inequitable conduct (the email correspondence and Viola paper, for example) would also be needed for the prior art determination. Thus, an early and separate bench trial, in my view, does not promote the interests of judicial convenience, economy, or expedition.

For these reasons, I am denying Microsoft's motion for an early bench trial on inequitable conduct. The bench trial on inequitable conduct will be held subsequent to the jury trial on infringement and validity, during which time the parties may present evidence not previously admitted. When there are witnesses at the jury trial that will testify to an aspect of the inequitable conduct claim that should not be heard by the jury, I will hear such testimony in the jury's absence and will make time to hear this testimony accordingly.

<u>Microsoft's Motions for Summary Judgment</u>

*Doctrine of Equivalents*

Before I proceed with Microsoft's motions for summary judgment, I will address the issue of whether prosecution history estoppel bars the doctrine of equivalents, since this issue has been raised in all three of Microsoft's motions. Under the doctrine of equivalents, "[m]ere colorable differences, or slight improvements, cannot shake the right of the original inventor." *Charles Greiner & Co. v. Mari-Med. Mfg.*, 962 F.2d 1031, 1035-1036 (Fed. Cir. 1992). Microsoft argues that "(1) the applicants' narrowing amendments to the claims . . . . and (2) the applicants' arguments distinguishing prior art OLE systems to secure allowance of their claims prevent application of the doctrine of equivalents to cover the distinguished operations of OLE" give rise to prosecution history estoppel according to *Festo Corp. v. Shoketsu Kinzoku Kogoyo Kabushiki Co. Ltd.*, 234 F.3d 558, 563, 586 (Fed. Cir. 2000), *cert. granted*, 121 S. Ct. 2519 (June 18, 2001) ("*Festo Corp. I*").

Plaintiffs' response is that "the doctrine of equivalents is unnecessary given that Microsoft's products literally perform the claim element of having the browser identify and locate an executable application," and that much of Microsoft's argument "relies upon Microsoft's faulty premise that the inventors disclaimed any use of the operating system in performing the claimed elements." In arguing prosecution history as a bar to the doctrine of equivalents, Microsoft does not argue that the "inventors disclaimed any use of the operating system in performing the claimed elements," but rather pointed to the Amendment filed on August 6, 1996, which specified that it was the *browser* that utilized type information to identify and locate an executable application. This Amendment does not appear to assert that the operating system has no part to play in performing the claimed elements but rather clarifies that it

-23-

is the browser that performs the bulk of that work. Similarly, the arguments made by the applicants to secure allowance of their claims distinguished their invention from systems in which the operating system linked an object and an executable application but did not state that the operating system is completely absent from that process. Even if Microsoft has mischaracterized the Amendment and the applicant's arguments as implying that the operating system has nothing to do with the linking of an object to an executable application, it is clear that the patent has been narrowed to specify a browser that performs the "heavy lifting" in that process for the purpose of patentability, and the applicants' arguments speak to the same purpose. Thus, because the claim has been narrowed with respect to the linking of an object to an executable application, and applicants' arguments made to secure allowance of their claims also cover this accused aspect of IE, prosecution history estoppel arises with respect to plaintiffs' infringement claims involving support for applets and ActiveX controls.

With regard to the object display function, I am denying summary judgment of plaintiffs' claim under the doctrine of equivalents for reasons which will become clear when I address Microsoft's motion for summary judgment of noninfringement for the object display function. Based on my interpretation of the amended claim language, I do not find that the scope of the claims has been narrowed with respect to the object display function and thus, prosecution history estoppel with respect to the object display function does not arise.

*Festo Corp. I* held that an amendment "that narrows the scope of a claim for any reason related to the statutory requirements for a patent will give rise to prosecution history estoppel." 234 F.3d at 563. Also, "[a]rguments made voluntarily during prosecution may give rise to prosecution history estoppel if they evidence a surrender of subject matter." *Id.* at 568; *see also Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999).

Since the parties briefed this issue, the Supreme Court has reviewed the *Festo Corp. I*

decision. 122 S. Ct. 1831 (2002) ("*Festo Corp. II*"). What is pertinent to this discussion is the

Court's affirmation that "a narrowing amendment made to satisfy any requirement of the Patent

Act may give rise to an estoppel." *Festo Corp. II*, 122 S. Ct. at 1839. In clarifying that the

avoidance of prior art is not the only purpose that may give rise to estoppel, the Court recognized

that a common instance where estoppel bars a claim under the doctrine of equivalents is when an

amendment narrows the scope of the patented invention in direct relation to the subject matter at

hand. *Id.* at 1839-40. Also, the Court held that prosecution history estoppel does not provide a

complete bar to *all* equivalents, for "[t]hough prosecution history estoppel can bar challenges to a

wide range of equivalents, its reach requires an examination of the subject matter surrendered by

the narrowing amendment." *Id.* at 1841. Hence, if the amendment does not narrow the scope of

a particular subject matter (as is the case with the object display function in the present case),

prosecution history estoppel does not bar a claim under the doctrine of equivalents with respect

to that particular matter.[3]


Support for Applets

Microsoft asks me to grant summary judgment of noninfringement for plaintiffs' claims

involving support for applets, asserting that the claim language of the '906 patent does not cover

IE's support for applets. Specifically, Microsoft argues that plaintiffs have been unclear as to

---

[3] The Court also clarified that estoppel does not bar an equivalent unforeseeable at the time of the amendment, but that is not at issue here. *Festo Corp. v. Shoketsu Kinzoku Kogoyo Kabushiki Co., Ltd.*, 122 S. Ct. 1831, 1841 (2002).

exactly what they consider to be the executable application, and even if plaintiffs were to be

clear, each route they might choose leads to a dead end.[4]

Applets are programs written in Java code that run only through use of a Java Virtual

Machine ("JVM"). Java is a programming language developed by Sun Microsystems for general

purposes, including creating programs such as applets on the Internet. A JVM is required to

translate the applet into a form that can be understood by the computer, which is necessary

because the applet cannot run directly on the computer's hardware. In the Windows operating

system, the JVM is "an ActiveX control" located in "msjava.dll." According to Microsoft, what

happens when IE encounters an APPLET tag in a web page is that it passes the CLASSID for

msjava.dll to the Windows Operating System, which then uses the Windows registry database to

identify the corresponding component on the computer's hard drive and the file path to that

component.[5] Once the JVM has been launched, IE provides the JVM with information from the

APPLET tag, including what is called a "class file," which "may contain miscellaneous code and

---

[4] One such route that Microsoft claims must fail is pointing to applets as the executable application. Since plaintiffs are not making this argument, I will not discuss its merits or shortcomings. However, I would like to make one point with respect to Microsoft's argument. In asserting that applets cannot be the executable application, Microsoft cites an email written by Dr. Doyle, which distinguishes Java applets from his invention. This email has been submitted not only for the present motion, but also in support of Microsoft's arguments against summary judgment of its inequitable conduct claim. For that motion, Microsoft argued that Java bore a close similarity to ViolaWWW, thus substantiating Microsoft's contention that like Java applets, ViolaWWW was prior art that should have been disclosed to the PTO. It seems disingenuous for Microsoft to highlight the difference between Java applets and the '906 browser to show the similarity between Java applets and ViolaWWW on one hand, and on the other hand, use that similarity to show how IE and the '906 invention are so different. In arguing against Java applets as the executable application, Microsoft mentions that Dr. Doyle stated that Java "bears a close similarity to Viola" as evidence of how different IE is from Java applets. However, in using the similarity between Java and Viola to illustrate the difference between Java applets and IE, Microsoft appears to be cutting against its own argument that ViolaWWW is so similar to the '906 invention that any information about ViolaWWW is material information that Dr. Doyle had a duty to disclose to the PTO.

[5] This part of Microsoft's description moves into the issue of whether it is the operating system or the web browser that performs this identification and locating function, which is the central question to whether Microsoft's ActiveX controls infringes the '906 patent. This issue, for which Microsoft has also moved for summary judgment of noninfringement, will be addressed in a subsequent section. For the purpose of this motion, I will focus on questions specific to applets and address issues pertaining to ActiveX controls later.

data" that the JVM sorts through to locate the program code for the applet. Once this program code has been located, the JVM interprets it line-by-line into a form that can be executed by the computer. Finally, Microsoft adds that "[t]he Java program code contained in the class file is not itself executable on the computer."

In response, plaintiffs argue that they have consistently been clear that the JVM is the executable application. Microsoft's answer to this is that even if that were true (which Microsoft insists it is not), JVM is not an executable application under my claim construction. In my Memorandum Opinion and Order from December 28, 2000 ("Mem. Op."), I defined an executable application, as used in the '906 patent, as "any computer program code, that is not the operating system or a utility, that is launched to enable an end-user to directly interact with data," concluding that "[i]f a computer code in the form of a DLL . . . can be launched by the browser and interact with the user, then it is the executable application contemplated by the claims and specification." Mem. Op. at 16, 35. It appears undisputed that a JVM is not the operating system or a utility, so the question becomes, does the JVM "enable an end-user to directly interact with data?"

Microsoft contends that it does not. Specifically, Microsoft argues that the JVM "is merely an interpreter . . . [that] reads the Java program code in the class file and interprets it line-by-line to convert it into a form that can be understood by the computer . . . . It has no user interface or any other facility for allowing a user to interact with displayed objects." Plaintiffs' counter to this argument rests primarily on the testimony of experts Edward W. Felten and John P.J. Kelly. Both men stated that the JVM is an executable application within the meaning of my claim construction order. Prof. Felten, having read and understood my order, stated that "[p]laintiffs correctly identify the [JVM] as an executable application." Felten Decl. at 5, ¶ 12.

Dr. Kelly, during his deposition, responded, "[y]es, it is," when asked if the JVM was "an executable application in view of the court's claim construction order." Kelly Dep. at 315, l. 20. Although Dr. Kelly later made a correction in the deposition transcript so that "[y]es, it is" was changed to "[t]he Java Virtual Machine is a DLL and it's my understanding that DLLs are not excluded by the Court's claim construction," the meaning of the answer has changed but little. By this logic, if DLLs are not excluded from my definition of an executable application, then a JVM, being a DLL, must fall within that definition.

Microsoft further asserts that despite this testimony, plaintiffs have not shown that a JVM allows an end-user to interact directly with data. Plaintiffs contend that "[t]he JVM enables interactive processing of an object, which may be a java applet." The issue then becomes, does JVM's functioning capacities enable interactive processing of an object? It is unclear in the record whether Prof. Felten and Dr. Kelly classified a JVM as an executable application simply because it is a DLL, and by strict adherence to the definition I formulated, a JVM has to be considered an executable application, or if in addition to following my claim construction, they considered a JVM's functionality in making such a determination. Dr. Kelly's correction of his deposition transcript suggests the former. Nevertheless, whether classification of a JVM as an executable application solely under my claim construction order is sufficient to consider a JVM an executable application is a question I cannot answer with the record before me. However, whether this claim survives summary judgment will ultimately depend on what happens with the support for ActiveX controls claim. If I construe all reasonable inferences in favor of plaintiffs, which I must for the purpose of this motion, then I accept that a JVM is an executable application, and consequently, it becomes just another ActiveX control. Therefore, the fate of the

applets claim with regard to this motion will be determined by what happens with Microsoft's summary judgment motion for ActiveX controls.

If the ActiveX claim does survive summary judgment, then there will be two genuine issues of material fact to resolve: first, is a JVM an executable application, and second, can the applet be the object? Plaintiffs have suggested that the applet is the object, which Microsoft argues would require the expansion of the '906 patent to allow for the executable application and the object itself, in addition to the browser, to carry out the display function. To resolve this issue will require resolution of two things, the first being the claim construction issue of the '906 patent raised in Microsoft's summary judgment motion for the object display function (this will be addressed later in this opinion), and the second being exactly what constitutes an object. Microsoft has defined an applet as a program "written in Java code that run[s] only though the use of" a JVM. The applet, as I understand it at this point, contains coding for something to be displayed on a web page. Is the end product, namely the image projected on a web page itself, the only thing that can be considered an object, or can the object encompass that image's coding as well? My review of the evidence before me does not provide a clear answer to that question.

*Support for ActiveX Controls*

Microsoft has also moved for summary judgment of noninfringement with respect to support for ActiveX controls which, as I indicated earlier, will affect Microsoft's summary judgment motion with respect to support for applets. The question central to this motion appears simple enough: is it the browser or the operating system that identifies and locates executable applications? However, as both parties have demonstrated, as simple as the question appears at first glance, it is not as easy to answer.

It is Microsoft's contention that in IE, the identification and locating of an executable application is performed by the operating system, not the browser, and thus, IE lies outside of the '906 patent claims. Plaintiffs argue that the bulk of the work in identifying and locating the executable application lies within IE itself, and thus, there is a genuine issue of material fact that defeats summary judgment.

In my claim construction order of December 28, 2000, I defined "utilized by said browser to identify and locate" to mean that "the enumerated functions are performed by the browser," adding that "[t]his is a fact-intensive inquiry." Mem. Op. at 35. The way I characterized the function of the browser is that it, not the operating system, does the "heavy lifting" of identifying and locating, reading the claim language "to mean that the browser identifies and locates the executable application and that it is able to perform these functions because it is armed with the knowledge of type information." *Id.* at 30. In developing my definition of "utilized by said browser to identify and locate," I addressed the question, "can the browser ask the operating system . . . to help it identify and locate an executable application?" *Id.* at 31. Looking at the specification of the '906 patent, I noted that it "makes clear that the inventors contemplated the browser's use of some outside resources." *Id.* at 32. During the *Markman* hearing, Microsoft agreed "that operating systems are always involved on some level" and did not "propose a claim construction that would entirely preclude the browser from using the operating system or some external resource." *Id.*

The distinction that I recognized the inventors of the '906 patent as making between their invention and Koppolu-OLE[6], which is what Microsoft argues is embodied in IE,[7] is that in OLE,

---

[6] Refers to an invention described in U.S. Patent No. 5,581,686 (issued December 3, 1996). As I described in my claim construction order, this invention "allows a user to interact with embedded or linked data in a windowing environment that results from a merger of sorts between a container application and another application,

-30-

the operating system does more than maintain a registry for use by the browser–the operating system itself "performs the linking function." *Id.* at 33. At the same time, I explicitly refused to construe the claim as "suggest[ing] that the browser must do it alone." *Id.*

Microsoft asserts that plaintiffs are attempting to argue that the operating system has absolutely nothing to do with the identifying and locating function in the '906 browser. Plaintiffs, however, deny that they are making such an assertion, and I believe that plaintiffs are willing to concede that the operating system has some role to play in this process. How much of a role is precisely what this motion turns on: is there a genuine issue of material fact with respect to exactly what the operating system does in the identifying and locating process?

Microsoft's basic argument can be summarized as follows: when the browser engages in the work of displaying a web page, it merely determines type information and passes it on to the operating system, which then utilizes this type information to identify and locate the executable application. Plaintiffs contend that IE "utilizes type information contained in the text of the web page that it parses to identify and locate executable applications." In other words, Microsoft believes that IE gives the operating system the information that the *operating system* needs so that the *operating system* can identify and locate the executable application, whereas plaintiffs believe that *IE* identifies and locates the executable information and then passes that information

---

called a server or containee application." The key to the Koppolu patent is OLE, which stands for object linking and embedding (pronounced olé), which allows communications between applications "by providing a set of functions for container applications to send and receive messages and date to and from server applications."

[7] Plaintiffs accuse Microsoft of trying to assert a "practicing the prior art" defense to literal infringement, which is not a valid defense. *See Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995). In arguing that IE embodies OLE, however, I do not interpret Microsoft as making such an argument. Rather, the emphasis on similarity between the operating system's role in identifying and locating executable applications with respect to IE and the OLE system seems more directed at distinguishing IE from the '906 invention than arguing that IE practices prior art.

onto the operating system, which then essentially just follows IE's instructions, so that the already-identified and located application can be executed.

From the outset, there is a dispute over whether IE uses Koppolu's OLE. This issue turns on the same questions pertaining to this motion overall, for the arguments put forward for each question are essentially the same–to answer the question of whether IE uses Koppolu's OLE is to answer the questions concerning what role the operating system plays in identifying and locating an executable application. If the operating system plays the role that Microsoft asserts, then it would appear that IE uses the same technology as OLE, since the operating system would be playing identical roles in both inventions, and this aspect of the OLE invention is its defining characteristic. Thus, what I must determine at this stage is whether an actual dispute of material fact exists as to what the operating system and browser do in identifying and locating executable applications.

Microsoft criticizes plaintiffs' analysis, describing their arguments as setting forth "quantitative or qualitative comparison of operations" performed by the browser and operating system. Clearly, determining whether the browser or operating system does more work overall does not reveal much, since it is the exact roles each plays that is the crucial question. Plaintiffs do not appear to engage in as simplistic an analysis as Microsoft contends but rather, challenges Microsoft's depiction of how IE and the operating system work together.

Microsoft's account of how an executable application is identified and located is as follows: when IE parses a tag in a web page that has reference to an ActiveX control, IE first derives the CLASSID of the ActiveX control from a direct specification in the tag or other information in the tag or object. The CLASSID is a 32-digit hexadecimal string that identifies the ActiveX control to be launched (each ActiveX control is associated with a unique CLASSID

-32-

in the Windows operating system registry, and the CLASSID cannot be identified without this registry). IE passes this CLASSID to the COM subsystem of the Windows operating system (COM allegedly provides the fundamental OLE function in Windows) by calling on the COM function "GoGetClassObject." This initiates the following steps: (1) COM checks the registry located and maintained in the operating system for the CLASSID; (2) if the CLASSID is located, the identity of the code to be loaded, the name of the executable file that implements that server for that CLASSID, and its location or path is found within the computer's file system; (3) if these things are found, the operating system loads the executable file from the hard disk, using the path and file name specified by the registry, and (4) execution of the ActiveX control starts.

Plaintiffs describe this process quite differently: first, the browser tries to use the type information in the object tag to determine a preliminary binary COM classid, which consists of five substeps in which the DATA, CLASSID HTML, CODE, CODETYPE, and TYPE are processed (in that order). Second, if a preliminary binary COM classid is found, it is checked against a list of forbidden binary COM classids (for example, to prevent a security breach), and if one is found in that list, the process ends there. Next, if the preliminary binary COM classid is not blacklisted, the browser looks it up in the Windows operating system's registry to see if there is an executable application that goes with that binary COM classid and if there is one, what version it is. Using the CODEBASE type information in the object tag, the browser determines whether the version of the executable application is suitable, and if it is not, the browser downloads a new executable application from a location specified in the CODEBASE type information. Finally, once the browser has concluded that the preliminary binary COM classid is the correct binary COM classid, it uses the COM function "CoGetClassObject" to instantiate the executable application.

The parties have a disagreement with respect to classids. Plaintiffs argue that Microsoft

has deliberately confused the HTML text formats with the binary COM classids in OLE,

clarifying that the textual CLASSID HTML is in a text format, whereas the COM classid in OLE

is in a binary format, and the CLASSID HTML is only one of several pieces of information

within the object tag that helps the browser figure out what executable application needs to be

invoked to allow interactivity with the embedded object. Plaintiffs assert that a CLASSID

HTML does not have to be in the object in order to link an application, and the binary COM

classid is the only vehicle though which this can be done in OLE. Microsoft's answer to these

contentions is that the CLASSID HTML is "merely one representation of the binary COM

classid," and that when a web page contains a CLASSID HTML, IE simply translates it into a

binary classid and passes it on to the operating system. One aspect of Microsoft's explanation of

the difference between a CLASSID HTML and binary COM classid makes sense: they are

different translations of the same thing. Thus, the real question within this debate seems to be

which of the two is involved with the heavy-lifting of identifying and locating the executable

application: Microsoft argues that the CLASSID HTML is merely information that IE translates

and gives to the operating system, which identifies and locates the executable application via the

binary classid, and it is plaintiffs' contention that the binary classid is only the byproduct of the

identifying and locating work IE performs with the CLASSID HTML. Again, as with the

question of whether IE uses OLE, the issue is essentially the same: what does the identifying and

locating?

What becomes apparent in this discussion is that rather than attributing the entire or most

of the identifying and locating processes to either the operating system or the browser, the more

accurate description of the process in question is the following: neither the browser nor the

operating system is trivially involved with the process of identifying and locating executable applications, but one does significantly more of the work than the other. There are at least two things that appear undisputed in the parties' arguments: first, the operating system keeps and maintains a registry of binary classids, and second, it is the operating system that executes the application, regardless of what identifies that application. At the risk of oversimplification, I will summarize both sides' basic arguments: in Microsoft's version of IE, the browser takes a classid from the object tag and translates it into an operating system-friendly version, and from that point, the operating system does the rest. In plaintiffs' version of IE, the browser takes a classid from the object tag, translates it into a binary code so that it may locate the classid in the operating system's registries, determines information about the classid, including the identification and location of the proper executable application, which is then passed on to the operating system–in short, the operating system does not really come into play until all of this information is obtained by the browser. So, one question that must be answered is, where in the process between the browser's obtaining a classid from an object tag in a web page and the operating system's executing the proper application does the operating system come in?

Another question raised by the parties is, what does it mean to locate an executable application? The parties do not appear to contest that the classid in either form, HTML or binary, contains information to discover the *identity* of the executable application, but there is a dispute over what provides the executable application's *location*. Microsoft contends that the classid itself "does not provide any information on the 'location' of the application" because the location of the application is "*always* determined by the Windows operating system using the classid and the registry database." Microsoft concludes that at a minimum, the locating of the executable application is clearly done by the operating system, and this is enough to show noninfringement.

Plaintiffs have recast Microsoft's argument as requiring that the file name be determined in order for the application to be located. However this argument is characterized, whether it defines location as a file name, a physical location on a hard disk, or a file path, to state that the classid is useless in locating the executable application seems to be wrong. It is clear that the classid plays an important role in helping either the operating system or the browser locate the executable application, and to what extent this is true is a factual question unresolved by the record.

What the parties have provided me with are arguments that criticize each other's contentions and limited evidence with which to determine how the browser and operating system work together in identifying and locating an executable application. From the briefing on this question, the parties' positions have become extremely clear, but little else has been clarified. In the process of arguing their respective positions, the parties keep raising issues within the larger issue, i.e., what is more important, a CLASSID HTML or binary COM classid, or what is the intended result of the identify and locate process, a file name, path, or a binary COM classid? While these questions help target some of the specific aspects of the identifying and locating process, thus streamlining the overall inquiry, they accomplish little else.

Microsoft states in one of their briefs that "a platform-dependent system registry is precisely what was disclaimed during prosecution [of the '906 patent]." However, in my references to my claim construction order, it appears that the problem does not concern the registry so much as the identifying and locating process. I summarized the inventors' argument "as saying not just that the operating system maintains a registry that a browser can use, but that in OLE, it is the operating system itself that performs the linking function." How central and active a role the operating system's registry plays in this process is yet another factual question that cannot be answered at this point. One thing that is clear from my order is that executing the

application once it has been identified and located is not "linking." This is plaintiffs' point, which is that according to how they perceive IE's role in identifying and locating an executable application, the operating system only executes the application (they term this "instantiation") post-linking. Microsoft does not dispute what constitutes a "linking function," but rather attacks plaintiffs' version of that function. The record does not provide me with sufficient information to resolve this question of whether the browser or operating system does the "heavy lifting," nor the smaller factual issues that accompany that larger question. The evidence provided clarifies beyond a doubt the fundamental differences between OLE and the '906 invention and the parties' stances. However, detailed depictions of the identifying and locating process by the parties, limited expert testimony, and attacks on each other's arguments do not provide clear or direct evidence that speaks to which version of the process is more accurate. What is needed is a detailed demonstration of how an executable application is identified and located when IE parses a web page, and explanations of each step by experts in order to delineate the process is also necessary. Whether Microsoft or plaintiffs are correct is a question for a jury to decide after seeing this detailed evidence. Because there exists a genuine issue of material fact with respect to this fundamental question and the accompanying smaller questions, summary judgment of noninfringement with respect to support for ActiveX controls is inappropriate, and I am denying Microsoft's motion. Because I am denying Microsoft's summary judgment motion for ActiveX controls, the motion for summary judgment of noninfringement with respect to support for applets is also denied.

*The Object Display Function*

Once an executable application is identified and located, whether it be primarily by the browser or by the operating system, we encounter another point of dispute between the parties once the application is instantiated. As with the issue of ActiveX controls, the question appears to be relatively simple: what displays the object, the browser or the executable application? Plaintiffs believe that it can be either and that the '906 patent allows for both possibilities, whereas Microsoft contends that the '906 patent only allows for the browser to display the object, and in the case of Internet Explorer ("IE"), the executable application displays the object. Microsoft has moved for summary judgment of invalidity or, in the alternative, noninfringement with respect to this claimed object display function.

Microsoft's argument can be summed up as this: the language of the claims is indefinite in that it is unclear whether the browser or an executable application displays, i.e., "paints the picture," on the screen, and the only saving construction of the claims is that the browser displays the object, which is fundamentally different from IE, in which the executable application does the displaying. The language of the claims that is at issue is the following: "wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object." '906 Patent, Col. 17, ll. 20-23, Col. 18, ll. 26-26. Microsoft argues that while this language clearly states that the browser does the parsing, "the claims neither specify what displays the object nor how the object is displayed." Citing to claim language describing "processing of said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window," Microsoft further asserts that there is only one possible interpretation of this language that is consistent with the '906 disclosures, which is that the *browser*, and *only* the browser, perform the display function. '906 Patent, Col. 18, ll. 27-

-38-

30. This is the preferred embodiment described in the specification, according to Microsoft, and thus, plaintiffs cannot argue that the executable application displays the object because such an interpretation would exclude that preferred embodiment. An interpretation excluding the preferred embodiment described in the specification is "rarely, if ever correct." *Dow Chemical Co. v. Sumitomo Chemical Co.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001).

Plaintiffs' answer to Microsoft's arguments is that because the claims of the '906 patent are "properly construed as covering display of the object by the browser or the executable application," the proper interpretation of the claim language does not exclude the preferred embodiment, nor does it restrict the patent to just the browser displaying the object, and because the object may be displayed by an executable application, IE infringes. Plaintiffs also contend that this issue of indefiniteness was never raised during the discovery or claim construction phases of this case and thus, this argument is untimely.

While it is true that "broad claims supported by the written description should not be limited in their interpretation to a preferred embodiment," it is also true that the patent must "provide clear warning to others as to what constitutes infringement of the patent." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir. 2001); *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000) (citation omitted). Plaintiffs have described the purpose of the '906 patent as "to allow for interaction of the displayed object, through use of the executable application. Naturally, the executable application that facilitates interaction with the displayed object may have some role in the actual display of the object." In support of the assertion that the specification of the '906 patent explicitly discloses an example of an executable application displaying an object, plaintiffs cite the following language: "[a]fter application client 210 receives the multidimensional data object, application client 210 executes instructions to display

-39-

the multidimensional embryo data on the display screen to a user of the claim computer." '906 Patent, Col. 9, l. 66- Col. 10, l. 2. Plaintiffs cite to another embodiment in which "[p]arameters are passed to the video player application to allow the player to display the video object within the DrawingArea within the display of the portion of hypermedia document on the client's computer." '906 Patent, Col. 15, ll. 43-47. The file history, plaintiffs assert, also confirms that an executable application can display the object. For example, in Paper #14 of the '906 File History, it is clearly stated that

> [t]he embed text format is parsed by the browser to cause the browser to automatically invoke the external application to execute on the client workstation. The external application displays, and allows the user to interactively process, the object in a display window created within the portion of the document being displayed in the browser-controlled window, at the location within the document of the embed text format.

'906 File History, Paper #14, E000315. Plaintiffs, drawing on examples from the specification, source code, and file history, argue that having the executable application display the object was clearly disclosed, and conclude that having either the browser or executable application display the object is not an erroneous interpretation of the '906 patent, nor does it render the claims indefinite.

Microsoft takes serious issue with these excerpts, characterizing them as false and misleading. It asserts that such passages are lifted from their larger context, which is to describe the preferred embodiment of the claims, namely that the browser does the displaying, and that what is actually being described is the transfer of images to a *buffer*, not an executable application, from which the browser displays the object onto the screen. Referring to the first example cited by plaintiffs in which "application client 210 executes instructions to display the multidimensional embryo data," Microsoft argues that this actually refers to the transfer of image

to the buffer. Similarly, with respect to the second example quoted by plaintiffs, Microsoft

alleges that "the embodiment described in detail in this text and in these figures *is* the preferred

embodiment, with its use of a pixmap buffer to receive any output from the executable

application requiring that the browser put the image data on the screen," citing additional

specification language to make its point:

> [t]he application program [VIS] updates pixmap data and transfers the pixmap
> data (frame image data) to a buffer to which the browser has access. The browser
> only needs to respond to the refresh request to copy the contents from the updated
> pixmap to the DrawingArea.

'906 Patent, Col. 15, l. 67-Col. 16, l. 4. Microsoft describes the DrawingArea as "a portion of

the browser-controlled window," into which the image data from the pixmap buffer, "which is a

set of memory locations that can be read by the browser and is used to store a pixel

representation of the image to be displayed," is copied. According to Microsoft's argument, it is

impossible for the executable application to display the object because, based on the language in

the specification and Figure 8A in the '906 patent, the executable application is not even

launched until after the object has been displayed in the browser-controlled window. Basically,

the flow of information in Microsoft's view is from the executable application to the browser via

the buffer.

However, accepting this explanation as accurate for the moment, it becomes completely

unclear exactly what the executable application does, or why it is needed. If, as Microsoft

asserts, the object has been displayed by the browser before the executable application is even

invoked, then what purpose does the executable application serve? In my definition of an

executable application in my claim construction order, it is clear that its purpose is "to enable an

end-user to interact directly with data." Thus, by Microsoft's argument, this enabling of

interactivity by the executable application cannot involve display of the object. But it does not seem logical that the executable application is absent from the process of displaying the object, nor does it make sense that to enable a user to interact directly with data has nothing to do with displaying that data. Microsoft seems to suggest that what the executable application is doing is aiding the continual flow of communication about the object to the browser via the buffer–there is a continual flow of information after the object is initially displayed, for the specification makes reference to a constant refreshing of information, which many web pages do require.

However, Figure 8A does not appear to support Microsoft's arguments. First if the DrawingArea is simply a portion of a browser-controlled window and thus represents the browser itself, and the pixmap is the buffer, then according to Figure 8A, the DrawingArea is created *before* the pixmap, thus calling into question Microsoft's assertion that information flows *from* the pixmap *to* the DrawingArea. Second, according to Figure 8A, the determination of the type information (meaning, whether it is a video object or an application object) does not occur until *after* the pixmap and DrawingArea have been created. It seems illogical that the object can be displayed *before* it is determined whether the object is an application object or a video object. Thus, Microsoft's depiction of the object-displaying process has some serious flaws. The specification language discussing Figure 8A states that "FIG 8A is a flowchart for routine HTMLwidget. HTMLwidget creates display data structures and launches an external application *to handle the data object* specified by the URL in the EMBED tag." While Microsoft contends that handling the data object does not establish that the executable application does the displaying and that it is clear in Figure 8A that the browser is performing all of the primary functions, the flowchart does not seem to show this. There is a flow of information that first creates a DrawingArea, then a pixmap, after which the type information is determined and the

-42-

proper executable application is launched. While the arrow from the executable applications

points back to the center of the chart, which Microsoft believes to represent the browser, that

does not unequivocally show that the browser does the displaying. It is equally possible that the

flow of information from the executable application to the browser simply shows *where* the

object is actually displayed–the executable application does not itself provide a viewing window,

and plaintiffs have not argued this. Clearly, the browser provides the window in which the object

is displayed, but Microsoft has not convinced me that the claim and specification language

clearly state that *only* the browser is responsible for the displaying itself. The browser window

could be a blank piece of paper onto which the executable application draws a picture.

     The file history cited by plaintiffs also troubles Microsoft, who argues that the cited

language is excerpted from the applicants' response to the examiner's rejection based on a prior

art, and the applicants were the ones who distinguished the '906 invention from the prior art by

pointing to the browser's display of the object. Specifically, Microsoft alleges that the applicants

argued that for the cited invention to be considered prior art, that invention would require non-

obvious modifications, one of which would be to enable the browser to display the object.

However, while applicants may have made this argument, Microsoft admits that it was only one

of other modifications asserted by the applicants, as evidenced in the language "one of which."

In File History Paper #5, when the applicants distinguished their invention from the Mercury

Project, they stated that "a multi-dimensional object may be displayed and manipulated within

the browser window by an application running on a remote computer." '906 File History, Paper

#5, E000180-81. Also, in this File History Paper, the applicants assert that the object

information "is communicated to the client computer which displays the information in the

document window and is used to manipulate the object according to the information displayed."

Here, it is not specified that the browser is the only thing displaying, and a reasonable interpretation of this language is that something other than the browser, which could be an executable application, may be performing the display function, or that a combination of the browser and that something is displaying the object.

Another problem Microsoft has with the claim, specification, and file history passages quoted by plaintiffs is that such citations address "only the question [of] whether it is possible for an executable application to perform the display function," and that "[r]ecitation of examples of programs that *could* perform the display function places no bounds on the programs that carry out the function and, thus, does not cure indefiniteness." However, plaintiffs' "recitation of examples" were taken directly from the claim specification, which is one place where the boundaries of the claim can be found. *See Miles Laboratories, Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993) ("The test for definiteness is whether one skilled in the art would understand the bounds of the claim when read in light of the specification."). Although it is Microsoft's contention that the claim specification is precisely one of the primary places where the indefiniteness of the '906 patent claims can be most clearly seen, I do not agree with Microsoft's assertion that the consequence of allowing both the browser and executable application to display the object "leave[s] open-ended the list of programs that can perform the display function." It is true that inclusion of having an executable application display the object adds to the number of programs that can perform the display function, but executable applications do not encompass *all* existing computer programs, and the term "executable application" has been narrowly defined by my claim construction order. Thus, while plaintiffs' construction of the '906 patent does expand the scope of programs displaying an object, it does not expand this scope to the point of indefiniteness.

Microsoft's vehement contention that the claim specification discloses only that the browser displays the object and that no alternative embodiment in which the executable application or some combination of the executable application and browser perform the display function is also refuted by Prof. Felten's statements. Microsoft alleges that Prof. Felten confirms that plaintiffs' saving construction is wrong. However, Prof. Felten's declaration states that

> [o]ne of ordinary skill in computer science would understand, on reading the '906 Patent's claims, specification, and file history, that the claims allow the display of the object to be performed by the browser, or by other software such as the executable application, or by a combination thereof . . . . The claims, which elsewhere specify that certain steps must be performed "by the browser," contain no such limitation regarding the displaying step. The structure of the claim, especially the language "in order to display said object and enable interactive processing of said object" is clearly constructed so as to be neutral about which program is doing the displaying.

Felten Decl. ¶ 5-6. Microsoft relies heavily on Prof. Felten's statement that "[t]he '906 Patent does not claim the executable application; what it claims is a method of running the executable application, and a computer program product that can run the executable application" for the proposition that even Prof. Felten agreed that the display function must be performed by the browser. Felten Rebuttal Rep. ¶ 33. However, simply because the '906 patent does not claim the executable application itself does not foreclose the possibility that the patent encompasses display of the object by the browser and/or an executable application, for all Prof. Felten's statement that "[t]he '906 patent does not claim the executable application" makes clear is that what is claimed by the '906 patent is a browser, and that browser can utilize an executable application and still be consistent with this assertion. Prof. Felten actually substantiates plaintiffs' interpretation of the patent more than Microsoft's, as his statements regarding the display of the object by the browser and/or the executable application are unambiguous.

Microsoft points to my language in my claim construction order in which I state that the inventors of the '906 patent "invented a method for building a web browser that can display interactive objects embedded in a single web page and that uses another application to enable the interactivity" as reflecting my understanding that what made the '906 invention so groundbreaking is that the browser displays the object. Mem. Op. at 1. However, the point that I was making in that introduction was not that the '906 invention was innovative because it enabled the browser alone to display an object, but rather, I was highlighting the ability of the '906 browser to allow interactivity with data objects within a browser window, in contrast to the Mosaic browser, which required the user to go outside of the browser to interact with the data. I explained that for an object to be displayed in Mosaic, the browser would have to launch a viewer or other external application separate from the browser, and the object would be displayed in that external application, and the browser was inactive while the "helper" program was active. Thus, in Mosaic, one could not utilize the browser function while the object was being displayed. The '906 invention purported to solve this problem by allowing the display of an object within the browser itself so that both functions could be utilized simultaneously. *Id.* at 4. The shift in the object being displayed in the browser window instead of the external application viewer does not alone prove that there has been a complete shift in which program performs the displaying function.

According to the Federal Circuit, indefiniteness is a question of law for the court. *Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001). The question to be answered is "whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the specification." *Id.* Based on my

examination of the '906 patent claims, its specification, and the file history, I do not find that the claims are indefinite and deny Microsoft's motion for summary judgment for invalidity.

Because I find that the proper construction of the '906 patent allows for display of the object by the executable application, as well as the executable application and the browser together, I am also denying Microsoft's alternative motion for summary judgment for noninfringement. Microsoft's motion for summary judgment for noninfringement was based on the argument that the only saving construction of the '906 patent was that *only* the browser could display the object. This argument has been rejected, which leaves a genuine issue of material fact with respect to whether IE infringes the claims of the '906 patent that cannot be resolved by the record here.

## DISCOVERY AND PLEADING MOTIONS

Also pending before me are a number of motions relating to discovery and pleadings. I will address these motions individually, starting with plaintiffs' motion to compel discovery.

## Plaintiffs' Motion to Compel Discovery

Plaintiffs have accused Microsoft of willful infringement and seek discovery relating to the willfulness aspect to their claims. This motion has been broken down into two separate issues, the first is production of Microsoft's patent applications, and the second is discovery relating to Windows server products. I conducted a hearing on the overall motion on October 30, 2001, during which I requested additional briefing on these two issues. For the sake of clarity, I will discuss each part of this motion separately.

*Microsoft's Patent Applications*

Plaintiffs assert that previous discovery has produced documents which refute Microsoft's assertion that it "had no pre-complaint knowledge of the '906 patent or the patent application that resulted in the '906 patent." What plaintiffs want is all of Microsoft's patent applications that cite the '906 patent, which Microsoft opposes. At this point, Microsoft has conducted a ten percent sampling of its patent applications having the greatest likelihood of including citations or references to the '906 patent. This sampling produced two applications that cite the '906 invention, and plaintiffs argue that this reveals the necessity of producing *all* patent applications citing the '906 patent.

On September 6, 2000, I denied plaintiffs' request for this discovery, stating that at the time, I saw it "as a useless endeavor." Although I left the door open in case "after I hear everything I will regard it as not useless," I also stated that "the odds are that it is not going to change." I also noted that "given the practice of citation before the Patent Office, particularly in Interference proceedings, I am unlikely to attach a great deal of weight to the fact that somebody has actually cited a patent." After examining the submitted documents relating to the two patents cited by plaintiffs as evidence that this request is not "useless," my position on the issue has not changed. In the application that resulted in U.S. Patent No. 6,049,671, the PTO sent Microsoft a rejection of its application, one of its grounds being a citation to the '906 patent as prior art. What this document shows is that the examiner found some prior art not relied upon in the application that was "considered pertinent to the applicant's disclosure," and it included a citation to the '906 patent as disclosing "that self-extracting data objects are known in the art." Consequently, during the prosecution of the application that resulted in U.S. Patent No.

6,256,668, Microsoft cited the '906 patent among 14 other U.S. Patent Documents in an Information Disclosure Statement.

As Microsoft points out, the period of time during which Microsoft would have had to know about the '906 patent to sustain plaintiffs' willful infringement claim is 77 days, and the approximate time when the '671 Office Notice citing the '906 patent was received by Microsoft was early January of 1999, which was about one month prior to the filing of this suit (February 2, 1999). Thus, Microsoft had to know about the '906 patent within that month. However, what does it mean to "know" in the context of this motion? Clearly, my statements from September 6, 2000, regarding the weight I would place on a mere citation by the PTO indicates that knowledge must constitute more than merely knowing that the patent existed. I do not find that evidence of such knowledge has been produced by plaintiffs, and thus do not find this reason for granting their request compelling.

Plaintiffs argue that they merely ask for *pending* patent applications, which they claim is not a burdensome request. On October 30, 2001, when I revisited this motion, I noted that an examination of Microsoft's pending motions "is likely to be a very low percentage of success inquiry from the point of view of [plaintiffs]." Even if plaintiffs' request is narrowed to cover only pending motions, I find that the burden placed on Microsoft in fulfilling that request outweighs the possibility that it will be fruitful to plaintiffs. Microsoft asserts that it will take approximately 2.5 to 3 hours to review a single patent application, and while plaintiffs contend that such a figure is "perplexing" and that their request "would require nothing more than a quick scan of the Information Disclosure Statements, Office Actions, and applications," the voluminousness of patent applications in general leads me to believe that the process will not be as simple as plaintiffs allege. Even if the number of applications is drastically decreased from

1800 by pulling only pending motions, having to examine even 100 applications (although my guess is that the number would be substantially higher) will be exert a fair amount of burden and cost to Microsoft. The most likely outcome of such a request is more citations similar to the two submitted by plaintiffs, and I place little weight on such evidence.

For these reasons, plaintiffs motion to compel discovery of Microsoft's patent applications referring to the '906 patent is denied.

*Windows Server Products*

The second component to this motion to compel is plaintiffs' request for discovery relating to a number of Microsoft products that Microsoft contends are not accused and irrelevant to plaintiffs' complaint. At the hearing on October 30, 2001, I asked the parties additionally to brief issues concerning plaintiffs' request for revenue and license information for the server versions of Windows NT and Windows 2000. Microsoft's basic argument is that these "server" products have never been accused, and to include these products in the list of accused products would substantially expand this case due to the fundamental difference between client and server products. Plaintiffs' response to this argument is that these products have in fact been accused, and the difference between client and server products does not mean anything with respect to this case.

Plaintiffs' complaint alleges infringement by Internet Explorer "for any platform," and by Microsoft Windows computer software products, including without limitation, Windows NT and Windows 2000 "and several other Windows versions between and more recent." While the language in the complaint does not specify the server versions of Windows NT and Windows 2000, my understanding of plaintiffs' claims is that their overall accusation points towards *all*

Microsoft products that incorporate or integrate Internet Explorer. Plaintiffs have emphasized throughout this case that they are casting a wide net, and I read the language of their Second Amended Complaint to reflect this tactic. Thus, I am willing to accept plaintiffs' assertion that the server versions of Windows NT and Windows 2000 that incorporate or integrate Internet Explorer are accused products and grant their request. Whether the difference between server and client software places server software outside the scope of plaintiffs' complaint is a question of fact for a jury to decide.

Plaintiffs specify in their additional briefing that what they seek is merely "garden-variety spreadsheet summary data regarding licenses, revenue and profitability of accused server versions of Windows 2000 and Windows NT 4.0 operating system software with Internet Explorer." In granting plaintiffs' request, I want to emphasize that the discovery that I am allowing plaintiffs is limited to what plaintiffs have enumerated above, nothing more. If additional discovery issues arise with respect to the server versions of Windows NT and Windows 2000, the parties can raise them before the court if such time arises.

Plaintiffs' Motion to Compel Microsoft's Response to Willfulness Issues

The question of Microsoft's alleged pre-complaint knowledge of the '906 patent is also raised in relation to my August 20, 2001, order when I denied Microsoft's motion to stay discovery with respect to pre-complaint conduct. In that order, I explained that I understood Microsoft's position to be that "it did not know of the patent (as opposed to press releases about the patent), had no legal concern about whatever it did know, had no reason to seek opinion of counsel, and thus did not receive any advice from counsel concerning the patent prior to the filing of the complaint." Based on this understanding of Microsoft's position, I reasoned that

"there is no undue invasion of attorney-client privilege and discovery should not be stayed," adding that "[i]f it did have knowledge of the patent and does have opinions of counsel (in-house or outside) then it must disclose those facts and provide a log of those opinions to plaintiff within 14 days of receipt of this order." Plaintiffs bring this motion alleging that evidence shows Microsoft's pre-suit knowledge of the '906 patent and thus, Microsoft, who has not provided a log of its counsel's opinions, has violated my order.

The evidence on which plaintiffs rely is: (1) an email from Timothy Krauskopf, president of Spyglass Technologies, to Thomas Reardon of Microsoft to which a press release referring to the '906 patent application was attached; and (2) instructions to Kate E. Sako, an in-house Microsoft lawyer, to not answer certain questions on grounds of attorney-client privilege during her deposition. Plaintiffs ask for sanctions under Fed. R. Civ. P. 37(b) and 37(c), specifically requesting either an order requiring Microsoft and its witnesses to answer deposition questions relating to Microsoft's pre-suit knowledge of the '906 patent or its application, which includes the unanswered questions to Ms. Sako, or an order establishing an inference from Ms. Sako's refusal to testify that Microsoft sought pre-suit legal advice on the '906 patent and that this advice was unfavorable. Plaintiffs also seek to prohibit Microsoft from disputing the relevance and admissibility at trial of pages 42-71 from Ms. Sako's deposition testimony and pages 71-98 of Mr. Reardon's deposition testimony. Finally, plaintiffs want an unredacted copy of emails in the chain to and from Ms. Sako that have the email from Mr. Krauskopf attached or in the very least, to have this court inspect those documents for a privilege determination.

In the email from Mr. Krauskopf, he wrote that he told Mr. Reardon "before that these guys were around," referring to Eolas. Plaintiffs rely on this statement and the deposition testimonies of Mr. Reardon and Mr. Krauskopf to show that these men had discussed the content

-52-

of the '906 patent application. When Mr. Krauskopf was asked if there was ever any discussion with anyone at Microsoft about the '906 patent application, he responded, "[t]his e-mail would indicate that I discussed it with Thomas Reardon." Krauskopf Dep. at 66, ll. 17-20. However, Mr. Krauskopf never stated that he discussed the contents or details of the '906 application, and he indicated that he could not recall if Mr. Reardon or anyone else at Microsoft asked him if he had a copy of the patent application. *Id.* at ll. 9-16. All that Mr. Krauskopf's email and deposition testimony show is that he informed Mr. Reardon of Eolas and the '906 patent application's existence at least two times, but existence of the '906 patent or its application alone does not prove much. As I have already discussed, knowledge in the context of willfulness issues in this case must constitute more than being aware that something exists. Although plaintiffs assert that Mr. Reardon felt a responsibility to raise awareness of the '906 patent application after receiving the email, his deposition testimony only suggests that he perceived his information as presenting a significant legal problem. Mr. Reardon admitted forwarding Mr. Krauskopf's email to Microsoft, but it is unclear that his understanding of raising visibility was the same as plaintiffs', and he described the sense of responsibility he felt in the context of being at "a fairly low level at the company" and needing to keep his bosses informed. Reardon Dep. at 78-79, 81-83. Also, Mr. Reardon testified that Mr. Krauskopf did not describe to him the content of the '906 patent application. Thus, the significance of the email from Mr. Krauskopf is limited with respect to plaintiffs' case, for it is suggestive, not definitive.

Mr. Reardon forwarded this email to Ms. Sako, a fact that is not disputed. During her deposition, she was asked a number of questions regarding possible conversations and actions that may have resulted from receiving this email, which she was instructed not to answer by Microsoft. Microsoft points to Ms. Sako's testimony that to the best of her recollection, she did

not have discussions with Mr. Reardon regarding the '906 patent as evidence that she gave no legal advice and her never having seen the '906 patent as further evidence that she lacked knowledge of the patent or its application. While this testimony does not prove that Ms. Sako never gave legal counsel or investigated the possible legal ramifications of the '906 patent, the inference plaintiffs seek from their unanswered questions is not warranted.

Microsoft, to the best of my knowledge, remains true to its assertion that it is not relying on advice of counsel as a defense to willfulness prior to the complaint. I have not seen evidence to the contrary in the briefing for this motion, and Microsoft appears to maintain the same argument, which is that it had no pre-suit knowledge of the '906 patent. This position is consistent with their arguments against plaintiffs' motion to compel discovery, and I see no indication that Microsoft is going to surprise plaintiffs with a defense of advice of counsel. Thus, the issue is whether plaintiffs have demonstrated that Microsoft is withholding evidence that shows knowledge of the '906 patent beyond what was revealed in the press release, for I already denied an amended complaint stating willfulness based on knowledge of the press release in my August 20, 2001 order, relying on *State Indus., Inc. v. A.O. Smith Corp.*, which held that a patent pending notice "gives no knowledge whatsoever." 751 F.2d 1226, 1236 (Fed. Cir. 1985).

The evidence submitted by the parties only shows that Microsoft had knowledge of the '906 patent application, not an issued patent at that time, and it does not indicate that Microsoft knew more than the existence of the application. Because I do not find that Microsoft has violated my protective order or engaged in conduct warranting punishment, I am denying plaintiffs' motion for sanctions under Fed. R. Civ. P. 37. With regard to plaintiffs' request for redacted documents in Ms. Sako's email chain, I would like to examine these documents *in camera* and then make a determination as to plaintiffs' entitlement to them. Therefore, I am

ordering Microsoft to produce these documents, specifically the emails to and from Ms. Sako subsequent to the email forwarded by Mr. Reardon that attach the email from Mr. Krauskopf on or before November 4, 2002.

### Plaintiffs' Motion for Lifting of Protective Order Regarding the Deposition of William H. Gates, III

I previously granted a protective order with respect to the deposition of William H. Gates, III, but without prejudice. Plaintiffs now seek to lift that protective order, asserting that Mr. Yusuf Medhi, a Microsoft marketing individual that was designated as a Fed. R. Civ. P. 30(b)(6) ("Rule 30(b)(6)") witness whom Microsoft had indicated would be "knowledgeable about the same issues Eolas indicated that it would pursue with Mr. Gates," has either been unable to answer many key questions or has testified contrary to his boss and Mr. Gates. Microsoft's answer to this motion alleges that plaintiffs have failed to demonstrate that Mr. Gates has factual knowledge unique to the issues of this case and that they are seeking opinion testimony from Mr. Gates which include opinions that predate the '906 patent. At minimum, Microsoft asks that if this court were to find Mr. Gates's deposition necessary, that it hold off ordering this deposition until the next phase of this case's proceedings and wait until Microsoft's summary judgment motions have been ruled upon. The summary judgment motions have been ruled upon, and the deposition has not been mooted. Hence, the questions that remain are whether Mr. Gates's deposition is necessary, and if so, if it should be ordered immediately.

In granting this protective order, I was asking plaintiffs to look for the information they sought from Mr. Gates from other individuals, but left the door open in case that search proved fruitless. Now, plaintiffs assert that they have made a good faith, but unsuccessful, attempt to

obtain this information. Microsoft accuses plaintiffs of merely seeking "useful sound bites [sic]

from a witness who is more 'high profile' than those persons deposed to date," and insists that

"the various Gates communications to which plaintiffs refer address the topic of the Internet in a

very broad fashion–such as his perceptions as to the value to Microsoft of the Internet generally,

or an Internet presence, or a successful Internet browser." Microsoft takes no issue with the

importance of the Internet and IE to Microsoft and contends that Mr. Gates's statements only

speak to that general point and therefore, he has no unique knowledge of this case.

I disagree with Microsoft's contention that plaintiffs are only looking for quotes from a

high profile individual and that Mr. Gates's statements on which plaintiffs rely do not speak to

ths issues of this case. Plaintiffs seek Mr. Gates's deposition because they believe him to be "a

key and active decision-maker not only in Microsoft's Internet strategy generally but also in

Microsoft's use of the patented technology." Although plaintiffs have sought information from

other individuals, this does not change the overall allegation, which is that Mr. Gates himself had

some role to play in Microsoft's use of IE, the allegedly infringing product. It is true that many

of the statements made by Mr. Gates address the general topic of the Internet's importance and

the importance of a successful browser. However, other statements made by Mr. Gates refer

specifically to ActiveX controls, which constitutes a significant aspect of the accused products,

and the interactivity of web pages that makes IE so effective. These features of IE are precisely

what makes IE an infringing product by plaintiffs' allegations. Thus, I do not agree with

Microsoft's general characterization of Mr. Gates's statements. It is apparent that Mr. Gates may

have information relevant and important to the central damages issue in this case, which is the

value of the '906 patent's technology.

Microsoft argues that because the communications attributable to Mr. Gates are all within the 1994-96 time-frame and the relevant time period for the hypothetical negotiations between the parties that will determine a reasonable royalty is post-November 1998, Mr. Gates's testimony is irrelevant to the damages issue. Microsoft relies upon *Rite-Hite Corp. v. Kelley Co. Inc.*, for the proposition that the hypothetical negotiation "requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." 56 F.3d 1538, 1554 (Fed. Cir. 1995). However, this opinion does not hold, or even suggest, that considerations of prior decisions and statements speaking to the value of the patented technology are irrelevant to the discussion. Indeed, the indefinite nature of an analysis based on a hypothetical necessitates flexibility.

While I am convinced that Mr. Gates's testimony may be relevant to the damages issue and important in determining a reasonable royalty and that the results of plaintiffs' efforts to obtain information from other individuals has been unsatisfactory, I also respect Microsoft's interests in maintaining the protective order. Thus, for the time being, I am denying plaintiffs' motion to lift the protective order on Mr. Gates's deposition but leave the door open should the issue need revisiting. However, I will allow plaintiffs to serve upon Mr. Gates a special set of written interrogatories so that they may obtain the information they need. If the results of the interrogatories prove deficient, plaintiffs may make their request to this court again.

Microsoft's Motion to Enforce the Protective Order

On October 14, 1999, I entered an agreed protective order. Paragraph 5 of that protective order provided that:

> [a]ll discovery material (and the information contained therein) whether designated "CONFIDENTIAL" or not so designated, shall be used by each party receiving it solely for the prosecution or defense of the claims in this litigation or any appeal therefrom and shall not be used by that party for any business, commercial, competitive, personal or other purpose.

Microsoft alleges that plaintiffs have violated the protective order, basing this allegation on a letter from the firm of Robins, Kaplan, Miller & Ciresi, who not only represent plaintiffs in this case, but also a party in a separate and unrelated case pending in the U.S. District Court for the District of Minnesota, captioned *Microsoft Corp. v. Multi-Tech Systems, Inc.* In this letter, an attorney informed Microsoft that it had come to his firm's attention that certain documents produced in the *Eolas* case relate to a product called NetMeeting, which is at issue in the *Multi-Tech* case, and that they would like these documents. There is an attorney at Robins, Kaplan, Miller & Ciresi who works on both the *Eolas* and *Multi-Tech* cases who, while working on the *Eolas* case, noticed that certain confidential documents mentioned NetMeeting in its subject line or title, and alerted attorneys working on the *Multi-Tech* case of these documents. Microsoft strongly contends that this constitutes use of confidential information in violation of ¶ 5 of the agreed protective order in the *Eolas* case.

However, it is clear from the evidence that the contents of those documents were never disclosed to the attorneys working on the *Multi-Tech* case. The documents only specified these documents by Bates numbers, and there is no indication that the attorney from Robins, Kaplan, Miller & Ciresi who requested these documents from Microsoft knew what was contained in them. Further, in the letter, this attorney told Microsoft that the firm was aware of the protective order in the *Eolas* case and that they "have no intention of using in the Multi-Tech case any of the documents that have been produced only in the Eolas case."

So the question is, does the disclosure of subject lines and titles of documents identified only by Bates numbers constitute a violation of ¶ 5 of the agreed protective order? I hold that it does not. As Microsoft itself makes clear, there is absolutely no commonality of products at issue in these two cases. Thus, an attorney working on both cases could logically believe that certain confidential documents produced in one case are relevant to the other case by the title or subject line of a document, and a law firm could conclude that they need those documents solely by that very limited information. Microsoft argues that confidential information has been "used" by plaintiffs to advance discovery in the *Multi-Tech* case. However, I am not willing to extend the meaning of "use" this far. Plaintiffs have been careful not to disclose the content of any confidential documents produced in the *Eolas* case, and I do nt find that the purpose of this protective order has been endangered by plaintiffs' action. However, I will caution plaintiffs that to release the requested documents for discovery purposes in the *Multi-Tech* case will require the permission of this court, as required under ¶ 6 of the agreed protective order. Thus, if the attorneys working on the *Multi-Tech* case wish to obtain these documents, plaintiffs will have to file a motion with this court requesting that the protective order be lifted with respect to those documents. Nevertheless, since there has not been a violation of the protective order at this point, Microsoft's motion is denied.

### Plaintiffs' Motion to Strike Certain Allegations in Microsoft's Answer to Second Amended Complaint and Third Amended Counterclaim

Plaintiffs seek to strike a number of paragraphs in Microsoft's Answer to their Second Amended Complaint and its Third Amended Counterclaim, alleging that these paragraphs are merely cosmetic variations of certain paragraphs that I had previously disallowed. Specifically,

Microsoft had sought to amend its answer and counterclaim with respect to its inequitable conduct claim, adding allegations that Dr. Doyle had mischaracterized OLE technology disclosed in the Koppolu reference and *Inside OLE 2*, a book written by Kraig Brockschmidt ("the Brockschmidt book") to the Patent Examiner. In my Memorandum Opinion and Order dated March 9, 2001, I denied Microsoft's request, stating that "[w]hat pushes the argument to the point of futility is that the Brockschmidt book was published, and the examiner could have easily read the entire book .... If the examiner wanted to learn more about OLE or DLLs, there can be no dispute that *Inside OLE 2* was a source to which Doyle directed him." Plaintiffs now assert that Microsoft has inserted new matter into an answer that has been amended without permission from this court, and furthermore, that new matter has already been rejected and thus cannot be allowed.

Microsoft's response is that it does not need to ask leave of this court to amend its answer, because plaintiffs' amended complaint changed the scope of the case, and thus, Microsoft was allowed to answer this amended complaint as if it were the original complaint. Microsoft further contends that the added allegations are not the same as those rejected by this court. Rather than making specific and narrow allegations that Dr. Doyle intentionally misrepresented the Brockschmidt book, these new allegations "instead sets forth specific evidence of Doyle's intent and alleges that Doyle intentionally mischaracterized the state of the art and the capabilities of OLE prior art during the prosecution of the patent-in-suit."

Did the Second Amended Complaint expand the scope of this case? Microsoft contends that plaintiffs' addition of accused products expanded their complaint, whereas plaintiffs argue that Microsoft Windows and IE have always been accused. The additions to plaintiffs' complaint, however, do appear to indicate an accusation of all Microsoft products that integrate

-60-

Microsoft had sought to amend its answer and counterclaim with respect to its inequitable

conduct claim, adding allegations that Dr. Doyle had mischaracterized OLE technology disclosed

in the Koppolu reference and *Inside OLE 2*, a book written by Kraig Brockschmidt ("the

Brockschmidt book") to the Patent Examiner. In my Memorandum Opinion and Order dated

March 9, 2001, I denied Microsoft's request, stating that "[w]hat pushes the argument to the

point of futility is that the Brockschmidt book was published, and the examiner could have easily

read the entire book . . . . If the examiner wanted to learn more about OLE or DLLs, there can be

no dispute that *Inside OLE 2* was a source to which Doyle directed him." Plaintiffs now assert

that Microsoft has inserted new matter into an answer that has been amended without permission

from this court, and furthermore, that new matter has already been rejected and thus cannot be

allowed.

Microsoft's response is that it does not need to ask leave of this court to amend its

answer, because plaintiffs' amended complaint changed the scope of the case, and thus,

Microsoft was allowed to answer this amended complaint as if it were the original complaint.

Microsoft further contends that the added allegations are not the same as those rejected by this

court. Rather than making specific and narrow allegations that Dr. Doyle intentionally

misrepresented the Brockschmidt book, these new allegations "instead sets forth specific

evidence of Doyle's intent and alleges that Doyle intentionally mischaracterized the state of the

art and the capabilities of OLE prior art during the prosecution of the patent-in-suit."

Did the Second Amended Complaint expand the scope of this case? Microsoft contends

that plaintiffs' addition of accused products expanded their complaint, whereas plaintiffs argue

that Microsoft Windows and IE have always been accused. The additions to plaintiffs'

complaint, however, do appear to indicate an accusation of all Microsoft products that integrate

or incorporate IE, something that was not necessarily clear before. Thus, I am willing to allow Microsoft's amended answer and do not require Microsoft to ask for leave of this court to do so. *See Fuente v. Honeggers & Co., Inc.*, 1987 WL 9019 at *1 (citation omitted) ("[W]hen a plaintiff files an amended complaint which changes the theory or scope of the case, the [d]efendant is allowed to plead anew as though it were the original complaint filed by the [p]laintiff.").

The next question is whether the allegations at issue are different from those I rejected previously. Comparing the old with the new allegations, it appears that what Microsoft has done is omit all references to the Brockschmidt book but maintain the remaining language. Does this change the nature of the allegations? On their face, they now seem more general. However, Microsoft is essentially making the same allegations, which is that Dr. Doyle intentionally made misrepresentations to the PTO using references to the Brockschmidt book. Even if the new allegations do not refer specifically to the Brockschmidt book, that does not change the substance of the allegations. To allege a misrepresentation without specifying how information was misrepresented or exactly what was misrepresented does not erase or change the basis of those allegations. Microsoft has not shown that the basis of those alleged misrepresentations has changed, and reading the new language, it is still apparent that the Brockschmidt book lies between the lines. Therefore, I am granting plaintiffs' motion to strike the following from Microsoft's Answer to the Second Amended Complaint and Third Amended Counterclaim, dated September 17, 2001: ¶¶ 28-40; the portion of ¶ 73 which incorporates by reference ¶¶ 28-40, and the language "in furtherance of his practice of misrepresenting the true state of the relevant prior art." in ¶ 51.

Microsoft's Motion for Leave to Amend Response to Plaintiffs' Third Request for Admissions

-61-

Microsoft seeks leave to amend its response to Request Number 160 ("Request 160") from plaintiffs' third set of requests for admission on plaintiffs. The request and original response stated the following:

> **REQUEST NO. 160:** For each unit of Windows or Internet Explorer product for which there is revenue or a licence reflected in MS-ET 0222545-550, and for which such revenue or licence was United States Only (as that term is used in MS-ET 0222545-550), admit that the unit of Windows or Internet Explorer product was made in the United States.

> **RESPONSE:** Microsoft objects to this Request as vague and indefinite, particularly with respect to the phrase "made in the United States." To the extent that it is understood, Microsoft admits the request.

Microsoft claims that when preparing for a Rule 30(b)(6) deposition of a person knowledgeable about the issues pertaining to Request 160, it became aware that the answer it had given was incorrect, and Microsoft now seeks to change the last sentence of its response to "[t]o the extent that it is understood, Microsoft denies the request." Plaintiffs received Microsoft's amended response thirteen days prior to the deposition, during which plaintiffs questioned the witness about the reasons for the amendment.

Plaintiffs now oppose Microsoft's attempt to amend its response to Request 160, arguing that not only has Microsoft failed to meet the standard under Fed. R. Civ. P. 36(b) ("Rule 36(b)") for withdrawal or amendment, but that its basis for requesting the amendment requires an erroneous redefinition of the word "made." Plaintiffs, relying on *Paper Converting Machine v. Magna-Graphics*, contend that a Windows or Internet Explorer product is "made" when it "makes an 'operable assembly' of the components of the patented invention, sufficient for testing." 745 F.2d 11, 18 (Fed. Cir. 1984). Microsoft makes a distinction between a prototype and unit, arguing that if a prototype has been developed in the United States, but the units are made outside of the United States, these units should not be included in the damages base.

The reports upon which Microsoft relied in formulating its original response to Request 160 constitute the document referenced in that request, MS-ET 0222545-550, which is a revenue summary for certain Windows and Internet Explorer products for fiscal years 1996-2001. In that document, there are four sections containing the phrase "United States Only," which Microsoft initially and allegedly mistakenly understood to encompass only sales of products manufactured in the United States, and the admission was made based on that understanding. The Rule 30(b)(6) witness, Carl Paschke, later testified that Microsoft's original admission was incorrect because the wrong criteria were used to generate those reports, and his testimony makes references to manufacturing steps that take place outside of the United States. Based on Mr. Paschke's view of Microsoft's original response to Request 160, Microsoft asks for leave to amend that response.

With respect to a response to a request for admission, Rule 36(b) provides that

> the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

Fed. R. Civ. P. 36(b). With respect to the first prong of this Rule, plaintiffs mistakenly argue that the amendment must subserve the merits of the action, as opposed to the *presentation* of the merits of the action, which Microsoft rightly asserts is a different burden to meet. Courts generally find that if the admission contradicts the evidence, the amendment should be allowed because presentation of the merits will be improved. *See Higgason v. Swihart*, 1995 WL 358780 at *2 (N.D. Ill. 1995); *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 123 F.R.D. 97 (D. Del. 1998). During his Rule 30(b)(6) deposition, Mr. Paschke testified that Microsoft's original answer to Request 160 was incorrect. Paschke Dep. at 93, l. 25-97, l. 23. He also made references to

writing of code, replication, and installation taking place overseas. *Id.* at 14, l. 12-21; 47, l. 18-48, l. 23; 61, l. 6-7. I do not agree with plaintiffs' interpretation of Microsoft's arguments as stating that the products in question are "made" when the Original Equipment Manufacturer ("OEM") "puts the previously-made copy of Windows inside of a computer with a monitor, keyboard and CPU at an OEM location." Rather, Microsoft argues that there are steps between the research/design stages and putting together a physical unit that comprise "making" the product, and some of those steps occurred outside of the United States with respect to the products in question. Whether Microsoft's arguments show that the products are not "made" in the United States is yet to be determined. For the present, my only concern is whether Microsoft has met the first prong of the Rule 36(b) standard, which it has.

The second prong of this standard requires the opposing party to show prejudice that will result from the amendment. Such prejudice "contemplated by the rule relates to the difficulty a party may face in proving its case because of the sudden need to obtain evidence required to prove the matter that had not been admitted." *Decor Gates, Inc. v. Fararo*, 1997 WL 399646 at *2 (N.D. Ill. 1997) (citation omitted). Plaintiffs allege that they will have to take additional discovery to refute Microsoft's new position, which they believe is unsustainable, and this results in prejudice. This assertion alone does not convince me that plaintiffs will suffer prejudice, for case law has indicated that having to "prosecute the case upon its merits" does not constitute the kind of prejudice contemplated by Rule 36(b). *See Szatanek v. McDonnell Douglas Corp.*, 109 F.R.D. 37, 40 (W.D. N.Y 1985); *Clark v. City of Munster*, 115 F.R.D. 609, 612 (N.D. Ind. 1987). Thus, I am allowing Microsoft to amend the final sentence of its response to Request 160 by changing the word "admits" to "denies."

CONCLUSIONS

To summarize this memorandum opinion and order:

1.    Plaintiffs' summary judgment motion on inequitable conduct is denied;

2.    Microsoft's motion for an early bench trial is denied;

3.    Microsoft's motion for summary judgment is granted for plaintiffs' claims under the doctrine of equivalents with respect to support for applets and ActiveX controls;

4.    Microsoft's motion for summary judgment is denied for plaintiffs' claim under the doctrine of equivalents with respect to the object display function;

5.    Microsoft's motion for summary judgment of noninfringement with respect to support for applets is denied;

6.    Microsoft's motion for summary judgment of noninfringement with respect to support for ActiveX controls is denied;

7.    Microsoft's motion for summary judgment of invalidity or in the alternative, noninfringement is denied;

8.    Plaintiffs' motion to compel discovery is denied with respect to Microsoft's patent applications referring to the '906 patent and granted with respect to Windows server products, but only to the extent allowed in my ruling;

9.    Plaintiffs' motion to compel Microsoft's response to willfulness issues is denied, and Microsoft is ordered to produce redacted documents in Ms. Sako's email chain for *in camera* inspection on or before November 4, 2002;

10.    Plaintiffs' motion for lifting the protective order regarding the deposition of Mr. Gates is denied without prejudice, and plaintiffs are permitted to serve upon Mr. Gates a special set of written interrogatories;

11.    Microsoft's motion to enforce the protective order is denied;

12. Plaintiffs' motion to strike certain allegations in Microsoft's answer to the Second Amended Complaint and Third Amended Counterclaim is granted; and

13. Microsoft's motion for leave to amend its response to plaintiffs' third request for admissions is granted.

ENTER:

James B. Zagel
United States District Judge

DATE: _____