ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

---------------------------------------------------

EOLAS TECHNOLOGIES INCORPORATED, )

and )

THE REGENTS OF THE UNIVERSITY OF )
CALIFORNIA, a California educational )
corporation, )

Plaintiffs, )

vs. )

MICROSOFT CORPORATION, )

Defendant. )

---------------------------------------------------

Case No. 99 C 0626

# FILED

NOV 0 6 2003

JUDGE JAMES B. ZAGEL
UNITED STATES DISTRICT COURT

Hon. James B. Zagel

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANT MICROSOFT'S MOTION FOR
## JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL

DOCKETED
NOV 6 2003

20063889.1

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    MICROSOFT'S ACCUSED PRODUCTS INFRINGE CLAIMS 1 AND 6 OF
THE '906 PATENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Court Properly Construed the Terms of the '906 Patent . . . . . . . . . . . . . . . 2

        1.    Executable Applications are not limited to standalone applications . . . . . 3

        2.    The claim does not require the executable application to be
resident on the client workstation at any particular time prior to
being executed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.    The claims do not limit display of the executable application to the
browser. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        4.    The browser's use of outside resources is not in dispute. . . . . . . . . . . . 22

    B.    Substantial Evidence Exists in the Record to Prove Microsoft's
Infringement of the '906 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        1.    The Jury's verdict of infringement of claim 6 has ample support in
the record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            a.    There is substantial evidence in the record to support a
verdict that the accused products infringe claim 6 as
construed by the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            b.    Only if the Court were to now change its claim construction
to limit executable applications to standalone applications,
or to limit the claim to the browser's display of the object,
would Microsoft be entitled to a new trial. . . . . . . . . . . . . . . . . 33

        2.    Substantial evidence supports the Jury's verdicts of both direct
infringement of and inducement to infringe Claim 1. . . . . . . . . . . . . . . 34

            a.    Microsoft directly infringes Claim 1. . . . . . . . . . . . . . . . . . . . . . 34

           b.      Microsoft induces infringement of Claim 1. . . . . . . . . . . . . . . 35

           c.      The inducement jury instruction was correct. . . . . . . . . . . . . . 38

      3.     Microsoft is liable under the patent laws for its export sales of the accused products. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

II.    THE '906 PATENT IS NOT INVALID; THE '906 PATENT SATISFIES THE § 112 REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    A.    Definiteness Is Not At Issue In This Case ; But Even If It Were, The '906 Patent is Definite . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    B.    The Jury's Verdict On Written Description Was Factually And Legally Correct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      1.     Plaintiffs' '906 patent satisfies the written description requirement. . . . 44

      2.     The jury instruction on written description is correct. . . . . . . . . . . . . . 47

III.   THE '906 PATENT IS NOT INVALID; MICROSOFT FAILED TO PROVE EITHER ANTICIPATION OR OBVIOUSNESS . . . . . . . . . . . . . . . . . . . . . . . . . 50

    A.    The '906 Patent Is Not Anticipated by DX 37; There Is No Evidence To Support A Finding That DX 37 Includes All Limitations of The '906 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      1.     DX 37 does not anticipate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      2.     DX 37 was legally deficient to prove anticipation for many other reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    B.    Microsoft Failed To Present An Obviousness Case During Trial . . . . . . . . . . . 59

    C.    The Court Properly Excluded Other Viola "Evidence" . . . . . . . . . . . . . . . . . . . 64

      1.     DX 34 was properly excluded as a matter of law. . . . . . . . . . . . . . . . . 64

      2.     The Court properly excluded the e-mails and Web postings not involving Dr. Doyle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

3.     The Court properly excluded the e-mail communications about ViolaWWW involving Dr. Doyle . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

IV.    THE '906 INVENTORS DID NOT COMMIT INEQUITABLE CONDUCT; THE COURT PROPERLY REJECTED MICROSOFT'S INEQUITABLE CONDUCT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

A.    The Evidence Does Not Support Inequitable Conduct; Microsoft Failed To Satisfy Its Burden For JMOL Or For A New Trial . . . . . . . . . . . . . . . . . . . . . 71

B.    The Court's Rejection of Microsoft's Inequitable Conduct Claim Based on HTML+ Does Not Warrant a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

# TABLE OF AUTHORITIES

## CASES:

Abbott Labs. v. Baxter Pharm. Prods., Inc.,
334 F.3d 1274 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Abbott Labs. v. Syntron Bioresearch, Inc.,
334 F.3d 1343 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

ACTV, Inc. v. Walt Disney Co.,
No. 02-1491, 2003 U.S. App. LEXIS 20498 (Fed. Cir. Oct. 8, 2003) . . . . . . . . . 5, 25, 30

Aliotta v. Nat'l R.R. Passenger Corp.,
315 F.3d 756 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

Allied Colloids Inc. v. American Cyanmd Co.,
64 F.3d 1570 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 66

Alloc, Inc. v. Int'l Trade Comm'n.,
342 F.3d 1361 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Altiris, Inc. v. Symantec Corp.,
318 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

American Standard, Inc. v. York Int'l Corp.,
244 F. Supp. 2d 990 (W.D. Wis. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Amgen Inc. v. Hoechst Marion Roussel, Inc.,
314 F.3d 1313 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 48

Anton/Bauer, Inc. v. PAG, Ltd.,
329 F.3d 1343 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Apotex USA, Inc. v. Merck & Co., Inc.,
254 F.3d 1031 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 64

ATD Corp. v. Lydall, Inc.,
159 F.3d 534 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 62

20063889.1

Atlantic Thermoplastics Co. v. Faytex Corp.,
    974 F.2d 1299 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Baxter Int'l, Inc. v. Cobe Labs., Inc.,
    88 F.3d 1054 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Bell Communications Research, Inc. v. Vitalink Communications Corp.,
    55 F.3d 615 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Bennett v. Smith,
    No. 96C2422, 2000 U.S. Dist. LEXIS 18253 (N.D. Ill. Dec. 18, 2000) . . . . . . . . . 40, 50

Billy-Bob Teeth, Inc. v. Novelty, Inc.,
    329 F.3d 586 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27, 41, 72

Burroughs Wellcome Co. v. Barr Labs., Inc.,
    40 F.3d 1223 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Chemetall GMBH v. ZR Energy, Inc.,
    No. 99C4334, 2001 U.S. Dist. LEXIS 23716 (N.D. Ill. Sept. 18, 2001) . . . . . . . . . . . . 42

Chestnut v. Hall,
    284 F.3d 816 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,
    No. 00-1172 (Fed. Cir. Jan. 8, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Clearstream Wastewater Sys. v. Hydro-Action, Inc.,
    206 F.3d 1440 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Comark Communications, Inc. v. Harris Corp.,
    156 F.3d 1182 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

Cooper v. Carl A. Nelson & Co.,
    211 F.3d 1008 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Cordis Corp. v. Medtronic AVE, Inc.,
    339 F.3d 1352 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Crown Operations Int'l, Ltd. v. Solutia Inc.,
    289 F.3d 1367 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Cybor Corp. v. FAS Techs., Inc.,.................................................................... 34
    138 F.3d 1448 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Daugherity v. Taylor Brothers, Inc.,.............................................................. 73
    970 F.2d 348 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

David v. Caterpillar, Inc.,........................................................................ 2, 73
    324 F.3d 851 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Dow Chem. Co. v. Astro-Valcour, Inc.,............................................................ 51
    267 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Dressler Indus., Inc. v. Waukesha Engine Div.,............................................... 40, 50
    965 F.2d 1442 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Ecolab Inc. v. Paraclipse, Inc.,................................................................ 2, 16, 34
    285 F.3d 1362 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Ekchian v. Home Depot, Inc.,..................................................................... 10
    104 F.3d 1299 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Elkay Mfg. v. Ebco Mfg. Co.,...................................................................... 10
    192 F.3d 973 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,............................................... 35
    279 F.3d 1022 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Exxon Research & Eng'g Co. v. United States,.................................................. 43
    265 F.3d 1371 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Gart v. Logitech,.................................................................................. 43
    254 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Gentry Gallery, Inc. v. Berkline Corp.,.......................................................... 49
    134 F.3d 1473 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Glaros v. H.H. Robertson Co.,.................................................................. 68, 69
    797 F.2d 1564 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Goodwin v. MTD Prods., Inc.,................................................................. 1, 2, 41
    232 F.3d 600 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

20063889.1

Graham v. John Deere Co., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-61, 63
    383 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Heliflix Ltd. v. Blok-Lok, Ltd., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 66, 69
    208 F.3d 1339 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In re Cruciferous Sprout Litigation, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    301 F.3d 1343 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In re Miller, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    441 F.2d 689 (CCPA 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In re Rouffet, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    149 F.3d 1350 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Johnson Worldwide Assoc., Inc. v. Zebco Corp., . . . . . . . . . . . . . . . . . . 3, 8, 44, 49
    175 F.3d 985 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Joy Techs., Inc. v. Flakt, Inc., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    6 F.3d 770 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Juicy Whip, Inc. v. Orange Bang, Inc., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
    292 F.3d 728 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Karlin Tech., Inc. v. Surgical Dynamics, Inc., . . . . . . . . . . . . . . . . . . . 4, 9, 10, 44
    177 F.3d 968 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Kearns v. Chrysler Corp., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    32 F.3d 1541 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Kimberly-Clark Corp. v. Johnson & Johnson, . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    745 F.2d 1437 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Kolmes v. World Fibers Corp., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    107 F.3d 1534 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Laitram Corp. v. NEC Corp., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    163 F.3d 1342 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Life Techs. v. Clontech Labs., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
    224 F.3d 1320 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

20063889.1

Mahurkar v. C.R. Bard, Inc.,
    79 F.3d 1572 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Manville Sales Corp. v. Paramount Sys., Inc.,
    917 F.2d 544 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-37, 65, 66

Markman v. Westview Instruments, Inc.,
    517 U.S. 370 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23, 24, 27

Mathur v. Bd. of Trustees of S. Ill. Univ.,
    207 F.3d 938 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

McRoberts Software, Inc. v. Media 100, Inc.,
    329 F.3d 557 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 27, 41, 71

Met-Coil Sys. Corp. v. Korners Unlimited, Inc.,
    803 F.2d 684 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Michalic v. Cleveland Tankers, Inc.,
    364 U.S. 325 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Moba, B.V. v. Diamond Automation, Inc.,
    325 F.3d 1306 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 48

Modine Mfg. Co. v. United States Int'l Trade Comm'n,
    75 F.3d 1545 (Fed. Cir.), cert. denied, 518 U.S. 1005 (1996) . . . . . . . . . . . . . . . . 8

Moleculon Research Corp. v. CBS, Inc.,
    793 F.2d 1261 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Munoz v. Strahm Farms, Inc.,
    69 F.3d 501 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 73

Netscape Communications Corp. v. Konrad,
    295 F.3d 1315 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Northern Telecom Ltd. v. Samsung Elec. Co., Ltd.,
    215 F.3d 1281 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Otto v. Variable Annuity Life Ins. Co.,
    134 F.3d 841 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Palmer v. Dudzik,
    481 F.2d 1377 (CCPA 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Panduit Corp. v. Dennison Mfg. Co.,
    810 F.2d 1561 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-63

Pena v. Leombruni,
    200 F.3d 1031 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Purdue Pharma L.P. v. Faulding Inc.,
    230 F.3d 1320 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48

Refac Int'l v. Lotus Dev. Corp.,
    81 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Regents of Univ. of Cal. v. Eli Lilly & Co.,
    119 F.3d 1559 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Reiffin v. Microsoft Corp.,
    214 F.3d 1342 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

Rexnord Corp. v. Laitram Corp.,
    274 F.3d 1336 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 43

RF Delaware, Inc. v. Pacific Keystone Tech., Inc.,
    326 F.3d 1255 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Rhine v. Casio,
    183 F.3d 1342 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.,
    324 F.3d 1346 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

Robinson v. Burlington N. R.R.,
    131 F.3d 648 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rockwell Int'l Corp. v. United States,
    147 F.3d 1358 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Ruiz v. A.B. Chance Co.,
    234 F.3d 654 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

S3 Inc. v. NVIDIA Corp.,
    259 F.3d 1364 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Schobert v. Illinois Dep't of Transp.,
    304 F.3d 725 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 40

Scripps Clinic & Research Found. v. Genentech, Inc.,
    927 F.2d 1565 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-54

Semiconductor Energy Lab. v. Samsung Elec.,
    204 F.3d 1368 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Shales v. Gen. Chauffeurs, Salesdrivers & Local Union No. 330,
    No. 00C575, 2003 U.S. Dist. LEXIS 15012 (N.D. Ill. Aug. 27, 2003) . . . . . . . . . . . . . 42

Singh v. Brake,
    222 F.3d 1362 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Smith & Nephew, Inc., v. Ethicom, Inc.,
    276 F.3d 1304 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Smith v. Great American Rests. Inc.,
    969 F.2d 430 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Snuba Int'l, Inc. v. Dolphin World, Inc.,
    No. 99-1357 (Fed. Cir. July 11, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Teleflex, Inc. v. Ficosa North America Corp.,
    299 F.3d 1313 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 54

Texas Digital Sys., Inc. v. Telegenix, Inc.,
    308 F.3d 1193 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5, 7, 16, 34

Toro Co. v. White Consol. Indus., Inc.,
    199 F.3d 1295 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Dack,
    987 F.2d 1282 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Vas-Cath Inc. v. Mahurkar,
    935 F.2d 1555 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48

Vitronics Corp. v. Conceptronic, Inc.,
     90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

W.L. Gore & Assoc. v. Garlock,
     721 F.2d 1540 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Waldemar Link GmbH & Co. v. Osteonics Corp.,
     32 F.3d 556 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Water Tech. Corp. v. Calco, Ltd.,
     850 F.2d 660 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Westchester Fire Ins. v. Gen. Star Indem. Co.,
     183 F.3d 578 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 40, 41, 50

Woodland Trust v. Flowertree Nursery, Inc.,
     148 F.3d 1368 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 65

Yamanouchi Pharm. Co., Ltd. v. Danbury Pharm., Inc.,
     231 F.3d 1339 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

York Prods., Inc. v. Central Tractor Farm & Family Ctr.,
     99 F.3d 1568 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATUTES:**

35 U.S.C. § 102(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 56, 57

35 U.S.C. 102(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 56, 57, 65, 66

35 U.S.C. § 102(g) . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 56, 57, 64, 65, 69, 72

35 U.S.C. § 103(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 62

35 U.S.C. § 112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

35 U.S.C. § 271(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

35 U.S.C. § 282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 51

Fed. R. Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 70

Fed. R. Civ. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Civ. P. 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

## OTHER AUTHORITIES:

Manual of Patent Examining Procedure (§ 2173.04) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Microsoft Press Computer Dictionary
    (3d ed. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## INTRODUCTION

Microsoft's Motion for Judgment as a Matter of Law and for a New Trial should be denied. Microsoft has not offered any credible grounds for disturbing the jury's verdict on infringement of claims 1 and 6 of United States Patent No. 5,838,906 ("the '906 patent"). The jury's verdict was based upon substantial evidence in the record which proves Microsoft's infringement of the '906 patent.

Nor has Microsoft demonstrated that it is entitled to judgment as a matter of law or a new trial on issues relating to the validity and enforceability of the '906 patent. For these claims, Microsoft, not Plaintiffs, had the burden of proof by clear and convincing evidence. The evidence presented makes plain that the '906 patent is neither anticipated nor obvious, and that the inventors did not commit inequitable conduct. The patent, therefore, is not invalid and is enforceable.

## ARGUMENT

Microsoft is not entitled to judgment as a matter of law. JMOL is only appropriate "where there can be but one conclusion from the evidence." McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 564 (7th Cir. 2003).[1] The jury's verdict may only be reversed if there "is no legally sufficient evidentiary basis to support the verdict." Id. This Court must consider "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." Goodwin v. MTD Prods., Inc., 232 F.3d 600, 606 (7th Cir. 2000). The

---

[1] Since a motion for JMOL is a procedural issue "not unique to patent law, [it] . . . is reviewed under the law of the regional circuit where the appeal from the district court normally would lie." Riverwood Int'l Corp. v. R.A. Jones & Co., Inc., 324 F.3d 1346, 1352 (Fed. Cir. 2003). Accordingly, Seventh Circuit law governs Microsoft's motions for JMOL.

inquiry is "limited to assessing whether *no rational jury* could have found for the prevailing party." McRoberts Software, Inc., 329 F.3d at 564 (emphasis added); Goodwin, 232 F.3d at 606; Westchester Fire Ins. v. Gen. Star Indem. Co., 183 F.3d 578, 582 (7th Cir. 1999). Where evidence is contested, this Court may not "substitute . . . its view of the contested evidence for the jury's." Mathur v. Bd. of Trustees of S. Ill. Univ., 207 F.3d 938, 941 (7th Cir. 2000).

Nor can Microsoft meet its burden to establish that it is entitled to a new trial. Microsoft cannot establish that the jury's verdicts are "against the *manifest* weight of the evidence." Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586, 591 (7th Cir. 2003) (emphasis added); David v. Caterpillar, Inc., 324 F.3d 851, 863 (7th Cir. 2003) ("A new trial may be granted if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party."). This jury's verdicts must be upheld as long as "there exists a reasonable basis in the record" to support the verdict. Westchester Fire Ins., 183 F.3d at 582 (citing Robinson v. Burlington N. R.R., 131 F.3d 648, 656 (7th Cir. 1997)).

## I.  MICROSOFT'S ACCUSED PRODUCTS INFRINGE CLAIMS 1 AND 6 OF THE '906 PATENT

There is substantial evidence that Microsoft infringed the properly-construed claims of the '906 patent. Thus, there is no basis for either judgment as a matter of law or for a new trial.

### A.  The Court Properly Construed the Terms of the '906 Patent

Microsoft begins by arguing that the Court's claim construction was erroneous. In order to alter a judgment based on a claim of erroneous claim construction jury instructions, Microsoft must establish "prejudicial legal error." Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1216 (Fed. Cir. 2002); Ecolab Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1373 (Fed. Cir. 2002). In other

2

words, Microsoft must establish that the jury instructions were legally erroneous, that their proposed instructions were proper and would have corrected the flaw, and that the errors had a prejudicial effect. Id. (both citations).

As set forth below, Microsoft's arguments regarding the Court's claim construction are without merit. The claim language was properly construed in light of its ordinary meaning, and the intrinsic evidence. The interpretation of patent claims is, ultimately, a question of law for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). The starting point for all claim construction is the language of the asserted claim itself. See Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 619-20 (Fed. Cir. 1995) (explaining that "[f]irst, and most importantly, the language of the claim defines the scope of the protected invention"). There is a "heavy presumption in favor of the ordinary meaning of claim language. . . ." Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999). There is no basis to suggest that the construction of the claims violated these tenets or is otherwise in error.

### 1. Executable Applications are not limited to standalone applications.

Microsoft argues that this Court's construction of "executable application" is in error because it is not limited to standalone applications. Stated simply, Microsoft's position is contrary to the plain language of the claims (which nowhere speak of "standalone"), the specification (which discusses various embodiments including standalone and non-standalone applications), and the prosecution history. Microsoft's attempt to import the term "standalone" into the language of the claim is contrary to established Federal Circuit law. The Federal Circuit has repeatedly stated that "[g]eneral descriptive terms will ordinarily be given their full meaning," and that "modifiers will not be added to broad terms standing alone." Johnson Worldwide Assocs., Inc., 175 F.3d at 989; see

also Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 865-66 (Fed. Cir. 1997); Bell Communications Research, Inc., 55 F.3d at 621-22. It is improper to import unstated and unintended words or limitations into the claims where no such words or limitations exist. See Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971 (Fed. Cir. 1999) (holding trial court erred in reading extraneous limitations into claim term where to do so would depart from ordinary use or term); see also Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998) (The specification should be used "to ascertain the meaning of a claim term as it is used by the inventor in the context of the entirety of his invention . . . .").

First, Microsoft argues that the Court ignored the "ordinary meaning" of the term "application" through a convoluted argument based upon selective excerpts from one of many versions of its own computer dictionary. MS Br. at 4.[2] However, the Court properly determined that there is nothing that restricts the definition of executable applications to standalone programs. The dictionary definition that Microsoft cites is not even a definition of "application," but instead is a definition of "computer program." Other dictionaries, including other definitions within Microsoft's own dictionary, define both of these terms differently. For example, other versions of Microsoft's dictionary define "application" (by reference to "program") contrary to Microsoft's proposed definition: "a sequence of instructions that can be executed by a computer . . . also called software." Microsoft Press Computer Dictionary 27 (3d ed. 1997).

Thus, the Court correctly held that the ordinary meaning of the term "application" is not limited to standalone applications. Claim Construction Order at 11-12.

---

[2]    Unless otherwise noted, all references herein to "MS Br." are to the Memorandum in Support of Defendant Microsoft's Motion for Judgment as a Matter of Law and a New Trial.

Microsoft's reliance on <u>Texas Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1201-02 (Fed. Cir. 2002), does not change the propriety of this analysis. Indeed, the Federal Circuit recognized that claim terms must be construed in light of the intrinsic evidence since dictionaries are often not consistent in their definition of a claim term:

> Because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor. . . . If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings. . . . The objective and contemporaneous record provided by the intrinsic evidence is the most reliable guide to help the court determine which of the possible meanings of the terms in question was intended by the inventor to particularly point out and distinctly claim the invention.

<u>Id.</u> at 1203-04 (internal citations omitted). In other words, the Federal Circuit in <u>Texas Digital Sys., Inc.</u> simply made clear that dictionaries are not characterized as extrinsic evidence. The court there did not, as Microsoft would have it, raise dictionary definitions to a role of prominence over the intrinsic evidence to determine the ordinary meaning of a claim term. Thus, the law was, and is, that the claims themselves, the written description, the drawings, and the prosecution history are appropriate sources to determine the ordinary and customary meaning of claim terms. <u>ACTV, Inc. v. Walt Disney Co.</u>, No. 02-1491, 2003 U.S. App. LEXIS 20498, at *14 (Fed. Cir. Oct. 8, 2003); <u>see also</u> <u>Toro Co. v. White Consol. Indus., Inc.</u>, 199 F.3d 1295, 1299 (Fed. Cir. 1999) ("As this case well illustrates, the dictionary definitions of common words are often less useful than the patent documents themselves in establishing the usage of ordinary words in connection with the claimed subject matter.").

This is precisely what the Court did. The Court examined the intrinsic evidence to determine that the proper construction of executable application is not limited to standalone programs.

Second, the Court properly examined the specification to construe the claim term. This is simply not the situation that Microsoft posits: the Court did not adopt a specialized definition of "executable application" contrary to its ordinary meaning, but rather the Court determined the meaning of the term according to how it is used in the context of the patent – not in the abstract or in any myriad of other contexts.

The examples in the specification to which Microsoft points in no way suggest that applications must be standalone programs. MS Br. at 5-6. To the contrary, the context of the specification demonstrates that "executable application" is not so limited. The specification states: "*[A]ny* manner of application program may be specified by the TYPE element so that other types of applications, such as a spreadsheet program, database program, word processor, etc. may be used with the present invention." PTX 1 at Col. 13, ll. 11-15 (emphasis added).[3] Whether these examples are "standalone" programs or modules is irrelevant to implementation of the invention. As long as they can be automatically invoked to allow interactive processing within the displayed Web page, they fall within the claim term.

The other portion of the specification cited by Microsoft also establishes that "executable application" was properly construed by the Court. Consistent with the purpose of the invention, the specification notes that *all* methods of implementation of the "browser application" are possible – including *non-standalone programs* such as routines, subroutines and modules:

---

[3]     Unless otherwise noted, all exhibit and transcript cites are to the Declaration of Emily M. Rome in Opposition to Defendant Microsoft's Motion for Judgment as a Matter of Law and a New Trial.

In general, the flowcharts in this specification illustrate one or more software routines executing in a computer system such as computer system 1 of FIG. 1. *The routines may be implemented by any means as is known in the art.* For example, any number of computer programming languages, such as "C," Pascal, FORTRAN, assembly language, etc., may be used. *Further, various programming approaches such as procedural, object oriented or artificial intelligence techniques may be employed.*

*The steps of the flowcharts may be implemented by one or more software routines, processes, subroutines, modules, etc.* It will be apparent that each flowchart is illustrative of merely the broad logical flow of the method of the present invention and that steps may be added to, or taken away from, the flowcharts without departing from the scope of the invention. Further, the order of execution of steps in the flowcharts may be changed without departing from the scope of the invention. Additional considerations in implementing the method described by the flowchart in software may dictate changes in the selection and order of steps. Some considerations are event handling by interrupt driven, polled, or other schemes. A multiprocessing or multitasking environment could allow steps to be executed "concurrently." For ease of discussion the implementation of each flowchart may be referred to as if implemented in a single "routine."

Id. at Col. 13, ll. 51- Col.14, l. 9 (emphasis added).

Microsoft argues that this language is irrelevant because it does not provide an "explicit definition" of executable application. That, however, is not the test. Rather, the Court's examination of the specification confirmed "which of the possible meanings of the terms in question was intended by the inventor to particularly point out and distinctly claim the invention." Texas Digital Sys., 308 F.3d at 1203-04. Indeed, the cited portions of the specification establish that the Court's construction of "executable application" is the only interpretation consistent with the purpose of the invention claimed in the '906 patent. See York Prods., Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996) (after reviewing the claim language, a court may review the patent specification to provide a context to illuminate the meaning of claim terms). See also Comark Communications, Inc., 156 F.3d at 1187 (directing that the specification should be used "to ascertain

the meaning of a claim term as it is used by the inventor in the context of the entirety of his invention. . . .").

Third, Microsoft latches onto the Court's statement that "the preferred embodiment does not use DLLs or components as the executable application," Claim Construction Order at 15, to argue that the Court's claim construction is not supported by the specification. MS Br. at 6. It is axiomatic, however, that claims are not limited to preferred embodiments. See Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347-48 (Fed. Cir. 1998) (finding that it is a "well-established principle that a court may not import limitations from the written description into the claims" and that "the mere repetition in the written description of a preferred aspect of a claimed invention does not limit the scope of an invention that is described in the claims in different and broader terms"); Johnson Worldwide Assocs., Inc., 175 F.3d at 992, 990 ("[J]ust as the preferred embodiment itself does not limit claim terms . . . mere inferences drawn from the description of an embodiment of the invention cannot serve to limit claim terms. . . . [I]f we once begin to include elements not mentioned in the claim in order to limit such claim . . . we should never know where to stop.") (citations omitted).

There is no legal or factual basis to limit construction of the claim terms to the preferred embodiment. The Federal Circuit has held *en banc* that even if there were only one embodiment, that would only restrict the claim to the embodiment where the inventor clearly so intended. See Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1551 (Fed. Cir.), cert. denied, 518 U.S. 1005 (1996). That limited exception to the general rule against restricting the claims to the preferred embodiment has no application here. In the '906 patent the inventors repeatedly and consistently referred to the preferred embodiment not as the sole invention, but rather, stated that the invention is *not* limited to a preferred embodiment (e.g., "In one application . . . . " PTX 1 at Col.

7, l. 7; "Other applications of the invention are possible." id. at Col. 7, l. 29; "Still other applications of the present invention are possible. . . ." id. at Col. 7, ll. 41-42; "Another embodiment of the present invention uses. . . . " id. at Col. 10, l. 33; "In the present example. . . ." id. at Col. 10, l. 47; "Other applications of the invention are possible." id. at Col. 11, l. 40; "Another type of possible application of this invention. . . ." id. at Col. 11, l. 52). The inventors explicitly stated their intent in the '906 patent:

> It will, however, be evident that various modifications and changes may be made thereunto without departing from the broader spirit and scope of the invention as set forth in the appended claims. For example, various programming languages and techniques can be used to implement the disclosed invention. Also, the specific logic presented to accomplish tasks within the present invention may be modified without departing from the scope of the invention. Many such changes or modifications will be readily apparent to one of ordinary skill in the art. *The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense....*

PTX 1 at Col. 16, ll. 49-59 (emphasis added). Thus, there is no "sole" embodiment described, and according to the specification, many embodiments are possible. Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 973 (Fed. Cir. 1999) ("The general rule, of course, is that the claims of a patent are not limited to the preferred embodiment, unless by their own language."); see also Rhine v. Casio, 183 F.3d 1342, 1346 (Fed. Cir. 1999) ("[P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.").

Finally, the prosecution history does not support Microsoft's conclusion that "executable application" should be defined to exclude DLLs. Microsoft's file history argument is premised upon the mistaken belief that by simply outlining how a particular piece of prior art operates, an applicant somehow has expressly disclaimed coverage of *all aspects* of the prior art, even if the actual grounds

for distinction are different. Cf. Elkay Mfg. v. Ebco Mfg. Co., 192 F.3d 973, 979 (Fed. Cir. 1999) ("It is the totality of the prosecution history that must be assessed, not the individual segments of the presentation made to the Patent and Trademark Office by the applicant....").

The Federal Circuit's recent pronouncements on the role of the file history in claim construction demonstrate why Microsoft's approach should be rejected. In Karlin Tech., Inc., 177 F.3d at 974, the defendant argued for a narrow meaning of a disputed claim term based on the applicant's response to an obviousness rejection. The Federal Circuit disagreed, stating that claim terms should be given their "broad ordinary meaning" absent a clear statement by the applicant limiting their scope. Id. In addition, the Court held that the broad ordinary meaning was consistent with the claim language, specification and prosecution history when viewed as a whole. See id.

More recently, the Federal Circuit again emphasized the need for a "reasoned analysis" of the file history in Northern Telecom Ltd. v. Samsung Elec. Co., Ltd., 215 F.3d 1281, 1295 (Fed. Cir. 2000). There, the defendant argued unpersuasively for a narrow construction of a disputed claim term based on a perceived ambiguity in the file history. See id. The court rejected this approach, instead emphasizing the need to apply a reasoned analysis to the prosecution history as a whole. See id. at 1293-95. The court also reaffirmed the need to apply a broad ordinary meaning of a claim term, rather than applying a "judicial narrowing of a clear claim term," absent an explicit statement by the applicant indicating exclusion of subject matter from the invention. Id. at 1294; see also Atlantic Thermoplastics Co. v. Faytex Corp., 974 F.2d 1299, 1301 (Fed. Cir. 1992) ("ambiguous prosecution history cannot trump unambiguous claim language"); Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1304 (Fed. Cir. 1997) (examining *specific reasons* patentee gave for distinguishing prior art and adopting broader claim interpretation).

A review of the entire file history unequivocally demonstrates that both the examiner and the applicants understood that an executable application is broadly interpreted as *any* executable code that allows interactive processing of the object – standalone programs and module and component based systems as well. In the very first office action, the examiner defined the executable application in this way. He noted that "[t]he disclosed prior art does not have embedded controllable application [executable/interpretable/'launchable' program instructions/codes] in the hypermedia document]." PTX 2, Paper # 4 at 5.

Later in the prosecution, the examiner rejected the claims based on a combination of the Mosaic Web browser and the Koppolu OLE patent describing the then-existing OLE facility. The Koppolu OLE patent showed an object handler – which is DLL code – that can be invoked at document rendering time and that allowed, for example, a spreadsheet to be included in a Word-based document. The examiner argued that it would have been obvious to combine this object handler DLL code with the Mosaic browser to arrive at the '906 invention. PTX 2, Paper # 15 at 2-4. In other words, the examiner understood that module components, such as DLL code, *could* function as the executable application in the '906 claims. And, in an examiner interview summary, the examiner noted that the inventive feature claimed by applicants was something wholly apart from any form or storage characteristic of the external application: the "crux of the claim[ed] invention [is] 'automatic invo[cation] of [an] external application to provide interactive control.' Applicant argues [that] the prior art does not teach or suggest this feature." PTX 2, Paper # 16 at 1.

In Paper # 19, the applicants vigorously protested the examiner's position on Koppolu's OLE. The applicants could have simply and decisively overcome the objection by asserting that DLL code could not be an "executable application," if the invention were so restricted. They said

no such thing. Rather, they showed, at length, that the *particular kind* of object handler DLL code

of the Koppolu patent did not teach automatic invocation of code that allows "interactive control."

The applicants specifically pointed out that the object handlers of Koppolu did not allow interactive

processing of the object, since in the Koppolu embodiment editing of the object was not possible.

PTX 2, Paper # 19 at 12-14. Nowhere in the argument did the applicants distinguish Koppolu on

the basis that it did not show an executable application. Thus, there is no support for reading such

an exclusion into the claim.

> In allowing the claims, the examiner agreed with the applicants' arguments, noting that:

> The claims are allowable over the prior art of record because the prior art does not teach nor reasonably suggest the claimed combination of a browser, while parsing a hypermedia document in a distributed hypermedia environment, automatically invokes an external executable application associated with an embedded object to provide interactive processing and to display the object within an area of the hypermedia document's display window.

> The examiner agrees that the claimed external executable application is not a code library extension nor object handler (e.g. windows dll and OLE)(*as pointed out in applicant's argument*. (Paper #19 pages 12-14).

PTX 2, Paper # 23 at 2-3 (emphasis added). In other words, the examiner agreed with the applicants'

argument in their Paper # 19 that the use of particular object handlers in the cited Koppolu reference

did not teach the features of the claimed invention – namely automatic invocation of a code that

allows for interactive processing of an object. Thus, even if the *examiner's* statement could

constitute a disclaimer by the *applicants* (which it cannot), the examiner did not suggest (as

Microsoft argues) that DLLs could never be an executable application; but rather, only that the

particular kind of object handlers as taught in Koppolu did not render the invention obvious.

Here, there simply is no explicit statement by the applicants indicating that DLLs were specifically excluded from the subject matter of the claims. In fact, during the prosecution, the inventors specifically pointed the examiner to an example of Microsoft's use of the '906 invention in which the executable application is a DLL. The inventors discussed Microsoft's use of ActiveX technology, and cited a specific reference, Denning, that describes how Microsoft practices the invention through ActiveX and DLLs. See PTX 2, Paper # 19 at 25-29.

Likewise, in an affidavit submitted to the PTO, Dr. Doyle specifically noted the distinction between OLE technology and ActiveX, stating that ActiveX specifically incorporated the features of the invention, including automatic invocation of an external executable application to allow interactive processing. See PTX 2, Paper # 14 at 10. As noted above, ActiveX utilizes DLLs.

In short, the plain language of the claims, the specification and the file history support the Court's proper construction of "executable application."

### 2. The claim does not require the executable application to be resident on the client workstation at any particular time prior to being executed.

Microsoft argues that it was an error for the Court *not* to instruct the jury that the claims require the executable application to be present on the client work station before the browser parses the embedded text format.[4] In fact, the Court correctly rejected Microsoft's proposed jury instruction on this point because "to execute on said client workstation" does not contain the limitation proposed by Microsoft.

---

[4] Microsoft's argues that the Court improperly left a question of claim construction to the jury, relying on Tr. at 3392-93. That interchange cited by Microsoft is not what Microsoft claims. Rather, it involved a request by Plaintiffs for a curative instruction after Microsoft's counsel argued to the jury in closing argument that the executable application must be located on the client computer prior to the time it is identified and located. See Tr. at 3358-59.

Despite Microsoft's repeated characterizations to the contrary, there is no limitation in the claim language as to the location of the executable application *prior to its execution*. The claim language calls for type information to be utilized to identify an executable application – without limiting where the executable application may be located – and then later allows for the "executable application *to execute* on said client workstation." PTX 1 at Col. 8, l. 67 - Col. 18, ll. 25-26 (emphasis added). It does not say, nor does it require, that the executable application be present on the client workstation at any particular time *prior* to being executed.

In the specification, the reference to an executable application resident on a client computer is simply to one embodiment of the invention. See PTX 1 at Col. 9, ll. 1-2 ("In *a* preferred embodiment, application client 210 is resident within client computer 200 prior to browser client 208's parsing of a hypermedia document as discussed below.") (emphasis added). Other embodiments are described. For instance, an executable application may be on a server:

> Another embodiment of the present invention uses an application server process executing on server computer 204 to assist in processing that may need to be performed by an external program. For example, in FIG. 5, application server 220 resides on server computer 204. Application server 220 works in communication with application client 210 residing on client computer 200.

Id. at Col. 10, ll. 33-39; see also id. at Col. 11, ll. 40-43 ("Other applications of the invention are possible. For example, the user can operate a spreadsheet program that is being executed by one or more other computer systems connected via the network to the user's client computer."); id. at Col. 11, ll. 52-55 ("Another type of possible application of this invention would involve embedding a program which runs only on the client machine, but which provides the user with more functionality than exists in the hypermedia browser alone.").

Microsoft repeatedly made arguments during claim construction which are fundamentally at odds with its current proposed construction. For example, in its claim construction briefs Microsoft repeatedly argued that the executable application could be on a server computer:

> As the patent explains, the invention modifies the Mosaic Web browser developed by the National Center for Supercomputing Applications ("NCSA") so that it allows the user to interact with an application program located *at a remote computer.*

MS Claim Construction Brief at 5, n.3 (emphasis added). Microsoft repeated this argument again and again:

> Many of the examples in the patent involve a browser application running on the user's (client) computer and the executable application *running on a remote or different computer or in a distributed environment.* Id. at 11-12 (emphasis added).

> The '906 patent proposed a solution to these problems, that provided for inserting an indicator into documents retrieved over a network When the 'browser' program that was displaying the document encountered that indicator, the browser program launched a second program. . . . The second program preferably was launched on a network server computer. . . . The '906 also describes variations on the suggested solution. *One such variation placed the second program, in a distributed form, on a number of different network server computers.*

Id. at 5-6 (emphasis added).

The jury instruction proposed by Microsoft would have improperly modified the claims by limiting the location of an executable application on the client workstation prior to locating it. The Federal Circuit has made it abundantly clear that it is improper to read limitations from the specification into the claims. The specification may describe more than one embodiment of the invention and the claims are not limited to such embodiments if the claim language is broader than such embodiments. See Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1370 (Fed. Cir. 2003);

Abbott Labs. v. Baxter Pharm. Prods., Inc., 334 F.3d 1274, 1280 (Fed. Cir. 2003); Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1328 (Fed. Cir. 2002).[5]

Furthermore, Microsoft never raised this issue during the claim construction hearing, and only belatedly attempted to inject it into the case. Having first raised it after expert discovery and during pre-trial proceedings, Microsoft then abandoned it by failing to timely object during jury instructions. As evidence of the half-hearted attempt to inject this limitation into the claims—Microsoft's experts never offered any opinion in support of this position during expert discovery, and naturally when they were deposed their views on these new Microsoft positions could not have been explored.

As noted above, only at the phase of the pre-trial proceedings when the parties were to submit proposed jury instructions did Microsoft first request that the Court instruct the jury that, "The computer code for the executable application referenced throughout the claim must be present on the client workstation before the browser parses the embed text format." Microsoft's Proposed Claim Construction Jury Instruction. On the eve of the jury instruction conference, however, Microsoft dropped this proposal, and instead suggested the Court modify the Court's draft claim construction instruction to read "[t]he invention includes the ability of the browser to automatically invoke some program located on the client workstation to process the data." Microsoft's Suggestions For The Court's Draft Jury Instructions Construing the '906 Patent Claims. After the

_____

[5] Even if the Court were to accept Microsoft's construction, requiring the executable application to be resident on the client computer prior to its location, the evidence in the record establishes infringement. For example, executable applications such as Macromedia Flash ship with every copy of Windows, as Mr. Wallent testified. Tr. at 1931; 2005. Thus, there is no basis for Microsoft to argue that the Court's failure to adopt its proposed claim construction had a prejudicial effect. Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1216 (Fed. Cir. 2002); Ecolab Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1373 (Fed. Cir. 2002).

jury instruction conference, and prior to reading the instructions to the jury, the Court gave the parties an opportunity to object to the instructions. Tr. 3396. While Plaintiffs' counsel raised an objection, giving the Court an opportunity to correct the instructions before the jury deliberated, Microsoft's counsel stated that "[t]hey look fine to me, Your Honor." Tr. 3396.

To the extent that Microsoft is attempting to revive here a proposed claim construction that it dropped by the end of the trial, it has waived its opportunity to raise this argument. See, e.g., Abbott Labs. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1352 (Fed. Cir. 2003); American Standard, Inc. v. York Int'l Corp., 244 F. Supp. 2d 990, 993 (W.D. Wis. 2002). Federal Rule of Civil Procedure 51 requires that a party timely object to a jury instruction to "preserve a claim of error on appeal." Riverwood Int'l Corp. v. R.A. Jones & Co., Inc., 324 F.3d 1346, 1353 (Fed. Cir. 2003); see also Fed. R. Civ. P. 51; Chestnut v. Hall, 284 F.3d 816, 819 (7th Cir. 2002) ("Failure to challenge a jury instruction in a civil case results in a waiver and precludes appellate review.") (citations omitted). Failure to adequately meet these requirements forfeits a party's objection. Schobert v. Illinois Dep't of Transp., 304 F.3d 725, 729-30 (7th Cir. 2002); Pena v. Leombruni, 200 F.3d 1031, 1035 (7th Cir. 1999). It is not enough that a party submitted their own jury instructions, since "[t]he submission of a proposed jury instruction, without more, does not preserve a specific objection to the instruction given by the court." Smith v. Great American Rests. Inc., 969 F.2d 430, 436 (7th Cir. 1992). See also Chestnut, 284 F.3d at 819 (finding that an appellant's objection to a proposed jury instruction was not enough to preserve the issue for appeal).

### 3. The claims do not limit display of the executable application to the browser.

The Court's claim construction jury instruction on the term "display" was not a "saving instruction." See MS Br. at 10. Rather, it is consistent with the claim language, specification and file history. The Court instructed the jury that:

> The word display. Once the executable application is invoked, the object is displayed to allow interactivity. The display of the object may be done by the executable application, the browser, or the executable application and the browser together . . . .

Tr. at 3424.

This was the proper construction of the claim term. Claims 1 and 6 of the '906 patent contain the following language relating to display of the object:

> and wherein said embed text format is *parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object* and enable interactive processing of said object within a display area . . . .

PTX 1 at Col. 17, ll. 20-25; id. at Col. 18, ll. 22-27 (emphasis added).

The claim language does not limit the display of the object to only the browser. To the contrary, the plain language of the claim states that the browser invokes the executable application in order to display the object. The text includes both the browser and the executable application in front of the "in order to" phrase, making clear that either program or any combination of the two programs can display the object. Thus, the plain language of the claim does not limit the scope of the claim and supports display by either the browser or the executable application that is invoked by the browser. See Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[U]nless compelled to do otherwise, a court will give a claim term the full range of ordinary meaning as understood by an artisan of ordinary skill.").

The description of the location of the object displayed does not support limiting the claim scope as Microsoft contends. MS Br. at 11-12. The claims disclose the location of the displayed object as "within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window." PTX 1 at Col. 17, ll. 24-28; id. at Col. 18, ll. 26-29. This does not limit the claims to display by the browser. To the contrary, the claims cover display of the object by the executable application within this area. The fact that the browser displays the HTML page does not imply that the browser must also display the object. After all, the purpose of '906 invention is to allow for interaction with the displayed object, through use of the executable application. Naturally, the executable application that facilitates interaction with the displayed object may have some role in the actual display of the object.

In addition to the specification's support for the display of the object by the browser, the specification also discloses the display of the object by the executable application. First, the specification explicitly discloses an example of the executable application displaying the object:

> Assuming application client 210 has made a request for the data object at 216, server process 218 ultimately receives the request. Server process 218 then retrieves data object 216 and transfers it over network 206 back to application client 210. To continue with the example of a multidimensional visualization application, data object 216 may be a three dimensional view of medical data for, e.g., an embryo.

> After application client 210 receives the multidimensional data object 216, *application client 210 executes instructions to display the multidimensional embryo data on the display screen to a user of the claim computer 200.*

PTX 1 at Col. 9, ll. 58 - Col. 10, l. 2 (emphasis added). Thus, the specification explicitly states that application client 210 – the executable application – executes instructions to display the object on the display screen.

Second, in yet another embodiment, the specification discloses the display of the object by the executable application in the context of a specific executable application – a video player application:

> If, at step 286, the type is determined not to be an application object (e.g., a three dimensional image object in the case of application "x-vis") a check is made at step 288 to determine if the type is a video object. If so, step 292 is executed to launch a video player application. Parameters are passed to the video player application to allow the player to display the video object within the DrawingArea within the display of the portion of hypermedia document on the client's computer. Note that many other application objects types are possible as described above.

PTX 1 at Col. 15, ll. 39-48.

The '906 patent specification discloses that the browser or the executable application can display the object in the modifications made to NCSA Mosaic version 2.4 software and attached to the File History in a Microfiche Appendix. The specification and source code disclose that the browser creates the display area (or DrawingArea). After the browser creates the display area, however, the executable application is passed information in order to enable it to perform the displaying within the display area:

> The external application is started as a child process of the current running process (Mosaic), and informed about the window ID of the DrawingArea created in HTML format. The external application is also passed information about the ID of the pixmap, the data URL and dimensions.

PTX 1 at Col. 15, ll. 22-26. One of ordinary skill in the art of computer science would understand that the window ID of the DrawingArea is passed to the executable application so as to enable it to display the object. Id.

The display of the object by the executable application is also disclosed in the file history. For example, the file history describes an embodiment of the claimed invention as having the executable application display the object:

> The embed text format is parsed by the browser to cause the browser to automatically invoke the external application to execute on the client workstation. The external application displays, and allows the user to interactively process, the object in a display window created within the portion of the document being displayed in the browser-controlled window, at the location within the document of the embed text format.

PTX 2, Paper # 14 at 6. Similarly, in discussing the Mercury Project, the inventors stated that "unlike the Mercury Project, a multi-dimensional object may be displayed and manipulated within the browser window by an application running on a remote computer." PTX 2, Paper # 5 at 17-18.

Thus, the instruction given by the Court has ample support in the claim, specification, and prosecution history.

In addition, for the reasons as discussed, supra, Microsoft waived its objections to this instruction by failing to object. Prior to trial, Microsoft proposed that the Court instruct the jury with alternative instructions on whether the "browser" or the "browser or the executable application" may display the object. Microsoft's Proposed Claim Construction Jury Instruction. On the eve of the jury instruction conference, however, Microsoft had dropped this proposal. Microsoft suggested then that the Court modify the Court's draft claim construction instruction to read "the object ~~may~~ must be displayed." Microsoft's Suggestions For The Court's Draft Jury Instructions Construing the '906 Patent Claims. At the jury instruction conference, Microsoft did not object to the instruction on the grounds it raises here. Rather, the extent of Microsoft's objections were to suggest that the word "may" should be changed to "must," and Microsoft ultimately agreed to the Court's use of "is." Tr.

3211-12. Nor did Microsoft raise this as an objection when the Court gave the additional opportunity to raise objections, stating instead that the instructions "look fine to me, Your Honor." Tr. 3396. Thus, Microsoft has waived its other objections to this instruction. Fed. R. Civ. P. 51. See, e.g., Abbott Labs. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1352 (Fed. Cir. 2003); American Standard, Inc. v. York Int'l Corp., 244 F. Supp. 2d 990, 993 (W.D. Wis. 2002). Microsoft's mere proposal of its instruction prior to trial is not sufficient to preserve its objection. Smith v. Great American Rests., Inc., 969 F.2d 430, 436 (7th Cir. 1992).

### 4.     The browser's use of outside resources is not in dispute.

Microsoft asserts that the Court's claim construction jury instruction of "identify and locate" was in error, and that the Court should have instructed the jury that "the browser must establish which executable application is to be launched, and the browser must determine where the computer code for that application can be found on the user's computer." MS Br. at 12-16. In Microsoft's view, in order to meet this claim element, the browser must determine the file name and file path of the executable application. MS Br. at 17; 20, n.6. Thus, Microsoft asserts that the Court's instruction on "identify and locate" was in error because the use of "heavy lifting" allowed, according to Microsoft, the jury to find infringement if the operating system identifies and locates the executable application. MS Br. at 13-14.

Microsoft has no basis to object to the Court's instruction on the role of the operating system, or on the use of the "heavy lifting" language to characterize what the claim requires of the browser. Throughout this case, Microsoft agreed that the '906 invention contemplates that the operating system is involved at some level. Claim Construction Order at 32 ("Microsoft agrees that operating systems are always involved on some level, and Microsoft also agrees that the specification discloses

the use of outside resources."); Summary Judgment Order at 30 ("During the <u>Markman</u> hearing, Microsoft agreed 'that operating systems are always involved on some level' and did not 'propose a claim construction that would entirely preclude the browser from using the operating system or some external resource.'").

That Microsoft now argues that the jury should have been instructed that "the operating system may not perform these steps" is remarkable. MS Br. at 13. Microsoft never proposed such a jury instruction. <u>See</u> Microsoft's Proposed Claim Construction Jury Instructions; and Microsoft's Suggestions For The Court's Draft Jury Instructions Construing the '906 Patent Claims.[6] To the contrary, at the jury instruction conference, Microsoft proposed language that is directly contrary to the position it takes here; language which acknowledges the browser's use of outside resources. Specifically, Microsoft proposed that the jury instruction read: "The browser may go to the computer storage, find an outside resource such as the MIME database and consult it." Microsoft's Proposed Claim Construction Jury Instruction. Moreover, Microsoft's counsel told the Court during the jury instruction conference that it was "undisputable" that the browser's use of some outside resources, such as the operating system, is involved in the operation. Tr. at 3207.

_____

[6]     Microsoft did not propose at trial a jury instruction of "identify and locate" that requires the browser to determine a file name and file path. <u>See</u> Microsoft's Comments on the Court's Draft Jury Instructions Construing the '906 Patent Claims; and Microsoft Corporation's Proposed Jury Instructions on Claim Construction. Rather, Microsoft moved for JMOL based on its view that the evidence did not support a conclusion that Internet Explorer did not determine the file name or file path. <u>See</u> Microsoft's Memorandum in Further Support of Its Motion For Judgment As A Matter of Law of Noninfringement as to Internet Explorer's Support for Active X Controls and Applets. Moving for a JMOL is not the same as a proposed jury instruction. Microsoft, however, did not object to the Court's jury instruction during the jury instruction conference on the basis that identify and locate was not defined to require the browser to obtain the file and file path of the executable application. Tr. at 3196-3211; 3396. Therefore, based on the authority discussed, <u>supra</u>, to the extent that Microsoft is arguing here that the jury should have been so instructed, Microsoft has waived its argument.

Nor does Microsoft have any basis to complain now about the use of the "heavy lifting" language to differentiate the role of the browser from the operating system – *for this was Microsoft's own suggestion*. Claim Construction Order at 31, 34. At the <u>Markman</u> hearing, the Court engaged in the following exchange with Microsoft's counsel:

> THE COURT: The identifying and locating, you identified as the heavy lifting?
> MR. PRITIKIN: Yes, making the connection.
> THE COURT: And that is the absolute minimum?
> MR. PRITIKIN: That's right. You recall, your Honor, I asked Professor Felten on cross-examination, what is the minimum amount that the browser has to do to satisfy this 1 claim. He said, it is a hard question – well, it is a hard question unless you are going to use the claim language properly. He had no answer to the question. *The heavy lifting, identifying and locating is what the browser has to do. That is what we are saying, it is the browser, not the operating system, that does that.*

Ex. A at 304-05 (emphasis added). Indeed, at the jury instruction conference, Microsoft's counsel stated, in reference to the use of "heavy lifting" in the jury instructions that: "We like it at this point, Your Honor." Tr. at 3211. To the extent Microsoft has any objections to this term, it has waived them.

Moreover, the Court's construction and jury instruction of "identify and locate" was correct based on the intrinsic evidence. There is no basis in the patent claims, specification, or prosecution history that "identify and locate" excludes the role of the operating system and requires the browser to determine the file name and file path.

In the context of Web browsers, Web pages are "located" through a Uniform Resource Locator (URL) without ever having a file path to the actual Web page. As the '906 specification describes:

> For example, hypertext document 10 of FIG. 1 may be located at user 110's client-computer 108. When user 110 makes a request by, for example, clicking on hypertext 20 (i.e., the phrase "hypermedia"), user 110's small client computer 108

24

> processes links within hypertext document 10 to retrieve document 14. In this
> example, we assume that document 14 is stored at a remote *location* on server B.

PTX 1 at Col. 4, ll. 66 - Col. 5, ll. 1-6 (emphasis added). In short, a file path is not required to be

known by a browser in order to locate and retrieve a Web page. Indeed, the Federal Circuit has

recently construed the term "URL" as "something that identifies the *location* of relevant information

segments." ACTV, Inc. v. Walt Disney Co., No. 02-1491, 2003 U.S. App. LEXIS 20498, at *21

(Fed. Cir. Oct. 8, 2003) (emphasis added).

Similarly, the '906 patent claims describe an embed text format that "specifies the *location*

of at least a portion of an object." In the specification, data objects can be found by simple reference

to a URL. PTX 1 at Col. 13, ll. 26-28 ("Other TYPE values are possible. HREF specifies a URL

address as discussed above for a data object."). In other words, the "object" can be located without

a file path. Simply put, there is no support in either the specification or the claims for a requirement

that a file path be known by the browser in order for it to identify and locate an executable

application.

Microsoft's construction -- that would exclude involvement of the operating system, and

require that the browser identify a file name and file path -- would read the preferred embodiment

out of the '906 claims. The description in the '906 patent of obtaining an application name does not

require a file name and file path, and contemplates a role for the operating system. As claimed in

the '906 patent, the browser application identifies and locates an executable application by utilizing

the type information associated with the object. See, e.g., PTX 1 at Col. 18, ll. 18-22. The

specification describes a preferred embodiment in which the browser application determines which

application to run after consultation with a resource, such as a database outside the browser itself:

At step 286 a check is made as to whether the type attribute of the object, i.e., the value for the TYPE element of the EMBED tag, is an application. If so, step 290 is executed to launch a predetermined application. *In a preferred embodiment an application is launched according to a user-defined list of application type/application pairs.* The list is defined as a user-configurable XResource as described in "Xlib Programming Manual." *An alternative embodiment could use the MIME database as the source of the list of application type/application pairs.* The routine 'vis_start_external_application' in file HTML format.c is invoked to match the application type and to identify the application to launch.

PTX 1 at Col. 15, ll. 9-21 (emphasis added). The user-defined list of application types is a database or look-up table for application types, created by the user, and therefore *not* part of the browser code.

During his testimony, Dr. Doyle demonstrated a browser application, conforming to the preferred embodiment that used type information to determine that it needed to launch a program called "panel." Tr. at 362 ("And all it did then was issue to the operating system a command to launch the program panel."). The code demonstrated by Dr. Doyle was 1994 binary code dated just after filing of the invention. Tr. at 310. No file path was required. Id. ("As long as the program panel was in the *operating system's* path, using the *operating system's* path capabilities, then that program was invoked.") (emphasis added). In other words, Dr. Doyle described that the browser does not know the file path but the operating system determines that in the process of invoking.

The Federal Circuit has held that constructions which read out the preferred embodiment are "rarely, if ever, correct and...require highly persuasive evidentiary support." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996). In fact, the Federal Circuit has adopted a claims construction that reads out the preferred embodiment only "in an instance where the patent applicant limited the full scope of the claim language to omit the preferred (and only disclosed) embodiment in order to overcome an examiner's rejection." Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1349 (Fed. Cir. 2003). Here, there is no support – much less "highly

persuasive" support – to overcome the usual presumption that the claims cover the preferred embodiment set forth in the '906 specification and demonstration done by Dr. Doyle.

Finally, Microsoft's argument that the language in the jury instruction that "[t]he inventors contemplated the browser's use of some outside resources" is based on subjective intent is misplaced. Stating that the "inventors contemplated" the browser's use of some outside resources is not improper in this case – to suggest otherwise would be to read the preferred embodiment out of the claims. Furthermore, cases since Markman have clarified that an inventor's testimony explaining the patent claims is admissible. Vitronics Corp., 90 F.3d at 1584 (noting use of inventor testimony to help in proper understanding of claim terms).

### B. Substantial Evidence Exists in the Record to Prove Microsoft's Infringement of the '906 Patent

As set forth below, the jury's verdicts are supported by substantial evidence. Accordingly, Microsoft's Motion for Judgment as a Matter of Law or for a New Trial must be denied. Where a party moves for JMOL in a case that has been tried to a jury, the district court must determine if there is a "legally sufficient evidentiary basis to support the verdict." McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 564 (7th Cir. 2003). Here, Microsoft also seeks a new trial, which it can only obtain if it can establish that the jury's verdicts are "against the *manifest* weight of the evidence." Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586, 591 (7th Cir. 2003) (emphasis added).

1. **The Jury's verdict of infringement of claim 6 has ample support in the record.**

Microsoft contends that it is entitled to judgment as a matter of law because the evidence presented by Plaintiffs does not support a jury finding of infringement. In fact, under the proper claim construction, substantial evidence supports the jury's verdict.

      *a.*      *There is substantial evidence in the record to support a verdict that the accused products infringe claim 6 as construed by the Court.*

Microsoft contends that Plaintiffs did not demonstrate that Internet Explorer "identifies and locates the executable application." MS Br. at 19-20. In fact, the record is replete with evidence that establishes infringement, both under the Court's claim construction, as well as Microsoft's rejected construction.

Consistent with this Court's construction of the '906 claims, Dr. Felten testified at length with respect to the Internet Explorer code which is used to identify and locate the executable application. Tr. at 1008-1024. Dr. Felten testified that "[i]dentify and locate means to take the type information out of the web page and to link it to an executable application that has to be used." Tr. at 1009. Dr. Felten also testified that regardless of whether "identify and locate" could be considered a single-step or a two-step process, the code in the Internet Explorer browser performs those functions. Tr. at 1137.

Dr. Felten then testified in great detail as to the heavy lifting done by the Internet Explorer browser in linking the type information in the Web page to the executable application. Dr. Felten led the jury through the process by reference to the actual Internet Explorer code and the HTML source from an actual Web page. Tr. at 1012 ("Each of these boxes is a step or series of steps that Internet Explorer carries out during the identify and locate.") and et seq. Dr. Felten also explained

how the type information in the form of CLASSID is also used by the browser to identify and locate an executable application. Tr. at 1015 et seq. In addition, Dr. Felten described use of other type attributes in connection with identifying and locating the executable application, such as CODEBASE. Tr. at 1019. Thus, there was compelling evidence presented at trial that Internet Explorer identifies and locates the executable application in a way that infringes the '906 patent.[7] Microsoft focuses its arguments on one of the many ways Plaintiffs demonstrated that Internet Explorer identified and locates the executable application. Microsoft argues that the evidence regarding the CODEBASE property does not support the jury's verdict. MS Br. at 17-18. As set forth above, however, the substantial evidence presented to the jury on infringement of this claim element was not limited to CODEBASE. Aside from the other ways Internet Explorer identified and locates the executable application, Microsoft is wrong in its arguments regarding CODEBASE.

Microsoft cannot dispute that:

- Internet Explorer, parses the text of a Web page, including type information such as the CODEBASE and HTML CLASSID attributes. Tr. at 1015 et seq.

- The CODEBASE property points to a location. Id.; see also Tr. at 2116.

---

[7]    Microsoft only contests infringement on this claim element for Internet Explorer's support for ActiveX controls and applets, not for plug-ins. MS Br. at 19. Throughout its brief, Microsoft attempts to divide its arguments on infringement between Internet Explorer's support for ActiveX controls, applets, and plug-ins, apparently under the impression that Plaintiffs have to separately prove infringement for all three categories. See, e.g., MS Br. at 21-22. However, this is not required. Plaintiffs consistently argued that Microsoft's products infringe because they support the ability to automatically invoke embedded, interactive objects – regardless of which particular tag was used. See, e.g., Tr. at 3269 ("Because the accused product contains certain functionality, and if it has that functionality, it infringes irrespective of whether it uses a particular executable application."). Therefore, even if the Court were to accept Microsoft's arguments, Microsoft has conceded that it is not entitled to a new trial or JMOL because it does not contest infringement with respect to Internet Explorer's support for plug-ins. Indeed, Dr. Felten testified that Internet Explorer's support for the EMBED tag infringes the '906 patent, including Internet Explorer versions after 5.5. Tr. at 1027 et seq.; Tr. at 1080 et seq.

Microsoft's response to this compelling evidence presented to the jury is to argue that CODEBASE is limited to "retrieving applications from the Internet and installing them on a user's computer." MS Br. at 17. The evidence, however, is to the contrary. Internet Explorer retrieves the specific executable application across the network and instantiates it on the user's machine *after first checking on the local machine and determining that the correct executable application is not present.* Tr. at 1018. Indeed, Mr. Wallent admitted that the browser, in undergoing this process, obtains the file name and file path for the executable application. Tr. at 2123-27; 2814-16. When faced with Internet Explorer Code in PTX 1111, Mr. Wallent admitted that:

> Q.    The code we're looking at here, sir, is actually capable of obtaining the file name and file path for an ActiveX control, isn't it?
> A.    Yes.
> Q.    And this is browser code that can do this, right?
> A.    Yes.

Tr. at 2127; see also Tr. at 2814 (Kelly cross-examination). If no executable application is found, or if one is found with an unsuitable version number, then the browser downloads a new executable application from a location determined from the CODEBASE type information, which, in the website used by Dr. Felten was a URL. Tr. at 1018-20; Tr. at 2816 (Kelly cross-examination). As discussed above, a URL specifies a location. Tr. at 2116; ACTV, Inc. v. Walt Disney Co., No. 02-1491, 2003 U.S. App. LEXIS 20498, at *21 (Fed. Cir. Oct. 8, 2003).

In the end, Microsoft is left with its claim, made without any citations to the record, that the "CODEBASE operation, even though performed by Internet Explorer, does not affect or alter the classID value that is retrieved from the Web page and provided by Internet Explorer to the COM subsystem of Windows." MS Br. at 17-18. What Microsoft cannot dispute is that the browser obtains the textual classid from a Web page. Tr. at 2096. Nor can Microsoft dispute that when the

browser obtains the classid from the Web page, it does not merely pass it on to COM, but rather undertakes other steps. Tr. at 2098-99. In fact, COM is unable to use the classid obtained from the Web page, and only the browser can use the information it obtains when it parses the Web page. Tr. at 2806. It is undisputed that all of the steps from parsing the text of the Web page to the ultimate passing of a classid to COM are done by Internet Explorer. Tr. at 1008 et seq. Nor can Microsoft dispute, as Dr. Felten testified, that the classid passed from Internet Explorer to COM "is not necessarily the same as the one that was in the Web page if, indeed, there was one in the Web page." Tr. at 1150. Indeed, as Mr. Wallent admitted, the classid passed to COM "is a type rev classID which is not a textual or a straight type." Tr. at 2113.

Microsoft's use of type information (including the CLASSID HTML attribute) to arrive at a classid that it hands off to COM to invoke an executable application infringes the '906 patent. It is no different than the description in the '906 patent of obtaining an application name. See PTX 1 at Col. 15, ll. 12-21 ("In a preferred embodiment an application is launched according to a user-defined list of application type/application pairs . . . An alternative embodiment could use the MIME database as the source of the list of application type/application pairs. The routine 'vis_start_external_application' in file HTML format.c is invoked to match the application type and to identify the application to launch."). As David Martin, one of the co-inventors, testified:

> That's something called a Multipurpose Internet Mail Extension. It's an Internet standard for how you find a link and type to an application. In that database, you would indicate for a TIF data type what the TIF application was that you wanted to view; for the MPEG data type, the MPEG application, et cetera. Then that application name could be used by the operating system to launch that appropriate application to enable the interactivity between those two applications.

Tr. at 716. Indeed, Dr. Doyle demonstrated a browser application conforming to the preferred embodiment that established this fact. At no time during Dr. Doyle's demonstration did the '906 browser need to "know" either the actual file path of the file to be executed or even the name of that file. All it needed was a unique identifier which the operating system could use in order to invoke the executable application. The same is true in Windows. Dr. Felten testified that CoGetClassObject (which is given a CLASSID) is the corresponding Windows operating system facility to invoke an executable application. Tr. at 1172.

Microsoft's argument that OLE/COM performs the function of identifying and locating an executable application is fatally flawed. MS Br. at 17. Microsoft's own expert, Dr. Kelly, admitted that OLE/COM cannot – and does not – parse the embed text format or, more importantly, use the textual type information *in the Web page* to identify and locate the executable application. Tr. at 2804-06; see also Tr. at 1033-35. Only the Internet Explorer browser can use the *text of the Web page* – particularly the type information in the embed text format – to identify and locate the executable application. The Internet Explorer browser uses the type information in the Web page to link to the executable application that is needed. Once that identification and location has occurred, as in the preferred embodiment of the '906, the command is issued to the operating system to invoke the application. Tr. at 1020-23. Thus, Microsoft's focus on OLE/COM relates solely to invocation, for which the browser is not required under the '906 claims. Tr. at 1020-23.

This reading is identical to the position applicants took before the PTO during the prosecution of the '906 claims; and therefore Microsoft's argument that the inventors disclaimed the use of the operating system is simply incorrect. MS Br. at 16-17. The file history states that "OLE does not **parse** text tags in the document in order to render the document . . . Therefore, the

document text is not used to determine. . .the <u>object's</u> type." PTX 2, Paper # 19 at 9 (emphasis in original). In other words, OLE/COM cannot be performing the steps of "identifying and locating" since it has no ability to "parse text tags" or read type information in a Web page. <u>See also</u> PTX 1 at Col. 12, ll. 54-56 ("Table II, below, shows an example of an HTML tag format used by the present invention to embed a link to an application program *within a hypermedia document*.") (emphasis added).

Accordingly, the evidence in the record provides substantial support for the jury's verdict of infringement.

> **b.** ***Only if the Court were to now change its claim construction to limit executable applications to standalone applications, or to limit the claim to the browser's display of the object, would Microsoft be entitled to a new trial.***

Microsoft contends that it is entitled to judgment as a matter of law or a new trial if this Court were to change its claim construction, and limit the meaning of executable application to stand-alone programs. MS Br. at 16. Similarly, Microsoft contends that it is entitled to judgment as a matter of law or a new trial if this Court were to change its claim construction, and limit the claim to display by the browser. MS Br. at 18, 20. Plaintiffs' case was presented to the jury based on the Court's claim construction, rulings on summary judgment, and draft claim construction jury instructions presented at the beginning of trial. Microsoft does not move for a JMOL or new trial based on these claim terms as construed by the Court. Only if the Court at this stage adopts a new claim construction would Microsoft be entitled to a new trial.[8]

---

[8]      No evidence was presented to the jury by Microsoft to require a finding of non-infringement if executable application were construed to be limited to standalone application. Nor was any evidence presented to the jury by Microsoft to require a finding of non-infringement if the
(continued...)

This is not the case, however, if the Court were to change its construction of identify and locate to require the browser to determine the application's file name and file path. MS Br. at 16-17. As set forth supra, evidence was presented that the browser does in fact identify the file name and file path of the executable application, and thus the evidence in the record establishes infringement. Tr. at 2123-27; 2814-16. Accordingly, there is no basis for Microsoft to argue that the Court's failure to adopt its proposed claim construction had a prejudicial effect. Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1216 (Fed. Cir. 2002); Ecolab Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1373 (Fed. Cir. 2002).

## 2. Substantial evidence supports the Jury's verdicts of both direct infringement of and inducement to infringe Claim 1.

### a. *Microsoft directly infringes Claim 1.*

Microsoft claims that Plaintiffs failed to prove infringement of Claim 1. This is incorrect; during trial Plaintiffs showed that Microsoft's use of the accused technology infringes Claim 1.

A determination of infringement is a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted. [Second,] the properly construed claims are compared to the allegedly infringing device." Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1349 (Fed. Cir. 2003) (quoting Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998)). "A method claim is directly infringed only by one practicing the patented method." RF Delaware, Inc. v. Pacific Keystone Tech., Inc., 326 F.3d 1255, 1267 (Fed. Cir. 2003) (quoting Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993)).

---

[8](...continued)
claims were reconstrued to require display of the object by the browser only. The citations in the record to which Microsoft points (Tr. at 1968-71, 2003) do not prove that Internet Explorer does not have the capability to display an object.

Plaintiffs proved Microsoft's direct infringement of Claim 1 by showing Microsoft's use of the accused technology in Microsoft's own Web sites. For example, during cross examination, Mr. Wallent testified that Microsoft used ActiveX on its Microsoft Network ("MSN") Autos site. Tr. at 2180-82. Mr. Wallent also testified that in pages accessed from the MSN Zone site, there were games, like Collapse and Mahjong, that used applets. Tr. at 2182-87. In addition, during Dr. Kelly's testimony he admitted that Microsoft was using the accused technology on its own Web site -- Microsoft Museum. Tr. at 2857. Moreover, Dr. Kelly also admitted that, in one instance after another, Microsoft was using the accused technology to sell the accused technology. Tr. at 2855-58 (Kelly admitting that Microsoft was using accused technology to sell things like: Tablet PC, X Box, and Windows XP).

### b.    *Microsoft induces infringement of Claim 1.*

In proving inducement to infringe under 35 U.S.C. § 271(b), there are two requirements: (1) a showing that the conduct being induced is, in fact, a direct infringement, Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1033 (Fed. Cir. 2002); and, (2) that the alleged infringer knowingly induced infringement and possessed the specific intent to encourage another's infringement. Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990). In other words, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." Id. (emphasis original). Plaintiffs satisfied both requirements.

To prove inducement to infringe, the plaintiff must prove that someone infringed the patent. Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed. Cir. 1986). This proof may be made through the use of circumstantial evidence. Moleculon Research Corp. v. CBS, Inc., 793

F.2d 1261, 1272 (Fed. Cir. 1986). It is hornbook law that direct evidence of a fact is not necessary. Id. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." Id. (quoting Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330 (1960)).

With regard to proving direct infringement, as discussed above, Microsoft itself directly infringed Claim 1. In addition, however, Plaintiffs proved that others also infringed Claim 1. For example, Plaintiffs showed during trial that at any one time, thousands of people were infringing the '906 patent by playing games on the Internet – games that were created using ActiveX, applets, and plug-ins. Tr. at 2183-85 (noting that Mr. Wallent was one of among 148,357 players); 2600-01 (noting that Ms. Couglan was one of among 144,673 players). In addition, Plaintiffs introduced evidence showing the magnitude of the downloads of, for example, Macromedia Flash and Macromedia Shock Wave Player, Adobe Acrobat, Java Virtual Machine, and QuickTime. Tr. at 2587-96 (noting that: Macromedia Flash and Macromedia Shock Wave Player have been downloaded hundreds of millions of times; Adobe has distributed over 500 million copies of its software; Java Virtual Machine has shipped with every copy of Windows; QuickTime was downloaded over 100 million times by Windows and Mac users in its first year). This is yet additional circumstantial evidence of direct infringement of Claim 1.

Plaintiffs also proved that Microsoft knowingly induced infringement of Claim 1. Active inducement is a factual inquiry. Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1318 (Fed. Cir. 2003). A patentee must show that an alleged infringer knowingly induced another to commit an infringing act to establish induced infringement under section 271(b). Alloc, Inc. v. Int'l Trade Comm'n., 342 F.3d 1361, 1374 (Fed. Cir. 2003) (citing Manville, 917 F.2d at 553). This

requisite intent to induce infringement may be inferred from all of the circumstances. Id. at 669. Proof of intent to induce infringement is necessary, but direct evidence is not required; circumstantial evidence may suffice. Water Tech. Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir. 1988). See also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., No. 00-1172, slip op. at 5 (Fed. Cir. Jan. 8, 2001) ("Proof of inducing infringement or direct infringement may be shown by circumstantial evidence."); Snuba Int'l, Inc. v. Dolphin World, Inc., No. 99-1357, slip op. at 18 (Fed. Cir. July 11, 2000) (considering circumstantial evidence of sales information and promotional materials).

Plaintiffs provided sufficient evidence for the jury to conclude – as they did – that Microsoft induced infringement of claim 1. Microsoft sold 354,124,000 units between November 1998 and September 2001, all of which support the '906 functionality—including support for applets, ActiveX controls, and plug-ins. Tr. at 2178-79. In addition, Plaintiffs showed that:

- Microsoft includes manuals and instructions with the accused products, showing how to use Internet Explorer on the Internet. Tr. at 981-82.

- Microsoft has sold books about using ActiveX. For example, one Microsoft employee wrote a book telling people how to use ActiveX -- including how to use it on the Internet. Tr. at 2827-28; PTX 2532 (Denning book).

- Microsoft sells subscriptions to Microsoft Developers Network (MSDN), a site that provides information to developers on how to use ActiveX controls and applets. Tr. at 2188-89.

- Microsoft knew that its products were being used to infringe. Tr. at 2180-87; 980-82.

- Microsoft encouraged Web developers to use Internet Explorer to support embedded applications. Tr. at 1928-29 (Wallent); see also Tr. at 980-82; 1077-79; 1322-23; 1337; 1359-60; 1759; PTX 379; PTX 363.

- Microsoft touted the benefits of the infringing technology in order to sell its products. Tr. at 2855-58.

- Microsoft has distributed an ActiveX SDK (Software Developers Kit). Tr. at 2188.

Microsoft's arguments regarding Internet Explorer's support for plug-ins are misplaced. As discussed above, the evidence of infringement was based on the functionality of the accused products, not on the particular executable application. The evidence cited above demonstrates active inducement by Microsoft to infringe Claim 1 by the browser's support of the patented functionality, regardless of the tag used.[9]

For all these reasons, the evidence was sufficient for the jury to find that Microsoft induced infringement of Claim 1. As a result, Microsoft's motion for JMOL or a new trial on inducement should be denied.

### c.     The inducement jury instruction was correct.

Microsoft's claim that the inducement jury instruction was incorrect is specious. Ignoring the actual instruction to the jury, Microsoft improperly focuses on an isolated comment during the charge conference. See MS Br. at 23 (citing Tr. at 3263). The instruction read in its entirety, however, not only specifically uses the word "actively" but it also clearly conveys the law:

> In addition to contending that defendant has directly infringed claims 1 and 6 of the '906 patent, plaintiffs also said the defendant has induced infringement of claim 1 of the '906 patent. To show inducement of claim 1, plaintiffs must prove by a preponderance of the evidence that someone has directly infringed on that claim --

---

[9]     In any event, Microsoft cannot dispute that Internet Explorer displays the pages of Web sites that use the EMBED tag. Microsoft has provided support for the EMBED tag since the release of Internet Explorer 3.0 in 1996, and that support continues. Tr. at 2128-29; 2178-79. Dr. Felten testified that Internet Explorer's support for the EMBED tag infringes the '906 patent, including Internet Explorer versions after 5.5. Tr. at 1027 et seq.; Tr. at 1080 et seq.

directly infringed that claim. If there's no direct infringement by anyone, defendant has obviously not induced infringement.

If you find that someone has directly infringed claim 1 of the '906 patent by practicing the method recited in that claim, it isn't necessary to show that the defendant itself has also directly infringed that claim if the plaintiffs prove by a preponderance of the evidence that defendant *actively and knowingly aided and abetted that direct infringement. Plaintiffs must show that the defendant actually intended to cause the acts that constitute direct infringement and that defendant knew or should have known that its actions would induce infringement of the claim.*

If you find that someone has directly infringed claim 1 of the '906 patent, and that defendant knew or should have known that its actions would induce direct infringement, you may find that defendant induced that infringement of the '906 patent if defendant provided instructions and directions to perform the infringing act with defendant's products through labels, advertising or other sales methods.

Tr. at 3426-27 (emphasis added).

Not only was the jury instruction itself correct, but the Court actually instructed the jury repeatedly throughout the instructions using the word "actively":

- "Plaintiffs also contend that defendant *actively induced or encouraged* infringement of claim 1. The defendant says that its browser infringes neither claim 1 nor claim 6. And defendant says that even if infringement of claim 1 had occurred, it did not *actively induce or encourage* it." Tr. at 3419 (emphasis added).

- "If you find such infringement, you must then decide whether plaintiffs have proven by a preponderance of the evidence that defendant *actively induced* or encouraged such infringement." Tr. at 3420 (emphasis added).

- "If you find that defendant *actively induced* infringement of at least one of the claims since November 17th, 1998, and if you further find that invalidity has not been proven, then you must decide what amount of damages, if any, the plaintiffs have shown by a preponderance of the evidence." Tr. at 3420 (emphasis added).

Furthermore, during closing arguments both sides discussed inducement, again repeating the need for *active* inducement. See Tr. at 3320; 3370. Moreover, the special verdict also explicitly referenced the need for *active* inducement:

> "3. Did Eolas and the University of California prove, by a preponderance of the evidence, that Microsoft *actively induced* U.S. users of Internet Explorer to infringe Claim 1 of the '906 patent?" The answer "yes."

Tr. at 3464 (emphasis added).

In any event, Microsoft fails to prove the prejudice that would warrant JMOL or a new trial. If the jury instructions treat the legal issues "fairly and adequately" they will not be found to prejudice the moving party and will not be "interfered with on appeal." Dressler Indus., Inc. v. Waukesha Engine Div., 965 F.2d 1442, 1452 (7th Cir. 1992). See also Otto v. Variable Annuity Life Ins. Co., 134 F.3d 841, 847 (7th Cir. 1998) ("[W]e must construe the instructions in their entirety, not in isolation, and look for overall fairness and accuracy.") (quoting United States v. Dack, 987 F.2d 1282, 1284 (7th Cir. 1993)). Indeed, a jury verdict based on erroneous jury instructions may be overturned *only* if "it appears that the jury was misled and its understanding of the issues was seriously affected to the prejudice of the complaining party." Westchester Fire Ins., 183 F.3d at 585 (7th Cir. 1999) (citations omitted); Schobert, 304 F.3d at 730 (explaining that reversal is only required if an instruction "*is so misleading* that a party was prejudiced") (citations omitted) (emphasis added); Bennett v. Smith, No. 96C2422, 2000 U.S. Dist. LEXIS 18253, at *17 (N.D. Ill. Dec. 18, 2000) (explaining that incorrect jury instructions only warrant a new trial if, "considering all the instructions, the evidence and the arguments that the jury hears, it appears that the jury was misled or did not have a sufficient understanding of the issues and its duty to determine them"). That Microsoft suffered no prejudice from the instructions as given is clear from the statement of

Microsoft's counsel before the instructions were read that the instructions "look fine to me, Your Honor." Tr. 3396.

For all these reasons, Microsoft's motion on Claim 1 should be denied.

### 3. Microsoft is liable under the patent laws for its export sales of the accused products.

Microsoft's request for JMOL or a new trial on sales of the accused products that it characterizes as "made and sold overseas," MS Br. at 18-19, is addressed separately in Plaintiff's Opposition to Microsoft's Motion for Judgment as a Matter of Law of Noninfringement with Respect to Products Made and Sold Outside the United States.

## II. THE '906 PATENT IS NOT INVALID; THE '906 PATENT SATISFIES THE § 112 REQUIREMENTS

It was Microsoft's burden during trial to prove invalidity by clear and convincing evidence. See Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1362 (Fed. Cir. 1998). In addition, the patent is supported by a presumption of validity that Microsoft never rebutted. 35 U.S.C. § 282. Now at this post-trial stage, Microsoft faces an additional burden. The JMOL and new trial standards are exacting: Microsoft must prove that "no rational jury could have found" for Plaintiffs, McRoberts Software, Inc., 329 F.3d at 564; Goodwin, 232 F.3d at 606; Westchester Fire, 183 F.3d at 582, or that the jury's verdict is "against the manifest weight of the evidence." Billy-Bob Teeth, 329 F.3d at 591. Microsoft cannot meet either of these burdens, and as a result, this Court should deny Microsoft's motions for JMOL or a new trial.

## A. Definiteness Is Not At Issue In This Case ; But Even If It Were, The '906 Patent is Definite

Microsoft's attempt to resurrect definiteness – a theory it never pursued during trial – is improper and should be rejected. Pursuant to Federal Rule of Civil Procedure 50, "[a] post-trial motion for judgment can be granted *only on grounds advanced in the pre-verdict motion*." Fed. R. Civ. P. 50, advisory committee notes (emphasis added); <u>Shales v. Gen. Chauffeurs, Salesdrivers & Local Union No. 330</u>, No. 00C575, 2003 U.S. Dist. LEXIS 15012, at *12 (N.D. Ill. Aug. 27, 2003); <u>Chemetall GMBH v. ZR Energy, Inc.</u>, No. 99C4334, 2001 U.S. Dist. LEXIS 23716, at *3-4 (N.D. Ill. Sept. 18, 2001). "The Seventh Circuit strictly adheres" to the requirement that "a party... move for judgment as a matter of law 'at the close of all evidence' to preserve the right to make such motion after trial.'" <u>Chemetall GMBH</u>, 2001 U.S. Dist. LEXIS at *3-4.

Microsoft cannot satisfy this requirement since Microsoft: (1) never presented a case on definiteness during the trial; (2) never objected during the jury instruction charge conference when Plaintiffs' counsel noted that definiteness – Microsoft's Instruction 3.14 – had not "been pursued by them in the case to this point"; and (3) never moved for JMOL on definiteness during either of its two JMOL motions. See Tr. at 2643-45 (Mr. Pritikin noting the potential § 112 issues as "written description and enablement"); <u>id.</u> at 3188 (jury charge conference); Microsoft's Motion for JMOL (7/22/03) (failing to discuss definiteness); Microsoft's Renewed Motion for JMOL (8/5/03) (same).

Furthermore, Microsoft is wrong on the substance of its argument. The requirement of § 112, ¶ 2 is met "when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." <u>S3 Inc. v. NVIDIA Corp.</u>, 259 F.3d 1364, 1367 (Fed. Cir. 2001). The claims,

specification, and file history of the '906 patent all disclose and reasonably apprise those skilled in the art that the browser or the executable application may display the object. See supra.

Microsoft argues that the claims are indefinite because "the patent fails to inform potential competitors of what displays the object and how it is displayed." MS Br. at 24. Microsoft's argument for indefiniteness improperly equates claim breadth with indefiniteness. As the Manual of Patent Examining Procedure (§ 2173.04) explains:

Breadth Is Not Indefiniteness

Breadth of a claim is not to be equated with indefiniteness. In re Miller, 441 F.2d 689, 169 USPQ 597 (CCPA 1971). If the scope of the subject matter embraced by the claims is clear, and if applicants have not otherwise indicated that they intend the invention to be of a scope different from that defined in the claims, then the claims comply with 35 U.S.C. 112, second paragraph.

The fact that either the browser or the executable application may display the object does not render the claims indefinite. See Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be.").

Microsoft's argument also incorrectly assumes that there can be only one embodiment to carry out a particular claim element. This is simply not the law. See, e.g., Rexnord, 274 F.3d at 1348 ("When the invention is being described in the specification (as opposed to when the preferred embodiment is being described), we have two distinct embodiments distinguished from one other embodiment."). The fact that the browser may display the object in one embodiment does not limit the claims to that embodiment. See Gart v. Logitech, 254 F.3d 1334, 1343 (Fed. Cir. 2001) ("[I]t is well established that broad claims supported by the written description should not be limited in

their interpretation to a preferred embodiment."); Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 992 (Fed. Cir 1999) (holding that varied use of a claim term throughout the patent specification demonstrates the breadth of the term rather than providing a limited definition). Since display by both the executable application and the browser is disclosed, a construction of the claim language that does not encompass each of these embodiments cannot stand. See Smith & Nephew, Inc., v. Ethicom, Inc., 276 F.3d 1304, 1309-18 (Fed. Cir. 2001) ("A claim interpretation that would exclude the reasonable practice of the method taught in the patent is 'rarely the correct interpretation; such an interpretation requires highly persuasive evidentiary support.'"); Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 973 (Fed. Cir. 1999) (citation omitted).

Even if Microsoft had pursued its claim of invalidity under this theory, it could not have prevailed. Accordingly, there is no basis to grant Microsoft's Motion on this ground.

**B.     The Jury's Verdict On Written Description Was Factually And Legally Correct**

**1.     Plaintiffs' '906 patent satisfies the written description requirement.**

Microsoft urges this Court to discard the jury's verdict, a verdict which *rejected* Microsoft's claims that the written description was inadequate. Microsoft claims that the '906 patent does not "describe allowing the user to interact with the object within the image window." MS Br. at 25. Microsoft, however, ignores the relevant evidence and erroneously characterizes Plaintiffs' reliance on the understanding of one of skill in the art as an "obviousness" argument. See MS Br. at 25-26. In fact, the facts and the law demonstrate that the '906 patent satisfies the written description requirement. Reading the '906 patent, one of skill in the art would understand that the controls could be placed anywhere, including within the image window.

The law on written description does not require the disclosure "to provide in haec verba support," Purdue Pharma L.P. v. Faulding Inc., 230 F.3d 1320, 1323 (Fed. Cir. 2000), and the clarity of the disclosure is assessed from the viewpoint of one of skill in the art. Id. (citing Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) ("disclosure 'must...convey with reasonable clarity to those skilled in the art that...[the inventor] was in possession of the invention'")). In other words, "one skilled in the art, reading the original disclosure, must 'immediately discern the limitation at issue' in the claims." Id. (citing Waldemar Link GmbH & Co. v. Osteonics Corp., 32 F.3d 556, 558 (Fed. Cir. 1994)). This is a factual inquiry that must be assessed on a case-by-case basis. Vas-Cath, 935 F.2d at 1561.

As Plaintiffs emphasized at trial, the patent itself – in its text and in the examples it gives – envisions various placements for the controls. Microsoft focuses exclusively on Col.16, ll. 15-18 – calling it the "single sentence" that Plaintiffs relied upon. MS Br. at 25. That portion of the specification does in fact prove Plaintiffs' point, but other language from the patent does so as well. PTX 1 at Col.16, ll. 15-18 ("Note that image window is within Mosaic window while panel window is external to Mosaic window. Another possibility is to have panel window within Mosaic window.");[10] id. at Col.11, l. 41 (discussing spreadsheet programs); id. at Col.12, ll. 3-6 (discussing MetaMap patent).[11] In a similar move, Microsoft attempts to recast Mr. Martin's testimony. See MS Br. at 25. This too is unavailing, however, as the trial transcript clearly reveals that Mr. Martin's testimony emphasized the flexibility the patent allowed the programmer in placing the controls

---

[10]     Microsoft admits, in fact, that this statement is broad and that based on it the controls "could be anywhere." MS's Renewed JMOL at 8.

[11]     Microsoft makes much of the fact that Mr. Lueck mentioned this in his closing statement; however, the '906 patent was admitted – in its entirety – into evidence as PTX 1.

where the programmer wanted them. Tr. at 760-61. Mr. Martin testified that the patent provides for placement of the panel window anywhere and that the implementer is free to put the interface panel "either inside or outside the browser at any location." Tr. at 760. He also noted that the '906 patent specifically refers to the Motif manual; he explained that use of a Motif/XT widget allows the programmer the freedom to choose "where they locate the controls for that application." Id. at 761.

And indeed, one of skill in the art would understand this flexibility with respect to placement of the controls having read the '906 patent. For example, Dr. Felten testified that the '906 patent teaches one of ordinary skill in the art how to place the controls inside the image window or the browser window. Tr. at 951-52. Dr. Felten also referenced specific sections of the patent that explicitly discussed that teaching. Tr. at 952-54; see also PTX 1 at Col.16, ll. 15-18; id. at Col.14, ll. 43-52 (referencing the "'Xlib Programming Manual,' 'X Toolkit Intrinsics Programming Manual,' and Motif Programming Manual'"). The use of controls in this manner was already known within the art.

In fact, Dr. Kelly – Microsoft's expert – admitted that in 1993 those of skill in the art knew how to build an executable application that could have the controls inside the window and they knew how to use that to display an object:

> Q. ...People such as yourself -- your person of hypothetical skill in the art knew how to build an executable application in 1993 that could have the controls inside the window, right?
> A. Certainly.
> Q. And they knew how to use that to display an object, right?
> A. Yes, definitely.
> Q. And you understand that the use of an executable application to do exactly that is one of the things that's covered by this language of claim 6, isn't it?
> A. Yes, I agree it is.

Tr. at 2798.

Microsoft misunderstands Plaintiffs reference to one of skill in the art; Microsoft claims that Plaintiffs are making an obviousness argument by relying on what one of skill in the art would have understood upon reading the patent. See MS Br. at 26. This characterization of Plaintiffs' argument is incorrect. The evidence in this case, including the patent and testimony by witnesses from both sides, demonstrates that those of skill in the art already knew how to place controls inside the image window. See Tr. 951-54 (Felten); id. at 2798 (Kelly). This is not the same as "obviousness." Plaintiffs' references within the patent, as outlined above, would have been enough for that skilled person to understand that the '906 inventors understood and envisioned flexibility in the placement of the controls – including placing the controls inside the image window.

Microsoft has not shown – and cannot show – that the validity verdict was against the manifest weight of the evidence or that no rational jury could have found for Plaintiffs.

### 2. The jury instruction on written description is correct.

Microsoft attacks the jury instruction on written description claiming it is "legally wrong." MS Br. at 27. Microsoft argues that the instruction is too "lax" and that as a result, it did not stress that "obviousness" is not enough to satisfy the written description requirement. MS Br. at 27, 29.

Microsoft is in error. Microsoft focuses on only a portion of the instruction, ignoring the context and guidance provided by the instruction in its entirety. The entire instruction was as follows:

> The specification of a patent must set forth an adequate written description. In order to satisfy the written description requirement, disclosure must reasonably convey either explicitly or implicitly to persons skilled in the art that the inventor invented what is claimed.
>
> One skilled in the art reading the disclosure must promptly discern the limitations at issue in the claims. What is necessary is that the disclosures show that the inventor

is in possession of the invention at issue. The purpose of this requirement is to define the scope of the right to exclude as set forth in the claims.

Defendant argues that the patent is invalid for failure to satisfy the written description requirement. It is defendant's burden to prove invalidity for failure of the written specification by clear and convincing evidence.

Tr. at 3428. The instruction is an accurate statement of the law.

In drafting this instruction, the Court took a very considered approach – carefully examining the relevant case law and parsing the parties' arguments. See Tr. at 3178-88 (discussing written description cases during jury instruction charge conference). Moreover, the instruction is based on Federal Circuit case law. E.g., Purdue Pharma L.P. v. Faulding Inc., 230 F.3d 1320, 1323 (Fed. Cir. 2000); Reiffin v. Microsoft Corp., 214 F.3d 1342, 1346 (Fed. Cir. 2000).[12]

Specifically, the language Microsoft objects to was taken directly from Reiffin. 214 F.3d at 1346 ("Thus, for example, the 1990 application considered as a whole must convey to one of ordinary skill in the art, either explicitly or inherently, that Mr. Reiffin invented the subject matter claimed in the '603 patent.") (citations omitted)). Microsoft now attempts to distance itself from Reiffin – a case it cited to the Court in its own instruction – instead pointing to the cases which Reiffin cites. No matter the legal citation, however, the law is clear that if one of skill in the art reading the specification would understand, that is what is required. See e.g., Vas-Cath, 935 F.2d at 1563-64; Purdue Pharma, 1323 F.3d at 1323 (citations omitted).

---

[12]     Microsoft relies on Regents of Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559 (Fed. Cir. 1997), to support its "obviousness" argument. MS Br. at 29. As discussed *infra*, Plaintiffs have never made such an argument; even so, any reliance on Regents should be carefully considered for another reason. The Regents case involved the disclosure of a biotechnology patent, and recent cases have distinguished Regents and have also questioned the analysis in that case. See Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d 1313, 1331-32 (Fed. Cir. 2003) (clarifying Regents holding); Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1322-27 (Fed. Cir. 2003) (criticizing the Regents decision) (Rader concurring).

Microsoft's failure to appreciate that the law focuses on the understanding of a person of ordinary skill in the art is fatal to its argument; Microsoft simply ignores this basic principle. Thus, the disclosure could be adequate based either on what is explicitly written or on what one of skill in the art would understand from reading the patent – not what is obvious, but what they understand as inherently disclosed to those of skill in the art. Reiffin, 214 F.3d at 1346. The law is clear that *in haec verba* support is not required. In order to satisfy the written description requirement, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352, 1365 (Fed. Cir. 2003).[13] The instruction was clear on this point; indeed, the whole second paragraph – a paragraph Microsoft curiously fails to mention – explains this point. Tr. at 3428-29 ("One skilled in the art reading the disclosure must promptly discern the limitations at issue in the claims. What is necessary is that the disclosures show that the inventor is in possession of the invention at issue. The purpose of this requirement is to define the scope of the right to exclude as set forth in the claims.").

---

[13]     In Cordis, the Court rejected the defendant's reliance on Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473 (Fed. Cir. 1998), noting that the written description requirement was not satisfied in Gentry because the original disclosure clearly identified the console as the "only possible location for the controls," while the claims did not limit the location of the controls to the console. The Cordis court found Gentry in applicable for the same reason it is inapplicable in the instant case, the specification did not limit the invention:

> In the present case, the entirety of the specification does not reflect that the invention goes to the narrower scope of a mixture of half and complete slots. Such a mixture was not conveyed as critical to the invention nor was it described as the only feasible design in the disclosure. Rather, as in Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 993 (Fed. Cir. 1999), "the patent disclosure provides ample support for the breadth of the term []; it does not 'unambiguously limit []' the meaning of [the term]" to the narrower embodiment.

Cordis Corp., 339 F.3d at 1365.

Moreover, for the same reasons discussed <u>supra</u> regarding the jury instruction for inducement of infringement of claim 1, Microsoft has not established any prejudice. The jury instruction treated the legal issues "fairly and adequately" and there is no doubt that the jury was not misled by the instruction. <u>Dressler Indus., Inc.</u>, 965 F.2d at 1452; <u>Westchester Fire Ins.</u>, 183 F.3d at 585; <u>Bennett v. Smith</u>, 2000 U.S. Dist. LEXIS at *17. That Microsoft suffered no prejudice from the instructions as given is clear from the statement of Microsoft's counsel before the instructions were read that the instructions "look fine to me, Your Honor." Tr. at 3396.

As a result, the Court should deny Microsoft's motion for a new trial based on the written description jury instruction.

## III. THE '906 PATENT IS NOT INVALID; MICROSOFT FAILED TO PROVE EITHER ANTICIPATION OR OBVIOUSNESS

As this Court is aware, getting Microsoft to identify exactly what prior art it was relying upon for its invalidity defense, what that alleged prior art was composed of, and what Microsoft's theory of invalidity was, has been an ongoing struggle. <u>See, e.g.</u>, Microsoft's Trial Brief at 7-8 (generally referencing Viola May 1993 software and noting it has been obtained from various sources). Microsoft's shifting-sands approach to its invalidity case continued throughout trial. <u>See</u> Tr. at 2382 (Microsoft asserts DX 37 does not anticipate but renders the '906 invention obvious); Tr. at 2385 (same); Tr. at 2628-31 (attempting to summarize a new theory of obviousness); Tr. at 2636 (asserting that, as to DX 37, Microsoft "still do[es]n't think there are any missing elements"); Tr. at 2373 (likening Microsoft's Viola arguments to Viola itself, characterizing both as a "moving target").

Eventually, it became clear that Microsoft wanted to combine – and pass-off as a *single piece* of prior art – the following separate and distinct items: May 12, 1993 Viola source code (DX 34);

May 27, 1993 Viola source code (DX 37); and various e-mails dated before and after the '906 invention date. Microsoft also attempted to run demonstrations that Microsoft *created* for the trial of adulterated versions of DX 34 and DX 37 to run over a network through the use of a modified and altered server.

Despite these attempts, in the end, Microsoft was left with two and only two prior art references from which to make its invalidity case: Viola source code dated May 12, 1993 (DX 34) and Viola source code dated May 27, 1993 (DX 37). These two exhibits were the only source code of the Viola browser disclosed, produced, or offered into evidence during this litigation. The May 27, 1993 Viola source code (DX 37) differs in material respects from the May 12, 1993 Viola source code (DX 34), with changes to 162 files. Tr. at 2282-83; 2322-27. DX 37, and not DX 34, was listed in Microsoft's Notice Pursuant to 35 U.S.C. § 282.[14]

----

[14]    Microsoft throughout its discussion of Viola attempts to characterize Viola as a 35 U.S.C. § 102(g) prior invention in still another effort to allow Microsoft to piece together the separate and distinct references of DX 34, DX 37, emails and other evidence into a single reference. MS Br. at 30, 35, and 39. Microsoft's attempt to use a general Viola "invention" rather than relying on a specific reference is simply improper, as discussed above, under Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991). Microsoft's reliance on Dow Chem. Co. v. Astro-Valcour, Inc., 267 F.3d 1334 (Fed. Cir. 2001), misses the mark. Here, unlike in Dow Chem., the very feature that Microsoft claims is anticipating – the <VOBJF> tag – was abandoned by Wei's own admission by January 17, 1994, before Viola was made public in February 1994. Tr. at 2319-20. The VOBJF tag was not part of the 1994 Beta release of the Viola code. The Beta release was not the same as the May 12 or May 27, 1993 versions (DX 34 and DX 37). By the time Mr. Wei made Viola public in 1994, he had switched instead to a <LINK> tag. Tr. at 2318-21. The <LINK> tag works differently, and had different capabilities (including passing arguments). Tr. at 2330.  There was no testimony or evidence produced, disclosed, or introduced that demonstrates how the <LINK> tag is implemented in Wei's source code. Thus, the other "evidence" beyond DX 34 and DX 37 on which Microsoft relies is not relevant evidence of Wei's invention. Neither DX 34 nor DX 37, as set forth above, have each element of '906 invention, and thus do not anticipate, whether characterized as a prior art reference under U.S.C. 102(a) and U.S.C. 102(b) or as a prior invention under 102(g).

(continued...)

Microsoft argues that the '906 patent is invalid as either anticipated under §102 or as obvious under § 103. Yet, Microsoft failed to prove either anticipation or obviousness during trial, ignoring governing case law detailing how such a showing should be made. The roadmap to presenting anticipation or obviousness is strictly laid out in Federal Circuit case law, specifically within <u>Panduit</u>, <u>Scripps</u>, and their progeny.

Despite this clear teaching, however, Microsoft did not follow the law. Instead, Microsoft asks this Court to ignore the rules of anticipation which require all elements and limitations be found within a single piece of prior art. Microsoft would also like to bend the rules with respect to obviousness. Having failed to present an obviousness case, Microsoft would have the jury—despite the absence of the evidence and guidance required by <u>Graham</u> and <u>Panduit</u>—piece together an obviousness case on its own. Once already this Court has correctly rejected Microsoft's attempts to contravene governing Federal Circuit case law. For the same reasons, the Court should now also reject Microsoft's motions for JMOL or a new trial regarding §§ 102 and 103.

---

[14](...continued)

For the same reason, Microsoft's attempt to use the same tactic as a vehicle to revive its § 103 argument must fail. It is true that to qualify as prior art, work must meet the requirements of § 102(g). <u>Kimberly-Clark Corp. v. Johnson & Johnson</u>, 745 F.2d 1437, 1444 (Fed. Cir. 1984). However, Microsoft still must prove what that invention is, and only DX 34 and DX 37 meet that standard. The other "evidence" on which Microsoft relies is not relevant even if Viola is characterized as a 102(g) invention. It either postdates Mr. Wei's <VOBJF> tag, is not enabling, or is not relevant as evidence of corroboration or reduction to practice of Mr. Wei's May 27, 1993 software as Microsoft asserts. Thus, characterizing DX 34 and DX 37 as part of a 102(g) invention does not change the legal analysis. There is no basis to give priority to Mr. Wei's claimed invention. <u>Mahurkar v. C.R. Bard, Inc.</u>, 79 F.3d 1572, 1578 (Fed. Cir. 1996).

### A. The '906 Patent Is Not Anticipated by DX 37; There Is No Evidence To Support A Finding That DX 37 Includes All Limitations of The '906 Claims

Microsoft now argues that DX 37 anticipates the '906 patent. After the voir dire of Mr. Wei, however, Microsoft unequivocally stated that DX 37 did *not* anticipate:

> MR. BAUMGARTNER: The argument we want to make to the jury about Defendant's Exhibit 37 is not that it anticipates. The argument instead is that a person of ordinary skill in the art having the DX 37 code would have been able to get the claimed invention through mere fixing of bugs, which was a trivial matter and the most obvious thing imaginable.
> THE COURT: So basically your answer to Scripps is, yes, there's a gap here, and, yes, we're filling this gap.
> MR. BAUMGARTNER: Correct.

Tr. at 2382; see also Tr. at 2384 (responding to Plaintiffs' request that Microsoft "come clean" as to whether Microsoft is arguing anticipation or obviousness, Mr. Baumgartner stated: "Well, I just came clean. With respect to this exhibit it's obviousness.").

### 1. DX 37 does not anticipate.

Despite this admission, Microsoft now argues that DX 37 anticipates. Nevertheless, it is clear from the evidence that this, in fact, is not the case. Microsoft's arguments – and its evidence – suffer from three primary, and ultimately fatal, problems.

First, Microsoft fails to appreciate the requirements of anticipation. Anticipation is an exacting standard – alleged similarities are not enough. Invalidity based on anticipation requires that "*all* of the elements and limitations of the claim are found within a *single* prior art reference." Scripps, 927 F.2d at 1576 (emphasis added). It is axiomatic that anticipation is measured by comparing the properly construed claim to the alleged prior art reference. In re Cruciferous Sprout Litigation, 301 F.3d 1343, 1346 (Fed. Cir. 2002). A finding of anticipation is "not supportable if it is necessary to prove facts beyond those disclosed in the reference in order to meet claim

limitations." Scripps at 927 at 1576. Extrinsic evidence sometimes may be used, if necessary, to educate the decision-maker about meaning to one of ordinary skill in the art, but *"not to fill in gaps in the reference."* Id. (emphasis added). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill." Id. If it is necessary to prove facts beyond those disclosed in the reference in order to make the claim limitations, then the reference does not by definition meet the requirements for anticipation. Id.; See also Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1335 (Fed. Cir. 2002) (rejecting attempts to "combine the teachings of the references to build an anticipation").

Microsoft's current anticipation case was that one could learn from DX 37 how to modify that code in order to make it do what the '906 invention covers. MS Br. at 30-31 (stating that: "this element was *inherently* present;" "the ViolaWWW browser was clearly aimed at;" and it "would work over the internet"). According to Microsoft, Dr. Kelly testified that the "users guide" acted as a "how to" manual that would have allowed others to get the code to work. MS Br. at 32.

This—as Microsoft's counsel in a moment of clarity admitted—is impermissible under Scripps as gap-filling of the reference Microsoft asserts as invalidating prior art. Tr. at 2382-83; Tr. at 2385.

Second, Microsoft is wrong as a substantive matter. The Viola code of DX 37 does not "teach" one how to fill in its missing elements. Most obviously, DX 37 had "bugs" that neither Mr. Wei, Microsoft, nor anyone to whom this code was distributed ever discovered until trial — it cannot use the object it is supposed to download. Thus, in an attempt to demonstrate the asserted plotting demo functionality with the Internet, Mr. Wei made changes to the May 27, 1993 Viola code while in the courtroom. Tr. at 2272-74. The demonstration still failed and was inoperable. Id. Mr.

Wei did not know why the Viola code could not perform the desired operations. Tr. at 2274. As part of the attempted demonstration, Microsoft consultants made substantive modifications to 1994-era server software that was not in existence in May of 1993. Tr. at 2331-33. The modifications were made to the server side of the system rather than the Viola side of the system so as to permit Microsoft to represent to the Court that the demonstration would work with no changes to the Viola code. Tr. at 2369. Even after the server side changes, the demonstration of both the asserted plotting demo, as well as an attempt to render a static HTML page, failed. Tr. at 2272-74 and 2355-56.

The Viola source code of DX 37, when printed in textual form, comprised some 3,800 pages. DX 37B. No evidence was introduced or explanation offered by any witness as to how a person of ordinary skill would have discovered the lines of the code which would need to be modified in order to enable the asserted plotting demo to work in a distributed hypermedia network environment. Indeed, when attempted modifications were made, the plotting demo failed and Mr. Wei was unable to explain why. Tr. at 2272-74.

Third, when properly viewed on its own merits, DX 37 does not anticipate because the evidence presented by Microsoft could not establish as a matter of law that it included all elements of the '906 invention. Indeed, there are several elements lacking in Mr. Wei's May 27, 1993 software. For example, DX 37 was not suitable for use over a distributed hypermedia environment, and thus was not "a computer program product for use in a system having at least one client workstation and one network server." In Wei's May 27, 1993 software, the testplot.hmml (what Microsoft characterizes as the hypermedia document) is on the same machine as ViolaWWW (what it characterizes as the browser), as is v.plot (what it characterizes as the executable application). Tr. at 2446-47.

Indeed, there is no evidence that it was ever used in a distributed hypermedia network environment. Mr. Wei never demonstrated the code on DX 37. Tr. at 2280-81; 2283; 2325. Rather, the May 27, 1993 code was, at most, given to two Sun Microsystems engineers. Tr. at 2429. The Sun Microsystems engineers were unable to make the May 27, 1993 Viola code work. Tr. at 2452-53; DX 43. There was no testimony from any other witness that DX 37 was used in a distributed hypermedia environment. Tr. at 2434-41; 2478; 2483-84. Nor could it have worked in such an environment, because of the bugs, discussed <u>supra</u>.

Also, Mr. Wei's May 27, 1993 software did not "parse a first distributed hypermedia document." Rather, the parsing – as Mr. Wei and Dr. Kelly testified – was done by SGMLS. Tr. at 2330-31; 2784-85; 2787. SGMLS is software that Mr. Wei did not write, but downloaded from somewhere else, and it was not included in the May 27, 1993 software. Tr. at 2350-51; 2356; 2441-42; 2746.

Finally, in Mr. Wei's software, as Dr. Kelly admitted, what Microsoft characterizes as the "object," not the browser, identifies and locates. Plot.v is not part of the browser. Tr. at 2433; 2846. It is plot.v that identifies and locates the executable application vplot. Tr. at 2729-30; 2846-47.

Thus, even if this question had gone to the jury, there would not have been evidence from which it could conclude that DX 37 anticipated the '906 invention.

## 2. DX 37 was legally deficient to prove anticipation for many other reasons.

Microsoft assigns error in the Court's exclusion of DX 37 asserting that it was in "public use" under § 102(b); "known or used by others" under § 102(a); and not "abandoned suppressed or concealed" under § 102(g). MS Br. at 31-35. However, the Court did not exclude Microsoft's anticipation defense based on DX 37 on these grounds. Tr. at 3048. Nonetheless, there was no

evidence introduced at trial from which the jury could have found that the May 27, 1993 software (DX 37) was "known or used by others," in "public use," or not "abandoned suppressed or concealed." As a result, these are additional grounds supporting the Court's ruling.

In order to invalidate a patent based on prior knowledge or use by others under § 102(a), "that knowledge or use must have been available to the public." Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998). Prior knowledge or use must generally be corroborated, and uncorroborated oral testimony of persons related to or associated with the defendant is generally insufficient. See id. at 1371-73. To determine public use under § 102(b), courts consider "all of the circumstances" as well as the policies underlying the statute. Allied Colloids Inc. v. American Cyanmd Co., 64 F.3d 1570, 1574-75 (Fed. Cir. 1995). The same rules apply to uncorroborated oral testimony of public use as in § 102(a). Id.; see also Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 737-38 (Fed. Cir. 2002). Under 102(g), Microsoft must prove that DX 37 was not abandoned, suppressed or concealed. Apotex USA, Inc. v. Merck & Co., Inc., 254 F.3d 1031, 1036 (Fed. Cir. 2001).[15]

Microsoft bases its argument on Wei's distribution of the May 27, 1993 code to engineers from Sun Microsystems. This distribution is insufficient to meet these standards. In providing the May 27, 1993 Viola code, Mr. Wei deliberately and successfully undertook steps to ensure that only the Sun Microsystems engineers received the code, and the members of the general public were precluded from access to it. Tr. at 2450-51. Mr. Wei did not maintain a record of the May 27, 1993 Viola code. Tr. at 2271; 2413-14. In fact, DX 37 was obtained not from Mr. Wei, but from a tape

---

[15]     For additional discussion of the law on these points, and why Microsoft cannot prevail, see infra regarding the discussion of the Court's exclusion of DX 34. That prior art reference was excluded by the Court on these grounds.

archive maintained at O'Reilly and Associates, Mr. Wei's former employer. Tr. at 2271 and 2413-14. There is no evidence that Mr. Wei was aware of the existence of this archived version of Viola prior to its production in this litigation.

Similarly, what Microsoft characterizes as Wei's "alpha releases" in 1993 and early 1994 cannot provide a basis for Microsoft to argue that these standards are met. First, they are simply irrelevant because these "releases" have nothing to do with DX 37. Mr. Wei claims he gave Viola code to Jay Weber on October 17, 1993 (PTX 37), John Cahill on October 21, 1993 (DX 63) and William Perry on January 6, 1994 (DX 64). Tr. at 2290-91; 2293-94. None of this code was disclosed, produced, or introduced at trial; moreover, there is no evidence that the code was the same as DX 37. See, e.g., Tr. at 2291; 2455-56. Indeed, Mr. Wei made changes to the Viola code during the period of these distributions, but did not maintain records of what he distributed. Tr. at 2454-55. On each occasion that Mr. Wei gave source code to Messrs. Weber, Cahill and Perry, he deliberately and successfully undertook steps to ensure that only the recipient of the Viola code would actually get possession of the code and so as to prevent access to the code by members of the general public. Tr. at 2294-95 and 2456.

Nor does Wei's demonstration at the World Wide Wizard's conference in the summer of 1993 help Microsoft. There is no evidence that whatever was demonstrated was the same as DX 37. Indeed, Mr. Wei testified that he did not even remember demonstrating an "embedded application." Tr. at 2288; 2424. And Mr. Silvey testified that he did not know the date of the Viola code demonstrated, Tr. at 2478. Furthermore, Mr. Silvey confirmed that whatever Viola code was demonstrated, it was done on one machine, not over a distributed hypermedia network environment. Id.

Furthermore, whatever distribution of the May 27, 1993 code Mr. Wei made, that code was not enabling. To be an invalidating prior art reference, the reference must be enabling. Heliflix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1346-47 (Fed. Cir. 2000). As discussed, supra, and as Mr. Wei testified, Tr. at 2439-41, the May 27, 1993 software did not work.

## B.    Microsoft Failed To Present An Obviousness Case During Trial

Microsoft asks this Court for JMOL or a new trial on obviousness. MS Br. at 35-36. The Federal Circuit has clearly set forth the rigorous analysis necessary for an obviousness determination. Microsoft did not conduct this analysis or present evidence to support it. As a result, Microsoft's Motion should be denied.

An invention is unpatentable due to obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). To determine obviousness, four factual inquiries must be made concerning: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations of nonobviousness, including commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results. Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966); Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1566 (Fed. Cir. 1987).

Simply put, Microsoft presented no obviousness case to the jury. Specifically, Microsoft did not: (a) identify the elements that were missing from DX 37; (b) explain and describe what could be combined with DX 37 to fill those gaps; or (c) explain and prove the existence of a suggestion or motivation to combine. See ATD Corp. v. Lydall, Inc., 159 F.3d 534, 546 (Fed. Cir. 1998) (listing

Graham factors and warning that there "must" be a suggestion or motivation to look to particular information, select particular elements, and combine them in the way the inventors did).

In fact, despite the representation by Microsoft's counsel that it intended to use DX 37 on obviousness only, see supra, Microsoft nonetheless presented testimony that DX 37 contains *each element* of the '906 invention, and thus anticipates that invention. Tr. at 2636 (Microsoft's counsel asserting that as to DX 37, there are no missing elements). *Dr. Kelly, Microsoft's technical expert testified unequivocally that he believed that the '906 patent was invalid because of anticipation – i.e., that each element of the invention was found in the prior art.* Tr. at 2834. Therefore, the evidence presented by Dr. Kelly was that Viola "teaches" each element of claim 6 of the '906 invention. Tr. at 2711-32. In other words, Microsoft's invalidity case was presented as one of anticipation — it asserted that DX 37 was missing no element of the '906 invention. Tr. at 2636; Tr. at 2711-12; Tr. at 2742.

Now, Microsoft seeks to transform its failed anticipation theory into an obviousness case. However, it is not sufficient to argue obviousness by asserting in conclusory fashion as Microsoft does here and did to the jury, MS Br. at 36; Tr. at 2711-32, that one examining the vast Viola code in DX 37 and its comments could understand how it could be altered and modified to meet all elements of the '906 invention. Graham, 383 U.S. at 17-18; Panduit, 810 F.2d at 1566.

Microsoft argues that Dr. Kelly's testimony allows for an obviousness finding because it explains "how with DX 37 one could have seen the solution to the problems that are solved by the '906 patent." MS Br. at 35. Dr. Kelly's testimony does no such thing. For example, Dr. Kelly's attempt to claim that DX 37 meets the claim element requiring its use in a distributed hypermedia environment through the simple fixing of bugs does not render the invention obvious. Dr. Kelly

testified that the comments in DX 37 show that it was intended to be used on the World Wide Web. Tr. at 2718-21; 2754-57. He then testifies that DX 37 renders the '906 invention obvious because one of ordinary skill in the art would have been able to fix the "bugs" in DX 37 to allow it to be used in a distributed hypermedia network environment. Tr. at 2719; Tr. at 2748-57.

Simply asserting that the comments suggest that one fix bugs does not mean that it would have been obvious how to fix them — particularly when Dr. Kelly has testified that the code contains each element. Thus, Dr. Kelly's testimony about this "teaching" falls far short of evidence as to how a person of ordinary skill would have discovered the lines of the code which would need to be modified in order to enable the asserted plotting demo to work in a distributed hypermedia network environment. Tr. at 2722. Neither Microsoft itself, Mr. Wei nor Dr. Kelly found the bugs in DX 37 until Plaintiffs pointed them out. Tr. at 2438-41; Tr. at 2838-39. Nor could they do it at trial, as discussed, supra. Indeed, the testimony demonstrates that it was in fact *not obvious* how to do this, because DX 37 was never fixed to solve the problem. Mr. Wei admitted that DX 37 was never used over a network. Tr. at 2443-47. Mr. Wei, Mr. Dougherty, and Mr. Silvey, as Dr. Kelly acknowledged, did not testify that DX 37 was ever used over a distributed hypermedia environment. Tr. at 2841; see also Tr. at 2288; 2424; 2478; 2485. For this reason, DX 37 was *never* demonstrated to the jury on a network. In fact, Microsoft could only attempt a demonstration of DX 37 if it made extensive server-side modifications, Tr. at 2369, and even with these changes the demonstration still failed. Tr. at 2272-74; Tr. at 2355-56. Therefore, the only demonstration Microsoft ran was on a standalone computer. Tr. at 2742-43.

This is not an obviousness case. The obviousness determination is a disciplined endeavor – not to be undertaken in ignorance of the guideposts in Graham and Panduit – for it often entices

the factfinder onto the forbidden path of hindsight. "'Determination of obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention.'" Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1376 (Fed. Cir. 2002) (quoting ATD Corp. v. Lydall, Inc., 159 F.3d 534, 546 (Fed. Cir. 1998)). This protection against hindsight is particularly important because there is "'a general rule that combination claims can consist of combinations of old elements as well as new elements,' Clearstream Wastewater Sys. v. Hydro-Action, Inc., 206 F.3d 1440, 1446 (Fed. Cir. 2000), '[t]he notion...that combination claims can be declared invalid merely upon finding similar elements in separate prior patents would necessarily destroy virtually all patents and cannot be the law under the statute, § 103.'" Ruiz v. A.B. Chance Co., 234 F.3d 654, 665 (Fed. Cir. 2000) (quoting Panduit Corp., 810 F.2d at 1575).

> '[V]irtually all [inventions] are combinations of old elements.' Therefore, an examiner [or accused infringer] may often find every element of a claimed invention in the prior art. If identification of each claimed element in the prior art were sufficient to negate patentability, very few patents would ever issue. Furthermore, rejecting patents solely by finding prior art corollaries for the claimed elements would permit an examiner [or accused infringer] to use the claimed invention itself as a blueprint for piecing together elements in the prior art to defeat the patentability of the claimed invention.
> . . . .
> . . . To counter this potential weakness in the obviousness construct, the suggestion to combine requirement stands as a critical safeguard against hindsight analysis and rote application of the legal test for obviousness.

Yamanouchi Pharm. Co., Ltd. v. Danbury Pharm., Inc., 231 F.3d 1339, 1343 (Fed. Cir. 2000) (quoting In re Rouffet, 149 F.3d 1350, 1357-58 (Fed. Cir. 1998) internal citations omitted).

Because Microsoft did not present a proper obviousness case, it provided no guidance to the jury on the elements of a proper obviousness analysis. Thus, the Court's determination was correct. Tr. at 3048-49.

Nor does the testimony of David Raggett and the exhibits regarding the draft HTML+ specification constitute an obviousness case. MS Br. at 36. In the middle of trial, Microsoft announced that it was going to present an obviousness case combining DX 37 with DX 27 and DX 167. Tr. at 2626-2631. However, Microsoft never presented any evidence on what elements of the '906 invention were missing from these references, and what gaps these references fill. In fact, afterward counsel withdrew a Raggett combination. To the extent Microsoft is now arguing that it should have been allowed to take to the jury a combination of Viola with the HTML+ draft specification, it did not suggest that such a combination go to the jury beyond that isolated announcement, never presented any evidence on this combination, and failed to present any evidence required for an obviousness determination under Graham and Panduit for this combination.[16] Microsoft implicitly acknowledges this by arguing that nonetheless the jury could have concluded from this evidence that "the claimed subject matter as a whole would have been obvious." MS. Br at 36. This is not the legal standard. At the most, the evidence Microsoft presented could have demonstrated that others knew of the *need* for a solution to a problem. This is not evidence that the *solution* to the problem provided by the '906 invention was obvious. Without evidence that conforms to the Graham and Panduit standards, the jury would have been without guidance – the guidance that the Federal Circuit has mandated must be evaluated.

As a result, this Court properly granted JMOL on obviousness. Microsoft's current attempt to resurrect its obviousness case should be rejected.

---

[16] Nor could Microsoft, all of the testimony at trial established that the EMBED tag contemplated by the HTML+ specification only supported static images and not interactivity. Tr. at 779-83; 1176-78. Even Mr. Raggett testified that the HTML+ specification was for "static formats." Id. at 1877 and 1879. The sum total of Dr. Kelly's testimony on this topic was to opine that the draft HTML+ specification demonstrated the state of the art. Tr. at 2761-62.

## C. The Court Properly Excluded Other Viola "Evidence"

### 1. DX 34 was properly excluded as a matter of law.

The May 12, 1993 Viola code (DX 34) was properly excluded during trial and is not a basis for granting JMOL or a new trial. During Mr. Wei's voir dire, Microsoft failed to prove, by clear and convincing evidence, that DX 34 was not abandoned, suppressed or concealed. See Apotex USA, Inc. v. Merck & Co., Inc., 254 F.3d 1031, 1036 (Fed. Cir. 2001). This rule is inherent in the concept of anticipation:

> Even though there is no explicit disclosure requirement in § 102(g), the spirit and policy of the patent laws encourage an inventor to take steps to ensure that "the public has gained knowledge of the invention which will insure its preservation in the public domain" or else run the risk of being dominated by the patent of another.

Id. at 1038 (quoting Palmer v. Dudzik, 481 F.2d 1377, 1387 (CCPA 1973)).

It is uncontroverted that DX 34 was the subject of no more than a single private demonstration on May 7, 1993, to two Sun Microsystems engineers. Tr. at 2334. Although Mr. Wei claimed to have demonstrated the May 12, 1993 source code to engineers from Sun Microsystems, the Sun engineers never saw and were never given access to the code of the demonstration. Tr. at 2325; 2284. In fact, Mr. Wei testified that DX 34 was never distributed at all to anyone. Tr. at 2328. Mr. Wei's testimony confirmed that DX 34 was actually altered in material respects by May 27, 1993. Tr. at 2282-83; 2322-27. Because Plaintiffs satisfied their burden of production of evidence that Mr. Wei abandoned, suppressed or concealed his allegedly prior invention, it was Microsoft's burden to rebut that proof by clear and convincing evidence. Apotex USA, Inc., 254 F.3d at 1038. Microsoft, however, did not come forth with any evidence that the May 12, 1993 version of Viola

was not abandoned, suppressed or concealed. Accordingly, the May 12, 1993 version of Viola in DTX 34 cannot serve as the basis of an invalidity defense under 35 U.S.C. § 102(g).

The Court also correctly determined that DX 34 did not qualify as section102(b) prior art as a matter of law. See Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 549 (Fed. Cir. 1990) (whether a "public use" has occurred is a question of law). Microsoft was required to show that the May 12, 1993 source code was in "public use" by clear and convincing evidence. Id. However, it was undisputed that DX 34, which was never distributed – even to the two Sun engineers at the single private demonstration – was not in public use.

Microsoft's citation to Netscape Communications Corp. v. Konrad, 295 F.3d 1315 (Fed. Cir. 2002), does not require a finding of § 102(b) "public use" for DX 34. The Netscape case involved a violation of the § 102(b) public use bar by the patentholder rather than an alleged prior inventor. The "public" requirement of the "public use" is more significant when involving actions by a third party rather than the patentee. Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("[W]hen an asserted prior use is not that of the applicant, § 102(b) is not a bar when that prior use or knowledge is not available to the public."); W.L. Gore & Assoc. v. Garlock, 721 F.2d 1540, 1549 (Fed. Cir. 1983) ("As between a prior inventor who benefits from a process by selling its product but suppresses, conceals, or otherwise keeps the process from the public, and a later inventor who promptly files a patent application from which the public will gain a disclosure of the process, the law favors the latter."). The policy goals underlying §102(b) support this distinction. "The public use bar serves the policies of the patent system, for it encourages prompt filing of patent applications after inventions have been completed and publicly used, and sets an outer limit to the term of exclusivity." Netscape Communications Corp., 295 F.3d at 1320 (quoting

Allied Colloids v. American Cyanamid Co., 64 F.3d 1570, 1574 (Fed. Cir. 1995)).  Accordingly, § 102(b) is concerned with encouraging the prompt filing of patent applications and "discouraging the removal of inventions from the public domain which the public justifiably comes to believe are freely removable." Manville Sales Corp., 917 F.2d at 550.

In light of these policy reasons, Microsoft's total reliance on the lack of a confidentiality obligation on the Sun engineers does not require finding that the use was "public" under § 102(b). In fact, Microsoft's own cited cases recognize that "[i]n considering whether a particular use was a public use within the meaning of § 102(b), we consider the totality of the circumstances in conjunction with the policies underlying the public use bar." Baxter Int'l, Inc. v. Cobe Labs., Inc., 88 F.3d 1054, 1058 (Fed. Cir. 1996).  The policy reasons for section102(b) are simply not furthered by finding that DX 34, which was the subject of at most a single private demonstration and never provided to anyone, constituted public use under 102(b).

In addition, the Court's ruling was informed by the Court's assessment of Mr. Wei's credibility, Tr. at 2378-79; 2391-94; 2401; 2404-05, an issue that the Court is particularly well situated to analyze. Refac Int'l v. Lotus Dev. Corp., 81 F.3d 1576, 1582 (Fed. Cir. 1996).

In any event, DX 34 could not anticipate the '906 patent under any provision of § 102 because the evidence at trial showed that DX 34 lacked the essential attribute of being suitable for use in a distributed hypermedia network environment. See Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1346 (Fed. Cir. 2000) (noting that "a prior art reference must disclose each and every limitation of the claim invention" to anticipate).  It is undisputed that the demonstration to the Sun engineers took place on a single machine. Tr. at 2334.  Indeed, Mr. Wei testified that the DX 34 code was never used in any way where plot.v (the executable application) and testplot.hmml (the

hypermedia document), were resident on another machine from the Viola browser. Tr. at 2334. Rather, the evidence showed that DX 34 was not enabled for use with the Internet with respect to the asserted prior art features without substantive changes to the source code. No witness proffered by Microsoft identified any specific distributed hypermedia network environment for which DX 34 was so enabled.

Finally, Microsoft's post-trial complaints for JMOL or a new trial based on the exclusion of DX 34 stand in stark contrast to Microsoft's previous concession that its exclusion was of no consequence in light of the arguments Microsoft was making about DX 37. Microsoft's counsel represented that DX 34 and DX 37 were "not different in any material respect." Tr. at 2138; see also Tr. at 2312-13. As a result, since Microsoft claimed that DX 37 was sufficient for invalidity purposes, then there was no error in excluding DX 34. See Munoz v. Strahm Farms, Inc., 69 F.3d 501, 504 (Fed. Cir. 1995) (noting that error is harmless unless correction of the error would have yielded a different result). Microsoft's reliance on DX 37 does not warrant JMOL or a new trial based on the exclusion of DX 34.

### 2. The Court properly excluded the e-mails and Web postings not involving Dr. Doyle.

Evidentiary decisions, including whether to exclude certain evidence, are within the discretion of the trial court. See Kearns v. Chrysler Corp., 32 F.3d 1541, 1547 (Fed. Cir. 1994) ("The decision to admit or exclude evidence is within the sound discretion of the trial court and will be reversed on appeal only for clear abuse of that discretion."); accord Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1018 (7th Cir. 2000). In light of Mr. Wei's testimony and the documentary evidence, the Court correctly determined under Fed. R. Evid. 403 that certain e-mails Microsoft

sought to admit – DXs 15, 22, 24, 26, 69, 73, 84 and 93 – should be excluded. See Glaros v. H.H. Robertson Co., 797 F.2d 1564, 1573 (Fed. Cir. 1986) (upholding district court's exclusion of evidence under Rule 403 and stating that "[t]rial courts have the right and duty to manage proceedings before them to insure both expedition and fairness, and must be granted a wide discretion in carrying out that duty").

None of the grounds advanced by Microsoft for admission of these e-mails at trial are supported by either the law or the record evidence. The substance of e-mails DXs 15, 22 and 24 only show a general idea by Mr. Wei in 1991 and February of 1993 that is not tied to the specific Viola prior art asserted in this case from May of 1993 (DX 34 or DX 37). Contrary to Microsoft's claims, simply possessing an "idea" is insufficient for conception. Conception requires "the formation in the mind of the inventor[] of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." Singh v. Brake, 222 F.3d 1362, 1367 (Fed. Cir. 2000) (internal quotation marks and citation omitted). The idea must be definite and permanent in the sense that it involves a specific approach to the particular problem at hand. Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1228 (Fed. Cir. 1994) ("An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue."). The Court recognized that, as a matter of law, the e-mails did not meet the standard for conception, let alone corroborate conception or reduction to practice. Tr. at 2372-73. Indeed, any such corroboration would be unwarranted given that the alleged code referenced in *any* of the e-mails at issue was never produced during the case or at trial.

Moreover, DXs 69, 73, 84 and 93 all relate to versions of Viola in 1994 or later and cannot corroborate the alleged Viola prior art code from May of 1993. Due to the irrelevant nature of these

e-mails, it was well within the Court's discretion to exclude them and Microsoft was not prejudiced by this exclusion. Glaros, 797 F.2d at 1573. See also Kolmes v. World Fibers Corp., 107 F.3d 1534, 1542 (Fed. Cir. 1997) (finding that exclusion of evidence offered to show invalidity under § 102(g) did not prejudice defendant's substantial rights).

Not only do the e-mails fail for corroboration purposes, the e-mails themselves are not prior art as Microsoft claims. They are not enabling in that they do not disclose each limitation of the claimed invention sufficient to have placed it in possession of a person of ordinary skill in the field of the invention. Heliflix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1346-47 (Fed. Cir. 2000). Significantly, none of these e-mails constitute the asserted prior art upon which Dr. Kelly relied. In fact, DXs 69, 73 and 89, which disclose Mr. Wei's use of a LINK tag in 1994, cannot be tied to any of the specific pieces of prior art using the VOBJF tag (DX 34 or DX 37), which Mr. Wei testified was different from the LINK tag and was abandoned after January of 1994. Tr. at 2319-21. Additionally, DX 93 *post-dates* the '906 invention and cannot be considered prior art.

Finally, these e-mails, specifically DX 26, are also not relevant to corroboration for the Sun demonstration and were properly excluded. Plaintiffs do not contest that employees of Sun saw a demonstration by Mr. Wei; rather, Plaintiffs take issue with using DX 26 to corroborate Mr. Wei's conception and reduction to practice claims. The contents of DX 26, where Mr. Wei simply informs his supervisor that he will be giving a demonstration to someone from Sun, sheds no light on the content of the code that was demonstrated or how it was demonstrated. As a result, DX 26 was also appropriately excluded for utterly lacking any probative value.

### 3. The Court properly excluded the e-mail communications about ViolaWWW involving Dr. Doyle.

The Court appropriately exercised its discretion in determining that the e-mails' probative value for validity purposes was substantially outweighed by the danger of unfair prejudice under Fed. R. Civ. P. 403. See Aliotta v. Nat'l R.R. Passenger Corp., 315 F.3d 756, 764 (7th Cir. 2003) ("In weighing the probative against the prejudicial [under Rule 403], the discretion of the district court is broad."). In fact, Microsoft's post-trial arguments that Plaintiffs would not have been unfairly prejudiced by presenting these e-mails to the jury stand in stark contrast to how Microsoft actually intended to characterize these e-mails during trial. Because Microsoft did not heed the Court's admonition that Microsoft could not use the e-mails to argue that Dr. Doyle should have disclosed ViolaWWW to the PTO, the Court properly precluded Microsoft from using the e-mails during the jury trial. At the July 3 hearing, the Court advised Microsoft that "I will not permit you to beat Dr. Doyle over the head with the proposition that he didn't disclose it to the patent office." 7/3/03 Tr. at 40. Microsoft's counsel assured the Court that Microsoft had "no intent of doing that." Id. at 42. Relying on this representation, the Court then ruled that during the jury trial Microsoft could use DXs 98, 107 and 136 identified in its motion to clarify.[17]

Two days before the beginning of trial when opening statement exhibits were exchanged, it was clear that Microsoft was attempting to use the e-mails to place evidence relevant only to the issue of inequitable conduct before the jury. See Ex. B. As a result, Plaintiffs challenged the use of both the demonstratives and the incorporated e-mails at a hearing on July 8. Tr. at 129. The

---

[17]     Although Microsoft says that it brought five e-mails to the attention of the Court in its motion to clarify, MS Br. at 40, Microsoft actually only identified four e-mails (DXs 98, 107, 136 and 126) and also the '906 file history.

Court sustained Plaintiffs' objection on two grounds: first, that Dr. Doyle's statements in the e-mails did not constitute admissions that Viola was prior art, and second, that "virtually all of the rest of the probative force" of the e-mails went to inequitable conduct. Tr. at 149. Indeed, even Microsoft's counsel conceded that "[t]here's no question but that this is highly probative evidence on inequitable conduct." Tr. at 147. This was well within the Court's discretion to determine that the e-mails' probative value for validity purposes was substantially outweighed by the danger of unfair prejudice under Rule 403. Aliotta, 315 F.3d at 764. The Court's proper use of its discretion precludes the grant of JMOL or a new trial.

## IV.  THE '906 INVENTORS DID NOT COMMIT INEQUITABLE CONDUCT; THE COURT PROPERLY REJECTED MICROSOFT'S INEQUITABLE CONDUCT CLAIMS

### A.  The Evidence Does Not Support Inequitable Conduct; Microsoft Failed To Satisfy Its Burden For JMOL Or For A New Trial

Evidence produced and elicited during trial established the lack of inequitable conduct. As a result, Microsoft failed to prove this alleged inequitable conduct by clear and convincing evidence.

Microsoft now moves for JMOL or a new trial. Microsoft's motion simply asks the Court to reconsider its ruling, and incorporates Microsoft's brief and proposed findings of fact by reference. MS Br. at 41-42. However, as set forth in Plaintiffs' Post-Trial Brief on Microsoft's Inequitable Conduct Claims (dated August 22, 2003) and Plaintiffs' Proposed Findings of Fact on Microsoft's Inequitable Conduct Claims (dated August 22, 2003), incorporated herein by reference, the Court's ruling was proper. Accordingly, Microsoft's motion is without basis and should be denied. See McRoberts Software, 329 F.3d at 564 (noting JMOL appropriate only "where there can be but one

conclusion from the evidence"); Billy-Bob Teeth, 329 F.3d at 591 (noting that to prevail on motion for a new trial a party must prove that the verdict is "against the manifest weight of the evidence").

In sum, Microsoft did not meet its burden of showing either materiality or intent by clear and convincing evidence.[18] First, it is undisputed that Dr. Doyle never had any of the Viola prior art asserted in this case. 8/15/03 Tr. at 241-42. Nor could he have found it, because Mr. Wei took specific steps to keep it from the public. Tr. at 2468. Second, *no* expert testified that the sparse Viola information that Dr. Doyle had was, in fact, prior art, material to the prosecution of the '906 patent, or otherwise pertinent to the '906 prosecution. Third, under Federal Circuit case law, uncorroborated and general claims of inventorship which lack any specificity are not material under § 102(g). See Life Techs. v. Clontech Labs., 224 F.3d 1320, 1326-27 (Fed. Cir. 2000). Fourth, Microsoft has proffered no clear and convincing evidence of any deceptive intent by Dr. Doyle. In fact, the record establishes that he affirmatively looked for Viola information in both 1994 and 1998. Finally, Dr. Doyle's belief that the Viola information he did find was not pertinent to the '906 prosecution has been unchallenged by any Microsoft witness proffered in this case.

For all these reasons, Microsoft does not – and cannot – satisfy its heavy burden at this post-trial stage by simply repeating that which has already been argued and rejected. As a result, Microsoft's request for JMOL or a new trial should be rejected.

---

[18]     The determination of inequitable conduct requires a two step analysis. Threshold levels of materiality and intent must be found, then, if these thresholds are satisfied the court balances materiality and intent to determine "whether the equities warrant the conclusion that inequitable conduct occurred." Semiconductor Energy Lab. v. Samsung Elec., 204 F.3d 1368, 1373 (Fed. Cir. 2000).

## B. The Court's Rejection of Microsoft's Inequitable Conduct Claim Based on HTML+ Does Not Warrant a New Trial

Microsoft misses the mark in arguing that a new trial is required because the Court did not address Microsoft's contentions based on HTML+ in its Ruling on the Defense of Inequitable Conduct. MS Br. at 42. The Court's ruling did not address HTML+ because the Court ruled *separately* that Microsoft's motion to amend its counterclaim to assert inequitable conduct based on HTML+ was untimely. Sept. 4, 2003 Minute Order.[19] See also Daugherity v. Taylor Brothers, Inc., 970 F.2d 348, 351 (7th Cir. 1992) (holding that granting leave to amend is improper when there is undue delay in seeking amendment). This procedural barrier to Microsoft's HTML+ claims does not meet the basis for granting a new inequitable conduct trial under Rule 59. See David v. Caterpillar, Inc., 324 F.3d 851, 863 (7th Cir. 2003) ("A new trial may be granted if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party."). As discussed in Plaintiffs' Opposition to Microsoft's Motion to Amend its Counterclaim Pursuant to Fed. R. Civ. P. 15 (dated August 13, 2003), incorporated herein by reference, there was no unfairness in the Court's denial of Microsoft's Motion to Amend because it was untimely.

In any event, Microsoft still fails to provide any reason for granting a new trial for inequitable conduct based on HTML+, thus, the Court's failure to address Microsoft's arguments based on HTML+ in its Ruling on the Defense of Inequitable Conduct is not error. See Munoz, 69 F.3d at 504 ("The correction of an error must yield a different result in order for that error to have been harmful and thus prejudice a substantial right of a party."). As set forth in Plaintiffs' Brief to

---

[19] Microsoft failed to make a motion to amend its counterclaim based on HTML+ until after the jury verdict was returned in this case. See Microsoft's Motion to Amend its Counterclaim Pursuant to Fed. R. Civ. P. 15, filed Aug. 12, 2003.

Exclude the HTML+ Specification as a Basis for Inequitable Conduct (dated July 23, 2003), Plaintiffs' Post-Trial Brief on Microsoft's Inequitable Conduct Claims (dated August 22, 2003) and Plaintiffs' Proposed Findings of Fact on Microsoft's Inequitable Conduct Claims (dated August 22, 2003), Microsoft's arguments on HTML+ are futile and would not have yielded a different result.

In sum, contrary to Microsoft's conclusory argument that the HTML+ specification was material, MS Br. at 43, the evidence at trial established that the functionality of the '906 inventors' EMBED tag lacked any similarity to Dave Raggett's EMBED tag with exception of the name "EMBED." The evidence showed that the HTML+ "EMBED" tag proposed in the July 1993 draft of the HTML+ specification by Dave Raggett only contemplated placing a static image, such as a mathematical equation, within a Web page, and was subsequently dropped for technical reasons and never implemented. PX 79 at E 022551; PX 752; DX 836; Tr. at 779-83; Tr. at 1176-78; Tr. at 1877, 1879; 8/15/03 Tr. at 174. In addition, the '906 inventors' communications with Mr. Raggett clearly showed that they were not intended to use the HTML+ "EMBED" tag, but instead "[o]ur implementation of EMBED, as documented in our paper 'Integrated Control of Distributed Volume Visualization through the World-Wide-Web.'" DX 836 at DM 000103. See also Tr. at 770 (Mr. Martin's testimony that the inventors did not implement what Mr. Raggett was discussing in the HTML+ specification). Microsoft's suggestion that Dr. Doyle and Mr. Martin engaged in inequitable conduct by falsely claiming that they first invented the tag using the word "EMBED," when the evidence at trial established that *any* sequence of letters could be used for the '906 invention, Tr. at 278-79 and 359-60, is not supported by the record and does not require a new trial.

In light of the overwhelming evidence at trial showing the dissimilarity of Mr. Raggett's

EMBED tag, as well as the '906 inventors' good faith in their representations to the PTO, no basis

exists for granting a new trial on inequitable conduct because of the HTML+ specification.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant

Microsoft's Motion for Judgment as a Matter of Law and a New Trial.

Dated: November 1, 2003            By: _Mn R. M_____

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
Martin R. Lueck  (MN Bar No. 155548)
Jan M. Conlin  (MN Bar No. 192697)
Richard M. Martinez   (MN Bar No. 225411)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

AND

**KEEGAN, LATERZA, LOFGREN & GLEASON**

Thomas B. Keegan (IL Bar No. 6196077)
Edward W. Gleason (IL Bar No. 6204438)

566 West Adams Street
Suite 750
Chicago, IL 60661
(312) 655-0200

**ATTORNEYS FOR PLAINTIFFS EOLAS
TECHNOLOGIES INCORPORATED AND
THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA**