# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 626 | **DATE** | 1/14/2004 |
| **CASE TITLE** | EOLAS TECHNOLOGIES vs. MICROSOFT | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Motion (503-1 and 503-2) for new trial or, in the alternative for remittitur is denied. Motion (504-1 and 504-2) for judgment as a matter of law and for a new trial is denied. Motion (505-1) to exclude foreign sales is denied. Motion (526-1 and 527-1 to stay entry of judgment and all further proceedings is denied. Plaintiff's request for injunction is granted. Plaintiff's request for for a determination of prejudgment interest is granted. Plaintiff's request for an equitable accounting is granted. Enter memorandum opinion and order consolidated rulings on post-trial motions.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JAN 15 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| DW | courtroom deputy's initials | '04 JAN 14 PM 6:24 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EOLAS TECHOLOGIES INCORPORATED, <br><br> and <br><br> THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> MICROSOFT CORPORATION, <br><br> Defendant. | No. 99 C 0626 <br> Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

## CONSOLIDATED RULINGS ON POST-TRIAL MOTIONS

Post Trial Motions of Microsoft

1. Judgment As a Matter of Law and For a New Trial

This motion rehearses a series of arguments that failed the first time around. The papers before me are, for the greatest part, a re-briefing of what has already been thoroughly argued and, in my view, correctly decided. The primary purpose of this motion is to avoid claims of waiver if the judgment is appealed, and it will be another court that decides whether this purpose has been


DOCKETED
JAN 1 5 2004
1

achieved.[1] The secondary purpose of this motion is to cite decisions not available at the time of the original claim construction with the hope that a change in law means a change in result.

That being said, I must review this motion and apply the widely held standards for JMOL and a new trial. JMOL is appropriate "where there can be but one conclusion from the evidence." *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 564 (7th Cir. 2003)(citation omitted). When reviewing a motion for JMOL, I must consider "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Goodwin v. MTD Prods.*, 232 F.3d 600, 606 (7th Cir. 2000)(citations omitted). A new trial is appropriate where the verdict is "against the manifest weight of the evidence." *Billy-Bob Teeth, v. Novelty, Inc.* 329 F.3d 586, 591 (7th Cir. 2003). I may not overturn a jury's verdict so long as it has a "reasonable basis in the record." *Westchester Fire Ins. Co. v. General Star Indem. Co.*, 183 F.3d 578, 582 (7th Cir. 1999).

As is demonstrated by the standards above, our judicial practice requires a high level of deference to the findings of a jury. These standards place a heavy burden on moving parties, like

---

[1] There is some protest in Eolas's response that Microsoft is arguing points that are waived. Eolas asserts that Microsoft abandoned its contention that the executable application had to be present on the client workstation before the browser parses the embed text format, that Microsoft failed to object to aspects of the instruction covering display of the object and that Microsoft waived its objection to instructions about "heavy lifting" referring to the use of resources outside the browser. Eolas may be correct, but waiver of objections to instructions that correctly embody the rulings on claim construction may not always serve as a waiver of appellate objections to the claim construction itself, so long as those objections were clearly stated during the claim construction hearing. I say "may be correct" because I have not reached a decision on the question of waiver. I have relied on the alternative ground that my rulings are correct. A reviewing court is, of course, free to decide the question of waiver and rely on that should it see fit to do so.

Microsoft. Despite Microsoft's best arguments, I adhere to my prior evidentiary rulings and my decisions excluding certain defenses from the case submitted to the jury, and I find there has been no material change in the law that would support another outcome in this case.

Finally, in asking for a new trial, Microsoft argues that there were errors in jury instructions concerning inducement of infringement. Given the whole set of instructions, I can not see how any jury could find Microsoft liable without first determining that Microsoft actively induced infringement. Accordingly, I do not perceive any error in the jury instructions.

2. New Trial with Respect to Damages or, in the Alternative, for Remittitur

The amount of damages based on a reasonable royalty is an issue of fact, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003), over which the jury has a great amount of discretion, *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 756 (7th Cir. 2002). The damages awarded by this jury are, in absolute terms, very large. However, one could argue that, in relative terms, that $1.47 is a relatively modest portion of a $60.00 selling price but relative terms are relative terms. I am unwilling to say that roughly 2.5% of $60.00 is either modest or immodest. In my view, the amount is not so huge in relative or absolute terms that the law will not countenance it, so I do not base any part of my decision on the size of the award *per se*. *See State Farm Mut. Auto. Ins. Co., v. Campbell*, 123 S. Ct. 1513 (U.S. 2003).

Microsoft argues against the validity of any damage calculation wherein the value of a complex, multi-functional product is the base from which a percentage is extracted–the percentage being the commercial value of a single infringing functionality. Microsoft has an institutional concern over such calculations because, as is widely known, it bundles together all

of its Windows functionality as seamlessly as it can. It argues that this bundling is good engineering; others argue that it has a more nefarious purpose. Whatever the truth, the bundling makes it very difficult for either party to assess the value of each individual component.[2] Since Microsoft has created this difficulty for itself, it must bear the legal risks attendant to its way of business. At times, Microsoft's arguments seemed to border on proposing that an infringer could wrap together, in a single product, 150 technological innovations without having to any pay a cent in royalties so long as each innovation contributed only a small part of the product's overall value and was not itself a standalone product. But, few would be willing to adopt this position explicitly.

Microsoft seems to propose, in the alternative, that even if it must bear the consequences of its bundling policy, a jury should not be invited to determine the percentage of Windows or Internet Explorer's value that is attributable to Eolas's invention. In short, Microsoft argues that, for damages to be appropriate, the accused technology must contribute in some meaningful way to consumer demand for Windows or Internet Explorer. Here, Microsoft claims Eolas has failed to show that its invention made a meaningful contribution and, thus, is not entitled to damages. Microsoft's experts made this point by arguing that automatic invocation of an application saved only a mouse click or two and could not be regarded as a meaningful addition to Windows. Certainly, this argument has some force. The jury may have accepted this argument as it did assess a royalty rate far below the one asked for by Eolas. In the end, even Microsoft's own experts did not really declare that Eolas's invention was of no value to Windows or Internet

---

[2] Even Microsoft's own expert had difficulty speaking in explicit terms about the correct measure of damages.

Explorer. At trial, sufficient evidence was presented from which the jury could infer that Microsoft itself saw significant value in the functionality at issue.

Microsoft's final arguments are that the jury's verdict makes no sense in light of the royalty paid to Spyglass for a license to use an entire browser technology, that the royalty far exceeds the amount of money Microsoft invests in its annual research budget, that Microsoft could have achieved the same functionality in a different way and that Eolas could not sell the technology on its own. These arguments too are not without force but have already been considered and rejected by the jury.

While I am not entirely comfortable with the large size of the judgment, it is not my comfort which matters. *See Oiness v. Walgreen Co.* 88 F.3d 1025 (Fed. Cir. 1996). Both sides presented complex chains of evidence that could have supported a significantly higher or significantly lower value than the one that appeared on the verdict. Exactitude is difficult in all damage cases, and it was made far more difficul here by the way Microsoft sells Windows. However, it was not outside the ability of a jury to make a rational judgment. The jury, to whom the decision was submitted, conscientiously reached a verdict as to the running royalty that was within the realm of reason.

3. Motion to Exclude Foreign Sales

Microsoft has moved for judgment as a matter of law of noninfringement with respect to products made and sold outside the United States and argues that, in light of new Federal Circuit precedent, I must reconsider and reverse my earlier decision in *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99 C 626, 2003 U.S. Dist. LEXIS 13482 (N.D. Ill. Aug. 1, 2003). In that decision, I

found infringement damages could be awarded, pursuant to 35 U.S.C. Section 271, for units of Windows with Internet Explorer produced and sold outside the United States. The relevant portions of that opinion are reproduced below.

> Section 271(f) prohibits manufacturing all or a substantial part of the significant components of a patented invention here and then having those components assembled abroad. This law was Congress's disapproval of the ruling of *Deepsouth Packing*.
>
> The intellectual property at issue in this case, namely the Windows source code, is contained on a computer disk, known as the "golden master." Microsoft provides this disk to foreign Original Equipment Manufacturers ("OEMs") pursuant to intellectual property licensing agreements for their use in making and selling abroad computer products containing Windows. According to Microsoft, new units of Windows code are created abroad when the foreign OEMs, for each unit, replicate the Windows code in its manufacturing facility using the single "golden master" and installs these new units of replicated code on a computer useable medium, such as a computer disk or hard drive, which is supplied by the foreign OEM. Microsoft argues that this "golden master" is not a component of the foreign sales products within the meaning of Section 271(f).
>
> The closest cases are *W.R. Grace & Co-Conn v. Intercat, Inc.*, 60 F. Supp. 2d 316, 319-21 (D. Del. 1999) and *Lubrizol Corp. v. Exxon Corp.*, 696 F. Supp. 302, 325 (N.D. Ohio 1988). In these cases the defendants sent chemical products abroad that were combined as supplied with other compounds into compositions that would have infringed had the combination occurred here. Those judges found that there was liability under Section 271(f). Only one of these opinions offered a rationale but both relied on what they, and I, agree is the plain language of the statute.
>
> Microsoft argues that the "golden master" is distinguishable from the chemical products in these cases. It asserts that the disk is analogous to the formula for those chemicals sent abroad, not the chemicals themselves and therefore, the disk is not a component of the allegedly infringing product.
>
> The "golden master" is like a chemical formula in that it is a series of directions (commands) written down so that it can be used again and again. If followed, the formula produces a result which is desired by its user or purchaser.
>
> The "golden master" is unlike a chemical formula because its contents are an operating element of the process which produces the result which is desired by a user or purchaser (like Paranox 300 and Paranox 600 when added to other ingredients made a better oil additive in Lubrizol).

A chemical formula can be memorized (as many complex recipes are) and discarded. The source code has to be installed, never to be discarded.

A philosophical argument can be made that installation of the source code is akin to memorizing it. But I think the recipe memory, of which we speak (in ordinary language) is not what we mean when we speak of computer memory.

The machine does not 'remember'--it holds code and, unlike the human, that is all it does. The result desired by the user of the compound product of the programmable machine (a computer) and Windows code is made from code and hardware together. That which invokes the operation to secure a result (i.e., my finger pushing buttons) and the devices connected to the buttons are, in the important sense here, external to the basic product. So too are the devices which input data. That which displays the machine's output is external in this way.

The devices which start the machine, input data, or display output are essential to the usefulness of the machine to users. Yet if the laptop on which I am writing this opinion had a power button stuck in the on position, a keyboard covered by a solid locked plate, and the screen was dead, but "my laptop" is still there. What is there is the internal hardware and the source code which operates, provides utilities, can browse and execute applications.

This analysis is not metaphysical. It is an analysis of language. It is appropriate because the goal is to find the meaning of ordinary language as it is used by lawyers and judges when deciding whether something is made and, if so, where it is made. Where code is installed on a disk or a hard drive to be put into a programmable machine, I conclude that source code in a computer product like my laptop is, in law, the legal equivalent of a piece of computer hardware and not the legal equivalent of a chemical formula.

In a legal sense, a source code is a made part of a computer product. In contrast, a chemical formula is discovered rather than made, and is not part of any product.

I will not bar plaintiffs from seeking damages for units of Windows with Internet Explorer which are produced and sold outside this country.

Microsoft argues that this decision has been effectively overruled by *Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367 (Fed. Cir. 2003). In *Bayer*, the Federal Circuit found that the process patent at issue did not fall within the parameters of 35 U.S.C. Section 271(g) because it yielded only intangible information and not a physical product. Microsoft claims that the same physical requirement should apply in this case. At the heart of Microsoft's argument is its

7

A chemical formula can be memorized (as many complex recipes are) and discarded. The source code has to be installed, never to be discarded.

A philosophical argument can be made that installation of the source code is akin to memorizing it. But I think the recipe memory, of which we speak (in ordinary language) is not what we mean when we speak of computer memory.

The machine does not 'remember'--it holds code and, unlike the human, that is all it does. The result desired by the user of the compound product of the programmable machine (a computer) and Windows code is made from code and hardware together. That which invokes the operation to secure a result (i.e., my finger pushing buttons) and the devices connected to the buttons are, in the important sense here, external to the basic product. So too are the devices which input data. That which displays the machine's output is external in this way.

The devices which start the machine, input data, or display output are essential to the usefulness of the machine to users. Yet if the laptop on which I am writing this opinion had a power button stuck in the on position, a keyboard covered by a solid locked plate, and the screen was dead, but "my laptop" is still there. What is there is the internal hardware and the source code which operates, provides utilities, can browse and execute applications.

This analysis is not metaphysical. It is an analysis of language. It is appropriate because the goal is to find the meaning of ordinary language as it is used by lawyers and judges when deciding whether something is made and, if so, where it is made. Where code is installed on a disk or a hard drive to be put into a programmable machine, I conclude that source code in a computer product like my laptop is, in law, the legal equivalent of a piece of computer hardware and not the legal equivalent of a chemical formula.

In a legal sense, a source code is a made part of a computer product. In contrast, a chemical formula is discovered rather than made, and is not part of any product.

I will not bar plaintiffs from seeking damages for units of Windows with Internet Explorer which are produced and sold outside this country.

Microsoft argues that this decision has been effectively overruled by *Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367 (Fed. Cir. 2003). In *Bayer*, the Federal Circuit found that the process patent at issue did not fall within the parameters of 35 U.S.C. Section 271(g) because it yielded only intangible information and not a physical product. Microsoft claims that the same physical requirement should apply in this case. At the heart of Microsoft's argument is its

assertion that the source code contained on the "golden master" is merely intangible information. For the reasons laid out in my August 1, 2003 opinion, I disagree. The source code contained on the "golden master" is not intangible information but is instead a real and substantial part of the final product. Because I find that the source code present on the "golden master" is not intangible information, *Bayer* does not affect my decision.

Microsoft also argues that no combination of elements exists that is sufficient to satisfy Section 271(f). For the reasons clearly laid out in my August 1, 2003 opinion, I disagree and find the combination requirement has been met.


4. Motion to Stay Entry of Judgment and *All* Further Proceedings

A Deputy Commissioner of the Patent and Trademark Office has, pursuant to his authority, ordered a reexamination of the '906 patent. The PTO rarely exercises this power, and when it does, it is usually not good news for the patent holder because a high percentage of such reexaminations end in cancellation or amendment. Therefore, Microsoft argues that I ought not to enter judgment until we hear what the PTO has to say. If the '906 patent is cancelled or gutted, the costs of proceeding with appeal are avoided. But, these costs are trivial compared to what has already been spent. The real problem for Microsoft is the decision about what to do with its products before all is said and done by all who can say and do.

If Microsoft chooses to change its products, many third parties will have to change their products so that Microsoft users can gain access. Microsoft itself will incur large costs to make

the change.[3] Additionally, since virtually no new software works right the first time, Microsoft users will likely pay a price as well. If the judgment here does not hold up, all this considerable cost and inconvenience will be for naught.

However, Microsoft does have another less costly alternative to making immediate changes to Windows and Internet Explorer.[4] It can stand fast on its positions of non-infringement and invalidity and minimal damages. What Microsoft risks is payment of royalties if the judgment here stands. Because of its strong financial condition, there is no question that Microsoft will be able to pay those royalties and, thereby, avoid the uncompensated third party costs and inconveniences associated with an unnecessary change.

Staying proceedings until the PTO acts on the reexamination, however, would impose more significant costs on Eolas. It is an entity whose only real asset is the patent. If its patent is finally found to be valid and infringed, it will have waited more than half a decade to be paid. Furthermore, no one has represented that the reexamination would necessarily be a short process.[5] Because of the '906 patent's high profile, I doubt that any prudent re-examiner would

---

[3] It is true that Microsoft sings a little different tune here than it did at trial where it argued that the patented invention even if valid and infringed was not a big deal. However, it lost that point and is now entitled to argue that a change in the technology is a big deal as Eolas has always said it was.

[4] It has this alternative because, for reasons stated elsewhere in this ruling, I stay the effect of injunctive relief until appeal issues are resolved and for a period of weeks thereafter.

[5] One possible reason to believe that the reexamination would not take long is that, according to the Deputy Commissioner for Patent Examination policy, the reexamination was triggered by a "substantial outcry" from the Internet community. The most prominent among the creators of the Web, Sir Timothy Berners- Lee, expressed the view that the PTO had missed clear prior art. Judging from the record before me, it is safe to say that some of the outcry arises from the view of a significant portion of Web experts, including Berners-Lee, that royalties ought not to be paid patented Web innovations. This contingent believes instead that Web invention is for

issue an opinion without an extended and thorough process, which as always will take time. The Deputy Commissioner for Patent Examination Policy signed an order for the reexamination in which he simply said that reexamination was ordered because "in view of the admitted prior art of the '906 patent and the teachings of Berners-Lee, Raggett I, and Raggett II, a substantial new question of patentability is raised." Although I am familiar with both the Raggett references, I still could not predict the time needed for reexamination, particularly since the PTO examines prior art unconstrained by certain presumptions about validity which bind judges like me. In the end, I can only opine that the PTO will not be quick about this and will need some significant measure of time.

There are cases in which courts have stayed ongoing proceedings pending reexamination. However, there is little support, if any, for staying entry of judgment when reexamination is ordered well into the briefing period for post-trial motions. *See Viskase Corp. v. American Nat'l Can Co.*, 261 F.3d 1316 (Fed. Cir. 2001). The reexamination is insufficient to warrant a stay on the entry of judgment and delay of the appeal at this time.

Post Trial Motions of Eolas

1. Motion for Injunction

Eolas seeks to enjoin Microsoft from continuing to use the infringing product or its colorable variations. Ordinarily, a patent holder is entitled to an injunction against unauthorized

---

the good of humanity and not the inventor. If this is the true reason for the reexamination, then I doubt the reexamination will take very long.

10

use of its invention.[6] Microsoft does not argue than an injunction is inappropriate but instead argues that any injunction must be carefully tailored and, in any event, ought to be stayed. The thrust of Microsoft's argument is that its product is in such widespread use that a broad injunction would impose unacceptably high costs on the product's users. These costs will include not only dollars but also other irreparable injuries such as loss of time and interruption of work. Many quite old infringing products are still in wide use today (including the one installed on my computer until fairly recently). Moreover, Web based business will be affected because Web pages may have to be redesigned. The redesign may, in some cases, require upgrades to millions of older Windows systems.

Injunctive relief is equitable and, in this case, where both granting and denying of the injunction will inflict irreparable injury, I must look to the balance of harms between these two parties. To balance harms is to assess the consequences of error and assess who is hurt worse if the court wrongly decides the question of injunction. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003). If I wrongly deny the injunction, Eolas loses some ability to exploit its invention for the next year or two. Since this will coincide with the time period for the appeals and reexamination, I think that Eolas's prospects can, at best, be considered poor. The running royalty Eolas will receive should come quite close to making it whole. This is far less than what Microsoft stands to lose. At a minimum, Microsoft will incur the cost of designing around the patent, testing and manufacturing of the new product, integrating the new product into the

---

[6] Compulsory licensing is possible, but it is not close to first on the list of remedies. Not only is there the presumptive irreparable harm, there is the possibility that Eolas will be precluded from using or licensing its technology to others because of Microsoft's dominance of the browser market. Moreover, Microsoft has said that it can design around the patent and this statement should be taken at its face value against Microsoft even if Eolas may doubt its truth.

11

existing web culture and losing the ability to return to its currently proven technology if the patent ultimately fails.

The cost to users of the infringing product should not, in my view, be put into the balance of harms analysis but rather should be used to determine whether the public interest is served by the issuance of the injunction. An injunction (as opposed to colossal damages) with respect to a product so widely used and deeply integrated into society, as is this one, presents a policy problem. This may be one of those matters (like widespread toxic torts and giant securities frauds) for which we need a maxim like De Maximus Non Curat Lex. The original De Minimus Curat Lex expressed the view that the law should not address trivial matters presumably because the costs, tangible and intangible, exceed the benefits. The new maxim is founded on the recognition that courts may not be able to answer the questions posed by these problematic policy cases. But, these policy problems are not for District Judges to decide. The law seems clear that inventors have a right (outweighed only by public health and safety needs and exercise of the taking power of government) to keep their invention to themselves, to share it with whom they choose or to completely preclude its use. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995). It is the loss of these rights that cause the irreparable injury that can be vindicated only by in injunction, not by damages.

Accordingly, Eolas is entitled to an injunction even if the balance of harms would, in a non-patent case, counsel against injunction and even if the public interest (excluding health and safety) would weigh against it. However, to minimize the harm that a wrongly decided injunction would inflict on Microsoft and on the public, the scope of the injunction should be limited. *See Atlas Powder Co. v. Ireco Chem.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) (While

monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement). The injunction should be carefully crafted to preclude infringement only with respect to future conduct by Microsoft; infringements in the past are to be remedied by damages. The distinction is important here because the infringement occurs many times each day as Windows users display interactive objects embedded in Web pages. These infringements, in my view, belong in the category of past infringements because the device used to infringe was made and sold long before the judgment in this case. The future infringement is limited to new versions of Microsoft's Windows operating system or any major service pack of any existing versions of the Windows operating system containing Internet Explorer that Microsoft releases to manufacturing.[7]

Eolas objects on the grounds that this injunction should not be limited to the specific ways in which Microsoft distributes the accused products but instead should reflect the traditional language which bars "making, using, selling and offering to sell." I do not read the Microsoft language so narrowly. I read "manufacturing" to mean "any entity, including Microsoft itself or its subsidiaries, which manufactures products containing or using the systems released to it by Microsoft." I read the word release to include "sell or offer for sale or use." I regard injunctions written to cover a specific way of doing business to be far more easily enforceable than general form language proposed by Eolas. So Eolas need not fear Microsoft might change its methods of distribution to avoid the force of the injunction, I have included language that will oblige Microsoft to notify Eolas and the Court of any change in its practice that might arguably affect the application of the injunction.

---

[7] These are the words that Microsoft suggests.

monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement). The injunction should be carefully crafted to preclude infringement only with respect to future conduct by Microsoft; infringements in the past are to be remedied by damages. The distinction is important here because the infringement occurs many times each day as Windows users display interactive objects embedded in Web pages. These infringements, in my view, belong in the category of past infringements because the device used to infringe was made and sold long before the judgment in this case. The future infringement is limited to new versions of Microsoft's Windows operating system or any major service pack of any existing versions of the Windows operating system containing Internet Explorer that Microsoft releases to manufacturing.[7]

Eolas objects on the grounds that this injunction should not be limited to the specific ways in which Microsoft distributes the accused products but instead should reflect the traditional language which bars "making, using, selling and offering to sell." I do not read the Microsoft language so narrowly. I read "manufacturing" to mean "any entity, including Microsoft itself or its subsidiaries, which manufactures products containing or using the systems released to it by Microsoft." I read the word release to include "sell or offer for sale or use." I regard injunctions written to cover a specific way of doing business to be far more easily enforceable than general form language proposed by Eolas. So Eolas need not fear Microsoft might change its methods of distribution to avoid the force of the injunction, I have included language that will oblige Microsoft to notify Eolas and the Court of any change in its practice that might arguably affect the application of the injunction.

---

[7] These are the words that Microsoft suggests.

I also agree with Microsoft that a lead time of 17 weeks to devise and release newer non-infringing technology is justified by policy. The line between past and future infringements should not invariably fall on the day that judgment is entered. Given the circumstances of this case, I think infringements occurring within 17 weeks of the effective date of the injunction are reasonable and best treated as past infringements. Finally, given the inability of Eolas to post bond, I stay the effective date of the injunction pending resolution or abandonment of appeal or a decision not to appeal. After the effective date of the injunction, motions to modify the injunction may be made in the normal course for good cause.

2. Motion for a Determination of Prejudgment Interest

Ordinarily, the winner in a case like this gets prejudgment interest. *See General Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1983). What is disputed here is the amount of (not the right to) prejudgment interest to which Eolas is entitled. Eolas wants the prime rate of interest compounded quarterly from the date of infringement, which adds up to about $110 million.[8] Some courts, like the Seventh Circuit, use the prime rate as the default standard, *Gorenstein Enters. v. Quality Care-USA, Inc.*, 874 F.2d 431 (7th Cir. 1989), however, the Federal Circuit does not. *Studiengesellschaft Kohle v. Dart Indus.*, 862 F.2d 1564 (Fed. Cir. 1988).

---

[8] This argument has some force, but it could be wrong if, say in the course of its operations (which might include the cost of this lawsuit), Eolas actually did borrow money at the prime rate and paid that interest. Then prime rate interest would clearly be compensatory. However, Eolas, so far as the record shows, did not borrow and this justification for a prime rate is lost. *See Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed. Cir. 1997). *Laitram* does not require evidence of borrowing to use the prime rate. It simply recognizes that absent borrowing, there is one less reason to use the prime rate.

14

Microsoft asserts, and I agree, that the rate and the method of compounding is left to my sound discretion. The argument against using the prime rate is that the prime rate is designed to compensate for financial risk (albeit the low risk of prime borrowers) associated with the possibility of non-payment by borrowers. Given Microsoft's strong financial position, it presents a risk that is much more like that of federal governments making the Treasury Bill rate more appropriate.[9]

Microsoft also challenges the assumption that it would have been paid its royalties on the first day of the quarter. Since is appears to me that royalty agreements in this business usually provide for payments within a reasonable period after the close of the quarter, I must agree with Microsoft. In fact, Eolas itself has entered into agreements providing for royalty payments sixty days after the close of the quarter. Using the Treasury Bill rate and setting the royalty payment date to a reasonable period after the close of the quarter, I find that the prejudgment interest owed comes to about $45.3 million (See Exhibit E of Creighton Hoffman's Supplemental and Second Supplemental Declarations). In effect, this compensates Eolas for receive royalty payments it would have received four times a year and would have invest in a risk-free instrument. This might not have happened in the real world, but pre-judgment interest calculations are made on the assumption of some logical practice in light of the investment options available when the money arrives.[10]

---

[9] Eolas's own evidence about the financial status of Microsoft establishes the absence of any risk of default greater than that which attaches to treasury bills.

[10] These assumptions can be overridden by showing some established money management practices of the plaintiff enterprise but there was no such showing.

3. Motion for An Equitable Accounting

I grant the motion and will require an accounting after any appeal in this case is terminated. At that time, I will order a hearing to determine the number of units of infringing products sold between October 1, 2001 and the final judgment, the reasonable royalty rate and the prejudgment interest, if any. I will consider at the time of the hearing certain specific defenses and objections that Microsoft has to the period October 1, 2001 through May 31, 2003. Microsoft objected early on to Eolas's proposal that its damage presentation at trial end with the period prior to October 1, 2001. Microsoft said that by doing so, Eolas deprived Microsoft of its right to trial by jury. Microsoft also objects on the grounds that the form and nature of the infringement verdict would render post-trial accounting impermissibly speculative. Eolas has responses to both objections. I decline to rule upon them now and reserve decision until the time for accounting is fixed. Prejudgment interest, if any, will be calculated in the same manner it was calculated for the present damage award.

For the reasons given herein, Mircosoft's motions for Judgment As a Matter of Law and for a New Trial, for a New Trial with Respect to Damages or, in the Alternative, for Remittitur, to Exclude Foreign Sales and to Stay Entry of Judgment and All Further Proceedings are DENIED. Eolas's Motion for Injunctions is GRANTED to the extent consistent with this opinion and, in lieu of a bond, is STAYED pending appeal. Eolas's Motion for Prejudgment Interest is GRANTED. Microsoft is ORDERED to pay Prejudgment Interest in the amount $45,332,588 is awarded in accordance with the method shown in Exhibit E of Creighton. Hoffman's Supplemental and Second Supplemental Declarations. Eolas's Motion for an

Equitable Accounting is GRANTED and will be conducted once the appeals process is completed.


ENTER:

_____
James B. Zagel
United States District Judge

DATE: 14 January 2004