**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EOLAS TECHNOLOGIES INCORPORATED | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | ) | Case No. 99 C 0626 |
| | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT MICROSOFT'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ON INEQUITABLE CONDUCT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND ......................................................................................................2

    I.    DOYLE'S KNOWLEDGE OF THE VIOLAWWW BROWSER DURING THE '906 PATENT PROSECUTION ....................................................................2

    II.    PROCEDURAL HISTORY.................................................................................6

ARGUMENT ...............................................................................................................................7

    I.    LEGAL STANDARDS ......................................................................................7

        A.    Summary Judgment ...............................................................................7

        B.    Inequitable Conduct ..............................................................................8

    II.    PLAINTIFFS CANNOT RELY ON THE NOW-VACATED "FINDINGS" FROM THE 2003 TRIAL ON INEQUITABLE CONDUCT TO SUPPORT THEIR MOTION FOR SUMMARY JUDGMENT.....................10

    III.    PLAINTIFFS' ARGUMENT THAT THERE CAN BE NO INEQUITABLE CONDUCT BECAUSE DOYLE DID NOT HAVE POSSESSION OF THE PRIOR ART IS ERRONEOUS.....................................12

        A.    "Material" Information Is Not Limited to Prior Art..................................12

        B.    Plaintiffs' Argument That the Prior Art Is Limited to DX 34 and DX 37 Is Incorrect .........................................................................14

    IV.    PLAINTIFFS' ARGUMENT THAT THE INFORMATION DOYLE HAD WAS NOT MATERIAL IS UNPERSUASIVE...........................................15

    V.    THERE IS AT LEAST A GENUINE ISSUE OF MATERIAL FACT THAT DOYLE INTENDED TO DECEIVE THE PTO BY NOT DISCLOSING MATERIAL INFORMATION ABOUT THE VIOLA BROWSER. ............................................................................................18

    VI.    PLAINTIFFS' ACTIONS DURING THE REEXAMINATION DID NOT CURE THE INEQUITABLE CONDUCT DURING THE ORIGINAL PROSECUTION. .........................................................................................21

CONCLUSION...........................................................................................................................23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.B. Dick Co. v. Burroughs Corp.*,
   98 F.2d 1392 (Fed. Cir. 1986) ........................................................................9, 21

*Action on Smoking & Health v. Civil Aeronautics Board*,
   13 F.2d 795 (D.C. Cir. 1983) ..............................................................................11

*Akron Polymer Container Corp. v. Exxel Container, Inc.*,
148 F.3d 1380 (Fed. Cir. 1998)....................................................................9, 12, 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................................1, 7

*Application of Clark*,
   522 F.2d 623 (C.C.P.A. 1975) ..............................................................................21

*Baker Oil Tools, Inc. v. Geo Vann, Inc.*,
   828 F.2d 1558 (Fed. Cir. 1987)....................................................................7, 9, 10

*Black & Decker Inc. v. Robert Bosch Tool Corp.*,
   No. 04 C 7955, 2006 WL 2088437 .....................................................................7, 8

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*,
   267 F.3d 1370 (Fed. Cir. 2001)..............................................................................9

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
   326 F.3d 1226 (Fed. Cir. 2003).............................................................................13

*Cargill, Inc. v. Canbra Foods, Ltd.*,
   476 F.3d 1359 (Fed. Cir. 2007).......................................................8, 9, 18, 19, 20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................................7

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
   120 F.3d 1253 (Fed. Cir. 1997)[B]oth ...........................................................12, 20

*Dayco Products, Inc. v. Total Containment, Inc.*,
   329 F.3d 1358 (Fed. Cir. 2003)..............................................................................9

*Digital Control, Inc. v. Charles Machine Works*,
   437 F.3d 1309 (Fed. Cir. 2006)...........................................................................8, 9

*Eaton v. Evans*,
    204 F.3d 1094 (Fed. Cir. 2000) ......................................................................................15

*Eolas Techs. Inc. v. Microsoft Corporation*,
    399 F.3d 1325 (Fed. Cir. 2005) (No. 04-1234) ...................................6, 7, 10, 14

*In re Epstein*,
    32 F.3d 1559 (Fed. Cir. 1994) .............................................................................14, 18

*FMC Corp. v. Manitowoc Co.*,
    835 F.2d 1411 (Fed. Cir. 1987) ....................................................................................17

*Fiskars, Inc. v. Hunt Manufacturing Co.*,
    221 F.3d 1318 (Fed. Cir. 2000) .......................................................................................9

*GFI, Inc. v. Franklin Corp.*,
    265 F.3d 1268 (Fed. Cir. 2001) ....................................................................................13

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) .............................................................................16, 17

*Highway Equip. Co. v. FECO, Ltd.*,
    469 F.3d 1027 (Fed. Cir. 2006) ....................................................................................17

*KangaROOS U.S.A., Inc. v. Caldor, Inc.*,
    778 F.2d 1571 (Fed. Cir. 1985) .....................................................................................8

*Kelso v. U.S. Department of State*,
    13 F. Supp. 2d 12 (D.D.C. 1998) ..................................................................................11

*Leigh v. Engle*,
    669 F. Supp. 1390 (N.D. Ill. 1987) ...............................................................................11

*Lewis v. Whelan*,
    99 F.3d 542 (2d Cir. 1996) ............................................................................................11

*Li Second Family Ltd. Partnership v. Toshiba Corp.*,
    231 F.3d 1373 (Fed. Cir. 2000) .......................................................................................9

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
    449 F.3d 1209 (Fed. Cir. 2006) ...................................................................1, 8, 13, 17

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*,
    439 F.3d 1335 (Fed. Cir. 2006) ................................................................................8, 9

*McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*,
    487 F.3d 897 (Fed. Cir. 2007)..........................................................................................13

*Molins PLC v. Textron, Inc.*,
    48 F.3d 1172 (Fed. Cir. 1995)..........................................................................................21

*Paragon Podiatry Laboratories, Inc., v. KLM Laboratoriess, Inc.*,
    984 F.2d 1182 (Fed. Cir. 1993)...........................................................................................8

*United States v. Krilich*,
    948 F. Supp. 719 (N.D. Ill. 1996) ..............................................................................11, 12

*United States v. Martin*,
    378 F.3d 353 (4th Cir. 2004) .....................................................................................11, 12

## FEDERAL STATUTES

37 C.F.R. § 1.56(a) (2006)...........................................................................................................8

Fed. R. Civ. P. 56(c) .....................................................................................................................7

## MISCELLANEOUS

*Black's Law Dictionary* (7th ed. 1999) .......................................................................................11

Manual for Patent Examining Procedure § 2001.04 (May 2004 ed.) ............................................13

## **INTRODUCTION**

Plaintiffs base their motion for summary judgment on several faulty premises. First, they rely heavily on Judge Zagel's resolutions of disputed fact issues—resolutions which were subsequently vacated by the Federal Circuit and have no legal effect.  Second, Plaintiffs misstate the standard of materiality by arguing that information concerning the Viola browser cannot be material if it is not prior art.  To the contrary, an applicant has the duty to disclose any information that is material to patentability, which encompasses "*any* information that a reasonable Examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent."  *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1226 (Fed. Cir. 2006) (citation omitted) (emphasis added).  Under the correct standard, the information that Doyle had concerning the Viola browser was clearly material, and Plaintiffs' failure to disclose it constituted inequitable conduct.  Third, Plaintiffs erroneously argue that the prior art at issue for inequitable conduct purposes is limited to DX 34 and DX 37, even though there is nothing in the Federal Circuit's opinion imposing such a limitation.

Neither Plaintiffs' self-serving denials nor their irrelevant arguments regarding Microsoft's actions during reexamination of the '906 patent can disguise the fact that Microsoft has alleged a legally sufficient claim for inequitable conduct and that there is evidence supporting each and every one of Microsoft's allegations.  In addition to misstating the law on materiality, Plaintiffs have presented the facts underlying Microsoft's inequitable conduct claim as if all inferences should be drawn in their favor, which is of course incorrect.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")  Plaintiffs' motion for summary judgment must therefore be denied.

## FACTUAL BACKGROUND

### I.   DOYLE'S KNOWLEDGE OF THE VIOLAWWW BROWSER DURING THE '906 PATENT PROSECUTION

Doyle learned about the Viola browser—and where he could find it—at least as early as May 20, 1994.  On that day, Dave Raggett sent Doyle an email advising that he "might want to look at Viola which [Raggett] seem[ed] to remember takes advantage of the tk tool kit to provide a certain level of embedding."  (Microsoft's Statement of Additional Material Facts ("SOF") ¶ 1.)  Raggett further advised Doyle that he could "find a pointer to Viola off the CERN WWW project page."  (*Id.*)

On August 30, 1994, several months later and before filing the application for the '906 patent, Doyle publicized his alleged invention by posting a press release on an Internet mailing list purporting to describe his invention:

> Researchers at the U. of California have created software for embedding interactive program objects within hypermedia documents.  Previously, object linking and embedding (OLE) has been employed on single machines or local area networks using MS Windows -TM-.  ***This UC software is the first instance where program objects have been embedded in documents over an open and distributed hypermedia environment such as the World Wide Web on the Internet***.

(SOF ¶ 2.)

> Pei Wei responded to this press release the next day:
>
> This is very interesting… But, I don't think this is the first case of program objects embedded in docs and transported over the WWW.  ***ViolaWWW has had this capabilities for months and months now***.

(SOF ¶ 3.)  Wei also provided a link to a Web page where anyone "interested in learning more about how violaWWW does this embedded objects thing" could get a paper on the Viola browser.  (*Id.*)

Dr. Doyle promptly obtained the paper, which described and depicted the Viola browser's ability to embed interactive objects in Web pages, including a plotting application that allowed the user to manipulate a three-dimensional object. (SOF ¶ 4.) Based on this paper, Doyle understood that in 1994 the Viola browser "allows one to code 'mini application' scripts that are transferred to the local client, and then interpreted and run locally on the client machine." (*Id.*) Doyle was sufficiently concerned by what he saw to respond to Wei that same night, asking Wei "[h]ow many months and months" the Viola browser had had this capability. (*Id.*) Wei responded that:

> ***Definitely by May 8, 1993 we had demonstrated that plotting demo (the very one shown in the viola paper) to visitors from a certain computer manufacturer***… This demo was memorable because someone and I at ORA had lost sleep the night before the meeting, in order to cook up that particular plotting demo :) We had to show something cool.
>
> That demo wasn't very hard to do because by that time the basic capability was already in place for violaWWW to fetch viola objects over HTTP (or whatever) and plug them into documents. Of course, our wire-frame plotting demo isn't anywhere as comprehensive as yours. But, the point was that there was a way to embed programmable & interactive objects into HTML documents.

(SOF ¶ 5.)

Six weeks after this email exchange, on October 17, 1994, Doyle and his co-inventors filed their patent application. (SOF ¶ 6.) Approximately one year later, on August 21, 1995, Doyle issued another press release announcing that Eolas had obtained "exclusive rights to a pending patent covering the use of embedded program objects, or 'applets,' within World Wide Web documents." (SOF ¶ 7.) Wei, again, quickly responded by e-mail, stating:

> And for the record, I just want to point out that ***the technology which enabled Web documents to contain fully-interactive***

3

> *"inline" program objects was existing in ViolaWWW and was*
> *\*released\* to the public, and in full source code form, even back*
> *in 1993.*

(internal quotations omitted) (SOF ¶ 8.)  The reference to "in-lined" applets is significant, because computer scientists at the time understood the term "in-line" to mean that the object appeared in "the HTML document itself."  (*Id.*)

Doyle replied on the same day, trying to get Wei to admit that he "did NOT release or publish anything like this before the Eolas demonstration."  (SOF ¶ 9.)  Later on the same day, Wei set the record straight, replying:

> Please carefully re-read my letter to you… I said Viola was
> demonstrated in smaller settings, but before your demo.  The
> applets stuff was demo'ed to whomever wanted to see it and had
> visited our office at O'Reilly & Associates (where I worked at the
> time).

(SOF ¶ 10.)  Pei Wei then quoted his earlier e-mail, where he told Dr. Doyle that "by May 8, 1993 we had demonstrated that plotting demo (the very one shown in the viola paper) to visitors from a certain computer manufacturer."  (*Id.*)  He continued:

> That date (May 93), at least, predates your demo if I'm not
> mistaken.  Then around August 93 it was shown to a bunch of
> attendees at the first Web conference in Cambridge.  So, it was
> shown, just not with lots of publicity and noise.

(*Id.*)  He went on to say:

> If you're talking about interactive apps \*specifically\* on the web,
> ie applets in-lined into HTML documents etc., and with bi-
> directional communications, then look at ViolaWWW as it existed
> around late '92 early '93.

(*Id.*)

Doyle continued to do further research concerning the Viola browser during the prosecution of the '906 patent.  Doyle collected most of the information he found in a file he labeled "Viola stuff."  (SOF ¶ 11.)  The items Doyle found concerning Viola included:

- A web page with a prominent link to a 1993 version of the Viola browser (*id.*);

- Wei's public announcements in early 1994 stating that the Viola browser supported "[e]mbeddable in-document . . . programmable viola objects," and providing Internet addresses where the "source and binary code" for two "beta" releases of the Viola browser could be found (*id.*);

- A presentation Wei delivered at Stanford University in September 1994, which described how "program objects can be embedded into documents" (*id.*); and

- Extensive links for various "demos" of the Viola browser's capabilities (*id.*).

Throughout the prosecution of the patent from the time of its filing in 1994 until issuance in 1999 (and despite Doyle's awareness of and admitted concern about Viola expressed in emails with Wei), Doyle never provided the Examiner with any of the information he had obtained regarding the Viola browser, or even so much as mentioned the Viola browser to the PTO.  (SOF ¶ 12.)

Not only did Doyle fail to mention the Viola browser to the PTO, but he also made arguments to the PTO that were contradicted by the Viola information he had.  During prosecution, Doyle continually stressed the absence of two features from the prior art— automatic invocation of an executable application and display of the object within the browser window.[1]  (SOF ¶ 13.)  But based on the information undisputedly in his possession, there can be little doubt that Doyle knew that both of these features were present in the Viola browser.

---

[1] For example, in response to the Examiner's first rejection of the claims, Doyle asserted that "unlike [the cited prior art], the claimed executable application does not generate a static HTML document . . . but displays and processes the object in the same window."  (SOF ¶ 13.)  Doyle also asserted at various times in the prosecution that "there is no suggestion in [the cited prior art] of modifying Mosaic so that an external application . . . is invoked to display and interactively process the object within the window" (SOF ¶ 14); that "Mosaic does not have an

## II.    PROCEDURAL HISTORY

Plaintiffs filed a summary judgment motion on inequitable conduct similar to this one in 2002.  Judge Zagel denied that motion, finding genuine issues of fact regarding both the materiality of the Viola materials that Doyle withheld from the PTO and Doyle's intent to deceive the PTO.  (Dkt. No. 323 at 19.)  The underlying conduct at issue in that motion was the same as the conduct at issue in the present motion.[2]  The Court acknowledged that there was evidence supporting Microsoft's allegations and that those allegations stated a legally sufficient claim for inequitable conduct.  (Dkt. No. 323.)

Judge Zagel conducted a bench trial and ultimately concluded that Plaintiffs' failure to submit Viola materials to the PTO during the original prosecution of the '906 patent did not constitute inequitable conduct because the Viola browser could not be prior art, and therefore could not be material to the pending claims.  (Dkt. No. 491.)

On appeal, the Federal Circuit vacated Judge Zagel's inequitable conduct findings. The Federal Circuit explained that "the district court based its inequitable conduct finding on the misunderstanding that Viola could not possibly constitute prior art."  *Eolas Techs.*, 399 F.3d at 1336.  "Relying on that erroneous determination," the Federal Circuit continued, "the district court concluded that Viola could not be material to patentability."  *Id.*  The Federal Circuit explained that "[o]n remand," the district court "will have an opportunity to include this potential

embed text format specifying an external object which automatically invokes an external application to execute and enable interactive processing within a portion of the browser controlled window" and that "the [cited prior art] reference does not disclose or suggest the missing features" (*id.*); and that the '906 technology made it "possible to embed fully-interactive external applications in Web pages, thereby turning the browser into a platform for the development of entirely new kinds of applications" (*id.*).

[2] Microsoft's pending motion to amend its answer adding additional claims of inequitable conduct, resulting from Plaintiffs' actions during the reexamination of the '906 patent, raises additional facts which render the claims unenforceable either alone or in combination with the conduct at issue in this motion.  (Dkt. No. 670.)

6

prior art in its inequitable conduct inquiry," and "[a]t the same time," the court "may reconsider

its findings on Doyle's intent to deceive the PTO." *Id.* For purposes of the remand, the Court

explained that documents describing a prior art software product can be material even if the

documents themselves are not prior art, because "the software product constitutes prior art, not

necessarily the later published abstract associated with that software product." *Id.* at 1336.

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party seeking summary judgment has the

burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,*

477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the

Court must construe all facts in a light most favorable to Microsoft as the non-moving party and

must draw all reasonable inferences in its favor. *Anderson*, 477 U.S. at 255.

In the inequitable conduct context, the Federal Circuit has warned that "[i]f the

facts of materiality or intent are reasonably disputed, the issue is not amenable to summary

disposition." *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1566-67 (Fed. Cir. 1987).

"Indeed, because the Court's analysis is fact intensive, Federal Circuit 'precedent urges caution in

the grant of summary judgment respecting a defense of inequitable conduct.'" *Black & Decker*

*Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2006 WL 2088437, at *4 (N.D. Ill. July 26,

2006) (quoting *Paragon Podiatry Lab., Inc., v. KLM Labs., Inc.,* 984 F.2d 1182, 1190 (Fed. Cir. 1993)). "Summary procedures should be used sparingly . . . where motive and intent play leading roles" in the inequitable conduct determination, *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1577 (Fed. Cir. 1985), because "the intent element of fraud or inequitable conduct . . . requires the fact finder to evaluate all the facts and circumstances in each case," and "[s]uch an evaluation is rarely enabled in summary proceedings." *Paragon Podiatry*, 984 F.2d at 1190.

      **B.**    **Inequitable Conduct**

      "Patent applicants and those substantively involved in the preparation or prosecution of a patent application owe a duty of candor and good faith to the PTO." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,* 439 F.3d 1335, 1339 (Fed. Cir. 2006) (internal quotations and citation omitted); *see also* 37 C.F.R. § 1.56(a) (2006). "The duty of candor and good faith requires that the applicant disclose to the PTO all information 'material to patentability.'" *Black & Decker*, 2006 WL 2088437, at *4 (citing 37 C.F.R. § 1.56(a)). The "breach of this duty may constitute inequitable conduct, which can arise from a failure to disclose information material to patentability, coupled with an intent to deceive the PTO." *M. Eagles Tool Warehouse,* 439 F.3d at 1339. If inequitable conduct is established, the patent is rendered unenforceable. *Liquid Dynamics*, 449 F.3d at 1226. "There is no reprieve from the duty of . . . full disclosure that rests on the patent practitioner in dealings with the PTO." *KangaROOS U.S.A.*, 778 F.2d at 1576.

      A failure to disclose information is "material" when "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1315-16 (Fed. Cir. 2006). "Materiality is determined from the viewpoint of a reasonable

patent examiner, and not the subjective beliefs of the patentee." *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1366 (Fed. Cir. 2007) (quotations omitted). Thus, to show materiality at trial, Microsoft would need show only that a reasonable examiner likely would have considered the withheld or misrepresented information important in deciding whether to allow the patent to issue. *Digital Control*, 437 F.3d at 1315-16; *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed. Cir. 2003). Notably, "the test for materiality is *not* whether there is anticipation or obviousness" based on the undisclosed information. *A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, 1397 (Fed. Cir. 1986).

The "intent" element "need not be proven by direct evidence." *Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1381 (Fed. Cir. 2000). "Indeed, direct proof of wrongful intent is rarely available, but may be inferred from clear and convincing evidence of the surrounding circumstances." *Id.* (internal quotations and citation omitted); *see also M. Eagles Tool Warehouse,* 439 F.3d at 1341 ("Intent is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for a nondisclosure."). In particular, "intent may be inferred where a patent applicant knew, or should have known, that withheld information would be material to the PTO's consideration of the patent application." *Cargill*, 476 F.3d at 1366 (internal quotations and citation omitted). "[T]he more material the omission, the less culpable the intent required" to prove inequitable conduct. *Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1383 (Fed. Cir. 1998) (internal quotations and citation omitted); *see also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1381 (Fed. Cir. 2001).

Both materiality and intent to deceive are issues of fact. *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1326 (Fed. Cir. 2000). If these issues are reasonably disputed,

inequitable conduct should not be decided on summary judgment. *Baker Oil Tools*, 828 F.2d at 1566.

## II.    PLAINTIFFS CANNOT RELY ON THE NOW-VACATED "FINDINGS" FROM THE 2003 TRIAL ON INEQUITABLE CONDUCT TO SUPPORT THEIR MOTION FOR SUMMARY JUDGMENT.

Remarkably, Plaintiffs assert in their brief that the Federal Circuit's 2005 decision "did not overturn any of Judge Zagel's inequitable-conduct findings." (Dkt. No. 686 at 7.) Plaintiffs then extensively rely on these vacated "findings" to assert that summary judgment should be granted on Microsoft's defense of inequitable conduct. (*See id.* at 5-6, 17-19.) This is clearly erroneous, and Plaintiffs' sophistry should be rejected.

After a bench trial in 2003, Judge Zagel held that Microsoft failed to prove that Plaintiffs had breached their duty of candor to the PTO. (Dkt. No. 491 at 17.) Microsoft appealed this decision, *see* Brief of Defendant-Appellant Microsoft Corporation at 47-50, *Eolas Techs. Inc. v. Microsoft Corporation*, 399 F.3d 1325 (Fed. Cir. 2005) (No. 04-1234), and the Federal Circuit "vacate[d] the district court's decision on inequitable conduct." *Eolas Techs., Inc.*, 399 F.3d at 1336. In its opinion, the Federal Circuit explained that the district court had erred in numerous important respects in its inequitable conduct decision, including: (1) that it had "based its inequitable conduct finding on the misunderstanding that Viola could not possibly constitute prior art" and thus "Viola could not be material to patentability;" (2) that it had found the DX34 version of Viola "was abandoned, suppressed, or concealed within the meaning of § 102(g);" (3) and that it "did not explain a reason for declining to consider" the DX37 version of Viola, "which was also created prior to Doyle's invention." *Id.* In its conclusion, the Federal Circuit held that "the district court . . . improperly rejected Microsoft 's inequitable conduct defense" and "vacate[d] the district court's decision[] and remand[ed] for further proceedings on th[is] issue[]." *Id.* at 1341.

10

Contrary to Plaintiffs' assertion, the Federal Circuit's decision voided and nullified all of Judge Zagel's "findings" on inequitable conduct. A decision vacated on appeal is "void," "nullif[ied]," and "cancel[led]." *Black's Law Dictionary* at 1546 (7th ed. 1999); *see also United States v. Martin*, 378 F.3d 353, 358 (4th Cir. 2004) ("Vacate means to render an act void; as, to vacate an entry of record, or a judgment." (internal quotations and citations omitted)); *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam) ("'To 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'" (citation omitted)). Consequently, when a court's "first judgment is vacated . . . , the vacated [decision] should be treated as a nullity[.]" *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996). And when a district court's decision has been vacated, all "findings" that supported that decision are also nullified, as a prior decision in this district has explained:

> [T]he final line of the Seventh Circuit's opinion reads "Vacated And Remanded." The parties disagree about whether this vacates [the prior judge's] findings of fact in their entirety, or vacates only those findings of which the Court of Appeals specifically disapproved. Resort to a dictionary settles the matter. To "vacate" comes from the Latin verb *vacare* for "be empty," and means to annul or leave empty. Because [the prior judge's] findings of fact have been "left empty," they have no continued vitality except insofar as the Seventh Circuit may have adopted certain findings and made them their own.

*Leigh v. Engle*, 669 F. Supp. 1390, 1393 (N.D. Ill. 1987) (internal citations omitted). Thus, because the Court's prior decision on inequitable conduct was vacated, it is a legal nullity, and Plaintiffs cannot rely on its purported "findings" in moving for summary judgment.[3]

---

[3] In their brief, Plaintiffs cite *Kelso v. U.S. Dep't of State*, 13 F. Supp. 2d 12, 18 (D.D.C. 1998) and *United States v. Krilich*, 948 F. Supp. 719, 725 (N.D. Ill. 1996) in support of their erroneous proposition. However, these cases actually contradict Plaintiffs' argument.

In *Kelso*, the plaintiff—an alleged fugitive from justice—petitioned the district court to vacate the Secretary of State's revocation of his passport. 13 F. Supp. 2d at 13-14. The initial

11

III.  **PLAINTIFFS' ARGUMENT THAT THERE CAN BE NO INEQUITABLE CONDUCT BECAUSE DOYLE DID NOT HAVE POSSESSION OF THE PRIOR ART IS ERRONEOUS.**

A.  **"Material" Information Is Not Limited to Prior Art.**

Plaintiffs' primary argument is based on a proposition that is clearly incorrect: that only "prior art" can be material for purposes of inequitable conduct, and because Doyle "never had possession" of the prior art (which Plaintiffs erroneously define as limited to the DX34 and DX37 versions of Viola), he had no obligation to disclose *anything* to the PTO about the Viola browser.  (*See* Dkt. No. 686 at 2, 15-16.)

The Federal Circuit has repeatedly held that "[a] patent applicant's duty to disclose is not limited to disclosing prior art.  A patent applicant must disclose any material *information* to the PTO."  *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1258 (Fed. Cir. 1997) (emphasis added) (citing 37 C.F.R. § 1.56(a) (1996)).  As the Federal Circuit explained in *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, (Fed. Cir. 1998),

> [B]oth the parties and the district court appear to have assumed, quite incorrectly, that only prior art can be a material reference. Materiality instead embraces *any* information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.

---

vacatur was the result of an administrative regulation that automatically vacated the Secretary's decision because of the State Department's failure to hold an administrative hearing.  *Id.* at 14. After the decision was vacated, the Secretary again revoked plaintiff's passport; plaintiff argued that this action was barred by res judicata.  *Id.* at 14-15.  The district court disagreed, declaring that a vacated decision was "annul[ed]" and "set aside," *id.* at 17, and that "basic understandings of vacatur dramatize that, by definition, that which is vacated loses the ability to 'spawn[] any legal consequences.'"  *Id.* at 17 (quoting *United States v. Munsingwear*, 340 U.S. 36, 41 (1950)).

In *Krilich*, the district court considered the impact of an earlier district court decision that had been vacated, rather than reversed, by the Court of Appeals in construing a consent decree. The district court explained that the word vacate meant "[t]o annul; to set aside" and "[t]o render an act void; as to vacate an entry of record, or a judgment."  948 F. Supp. at 724 (internal quotations and citation omitted).

*Id.* at 1382 (internal quotations and citations omitted).

In the *Akron Polymer* case, the Federal Circuit held that an undisclosed reference was "highly material," despite the plaintiff's argument that it was not prior art, "because it could have conceivably served as the basis of a double patenting rejection." *Id.* 148 F.3d at 1382. Similarly, in *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001), the Federal Circuit held that five undisclosed references were material, even thought they were not prior art, because the references at issue raised a "potential priority conflict" having an impact on patentability. *Id.* at 1274. Numerous recent Federal Circuit cases have reaffirmed the proposition that the duty of disclosure extends to "*all* material information" that the applicant is "aware of, or reasonably should have been aware of," regardless of its source. *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 923 (Fed. Cir. 2007) (internal quotations and citation omitted). *See also Liquid Dynamics Corp. v. Vaughan Co.,* 449 F.3d 1209, 1226 (Fed. Cir. 2006) ("Materiality *is not limited to prior art* but embraces *any* information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." (first emphasis added)); *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (same). Similarly, the PTO has explained in the Manual For Patent Examining Procedure ("MPEP") that "the term 'information'" in the context of an applicant's duty of disclosure "is intended to be all encompassing" and "includes any information which is material to patentability." MPEP § 2001.04, at 2000-03 (May 2004 ed.)

Indeed, the Federal Circuit decision in this case rejected the position taken by Plaintiffs here. In its opinion, the Federal Circuit explained that later information evidencing a prior art software product, such as an abstract describing the product, can be material to patentability, even if the later abstract is not prior art. As the Court explained, "the software

13

product constitutes prior art, not necessarily the later published abstract associated with that software product." *Eolas Techs.*, 399 F.3d at 1336 (citing *In re Epstein*, 32 F.3d 1559, 1567-68 (Fed. Cir. 1994) (upholding Examiner's rejection based on later abstracts describing prior art software product)).

Consequently, Plaintiffs' argument that information which "is not prior art . . . . cannot be material" is flatly incorrect.  (Dkt. No. 686 at 2.)

**B.      Plaintiffs' Argument That the Prior Art Is Limited to DX 34 and DX 37 Is Incorrect.**

Plaintiffs' motion is also based on the false assumption that the only prior art that is relevant for inequitable conduct purposes is the DX 34 and DX 37 Viola browser code.  (Dkt. No. 686 at 15.)  Plaintiffs argue that this is required because the Federal Circuit stated that "[o]n remand, the district court will have an opportunity to include" DX 34 "in is inequitable conduct inquiry."  (*Id.*)  But the Federal Circuit never said that the district court's consideration on remand was *limited to* DX 34 and DX 37.  It merely stated that the district court may include DX 34 (among other things) in its inequitable conduct analysis.  And, it vacated all of the district court's prior inequitable conduct findings.  Consequently, on remand, the Court should consider in its inequitable conduct analysis all of the relevant prior art and other material information that Doyle had.

The record clearly shows that Doyle had possession of prior art concerning the Viola browser during the prosecution of the '906 patent.[4]  This prior art included the Viola paper,

--------

[4] Plaintiffs have also argued that the Court is bound by Judge Zagel's prior invention date "finding," which was vacated by the Federal Circuit, in determining what is prior art in this case. As Microsoft explained in the parties' Motions *in Limine* on this subject, any such "finding" by Judge Zagel was vacated and has no legal effect, and therefore the invention date should be determined by the jury in the retrial of this case.  (Dkt. No. 735 at 11-12; Dkt. No. 776 at 6-7; Dkt No. 759 at 759.)  The invention date of the '906 patent is presumed to be the filing date of

which described the Viola browser in detail, as well as the e-mails from Wei explaining that the Viola browser had the capability to embed program objects in documents and transmit them over the World-Wide-Web. Plaintiffs' argument that Doyle did not have possession of prior art relating to the Viola browser is therefore clearly wrong.

Additionally, there is at least a disputed issue of material fact as to whether Doyle obtained Viola code. Doyle was given a link to the Viola browser code by Dave Raggett in 1994 (SOF ¶ 1), and had e-mails in his possession with links to beta releases of the Viola browser (SOF ¶ 11). Plaintiffs' argument that the Viola browser was "nearly impossible to obtain"[5] is false and is contradicted by abundant evidence in the record showing that Wei freely shared his browser code with others, including engineers from Sun Microsystems in May 1993 (SOF ¶ 16), interested members of the public who requested access to the alpha releases in the Fall of 1993 (SOF ¶ 17), and the general public by means of beta releases in early 1994 (SOF ¶ 18).

## IV. PLAINTIFFS' ARGUMENT THAT THE INFORMATION DOYLE HAD WAS NOT MATERIAL IS UNPERSUASIVE.

Plaintiffs' argument that Doyle did not have any information about the Viola browser other than "Wei's assertion that he achieved something" borders on the incredible. To the contrary, Doyle indisputably possessed a trove of relevant information about the Viola browser which would have been important to a reasonable Examiner in considering the patentability of the '906 claims. This information included at least the following:

- Wei's paper describing the Viola browser in detail, including the embedding of interactive objects in Web pages, and their display within the browser window (SOF ¶ 4);

---

the patent application, unless Plaintiffs can prove an earlier date. *See Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000).

[5] Plaintiffs again improperly rely on factual findings vacated by the Federal Circuit for this proposition. (Dkt. No. 686 at 17.)

- Emails from Wei in 1994 before the '906 patent was filed explaining that the Viola browser had the capability to embed interactive objects in Web pages and that the "plotting demo" shown in the Viola paper was demonstrated "by May 8, 1993" to a "certain computer manufacturer" (SOF ¶ 5);

- Emails from Wei in 1995 further explaining that the Viola browser "enabled Web documents to contain fully-interactive 'inline' program objects" in 1993 and was "released to the public, and in full source code form, even back in 1993" (SOF ¶ 8);

- A web page with a prominent link to a 1993 version of the Viola browser (SOF ¶ 11);

- Wei's public announcements in early 1994 providing Internet addresses where the "source and binary code" for two "beta" releases of the Viola browser could be found and explaining that the Viola browser supported "[e]mbeddable in-document . . . programmable viola objects" (SOF ¶¶ 11, 18);

- A presentation Wei delivered at Stanford University in September 1994, which described how "program objects can be embedded into documents" (SOF ¶ 11); and

- Extensive links for various "demos" of the Viola browser's capabilities (SOF ¶ 11).

This information would clearly have been important to a reasonable examiner in evaluating the patentability of the '906 patent. If Doyle had simply provided this information to the Examiner, the Examiner could have made an assessment of whether it impacted the patentability of the pending claims. Instead, Doyle unilaterally made the decision to withhold it in its entirety. (SOF ¶ 12.)

The facts of this case are in no way comparable to the cases cited by Plaintiffs. For example, in *Hebert v. Lisle Corp.*, 99 F.3d 1109 (Fed. Cir. 1996), the inventor did not have *any* specific information about any particular prior art product, but rather was merely provided the following general statement by the defendant:

> [O]ver the years twelve (12) other inventors had sent in a very similar tool idea.... Several years ago we made prototypes and gave

16

> them to area garages to see if these tools would work very well.
> We must not have received a very positive response because
> Management has not been interested in pursuing this idea.

*Id.* at 1112-13. Such general information, unlike the specific information Doyle had here, would

not have been of any use to a reasonable Examiner in evaluating the patentability of the

inventor's claims.

In *Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027 (Fed. Cir. 2006), the district

court held a trial in which it determined that the patentees did not have "the requisite intent to

deceive the PTO" because "they were not able to discern how the device operated or whether or

not it had" the key feature claimed in the patent, and the Federal Circuit affirmed. *Id.* at 1036-

37. Here, by contrast, Doyle had abundant information showing that the Viola browser had the

capability to embed interactive objects in Web pages, the key feature claimed in the '906 patent.

(SOF ¶¶ 3, 5, 8, 10, 11.) And, unlike in *Highway Equip. Co.*, Plaintiffs want the Court to grant

summary judgment without a trial. *See also FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415

(Fed. Cir. 1987) (upholding district court's finding of no intent to deceive the PTO following

trial).

Finally, Plaintiffs argue that Doyle cannot have committed inequitable conduct

because he lacked "first-hand awareness or familiarity with the Viola prior art." (Dkt. No. 686 at

18.) This argument is flawed in at least two respects.

First, a patent applicant's duty of disclosure is not limited to "first-hand"

awareness of prior art. To the contrary, applicants have a duty to disclose "material"

information, which "embraces any information that a reasonable examiner would be substantially

likely to consider important in deciding whether to allow an application to issue as a patent."

*Liquid Dynamics*, 449 F.3d at 1226 (internal quotations and citation omitted). None of the cases

cited by Plaintiffs provide any support in the law for Plaintiffs' new requirement of "first-hand

knowledge" of the prior art. Indeed, under Plaintiffs' theory, if an inventor had a later abstract describing a prior art software product, he would be perfectly justified in withholding it from the PTO because he would not have "first-hand awareness or familiarity" with the software. But the Federal Circuit has held that such an abstract to be sufficient evidence to support a prior art rejection by an Examiner. *In re Epstein*, 32 F.3d 1559, 1567-68 (Fed. Cir. 1994) (upholding Examiner's rejection based on later abstracts describing prior art software product). There can be no question that such information would be material to patentability, even if the inventor himself lacked "first-hand awareness or familiarity" with the prior art software itself.

Second, much of the information Doyle had, such as the Viola paper, the 1994 Wei emails, Wei's Stanford, presentation, and the beta release announcements, were themselves prior art. Doyle, therefore, did have "first-hand awareness" of prior art relating to the Viola browser.

## V. THERE IS AT LEAST A GENUINE ISSUE OF MATERIAL FACT THAT DOYLE INTENDED TO DECEIVE THE PTO BY NOT DISCLOSING MATERIAL INFORMATION ABOUT THE VIOLA BROWSER.

In their brief, Plaintiffs have not asserted that there is no material issue of disputed fact concerning whether Doyle intended to deceive the PTO when he withheld information about Viola. Rather, they (wrongly) argue that such information is not material, and thus cannot serve as the basis for an inequitable conduct claim. (*See* Dkt. No. 686 at 2.)

There is at least a genuine issue of material fact that Doyle intended to deceive the PTO by failing to disclose information about the Viola browser. The Federal Circuit has explained that "[t]he more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct." *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007) (internal quotations and citation omitted). Here, because the information Doyle had about the Viola browser was highly material to the patentability of the

'906 technology, Microsoft need only prove a low level of intent to deceive by Doyle. This "[i]ntent may be inferred where a patent applicant knew, or should have known, that withheld information would be material to the PTO's consideration of the patent application." *Id.* at 1366 (internal quotations and citation omitted).

Intent to deceive may be inferred because Doyle knew, or should have known, that he had highly material information that would be important to the PTO's consideration of the '906 patent application. Based on the information he had, Doyle was aware that Viola had the capability to embed interactive objects in Web pages since at least May 1993. (SOF ¶ 15.) And Doyle personally downloaded and reviewed Wei's 1994 paper on Viola, which explained how Viola rendered documents with embedded Viola objects, including the example of an interactive chess board. (SOF ¶ 4.) "Such a high degree of materiality," coupled with evidence that the Doyle knew or should have known of that materiality, "creates a strong inference of an intent to deceive" in this case. *Cargill*, 476 F.3d at 1367.

Moreover, Doyle's responses to the PTO's rejections during the '906 prosecution also create a strong inference that he intended to deceive the PTO. "An applicant should know information is material when the examiner repeatedly raises an issue to which the information relates." *Cargill*, 476 F.3d at 1366. During prosecution of the '906 patent application, each time the Examiner rejected the '906 patent application's claims, Plaintiffs relied on the same basic point to distinguish the Examiner's cited prior art: that the '906 invention was a browser that enabled the use of program objects embedded in documents, and the prior art cited by the Examiner did not show that. (SOF ¶ 13.) Thus, in response to the first rejection, Doyle asserted that "unlike [the cited prior art], the claimed executable application does not generate a static HTML document . . . but displays and processes the object in the same window." (*Id.*) Plaintiffs

made similar statements in distinguishing the prior art in response to two subsequent rejections.[6] But based on the information undisputedly in his possession, Doyle knew—or at least should have known—that Viola allowed interactive, embedded program objects within the same web page. (SOF ¶ 15.) Despite this, Plaintiffs never said a word about Viola to the PTO.

In addition, Doyle's public misrepresentation about the timing of Viola's support for interactive, embedded objects also supports an inference that Doyle knew and was concerned about Viola as potentially invalidating prior art. In their August 31, 1994 email exchange, Wei told Doyle that Viola was able "to embed programmable & interactive objects into HTML documents" since the May 1993 demonstration. (SOF ¶ 5.) A year later, in response to Eolas's August 1995 press release, Wei again told Doyle that Viola had "the technology . . . to contain fully-interactive 'inline' program objects . . . even back in 1993," when Wei publicly released Viola's source code. (SOF ¶ 8.) In a message publicly copied to the WWW-Talk web page, Doyle then blatantly misrepresented Wei's prior statement, claiming that Wei had not "release[d] or publishe[d] anything like this" before Eolas's demonstration. (SOF ¶ 9.) Wei again corrected Doyle, stating that Viola had the relevant capability since late 1992 or early 1993, and again mentioning his May 1993 demonstration to the Sun engineers. (SOF ¶ 10.) In this context, Doyle's public statement is clearly an attempt to get an "admission" out of Wei, in order to argue that Viola had a later invention date than the alleged '906 technology.

"[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good

---

[6] *See* SOF ¶ 14 (asserting that "there is no suggestion in [the cited prior art] of modifying Mosaic so that an external application … is invoked to display and interactively process the object within the window"; *id.* (claiming that "Mosaic does not have an embed text format specifying an external object which automatically invokes an external application to execute and enable interactive processing within a portion of the browser controlled window," and that "the [cited prior art] reference does not disclose or suggest the missing features").

faith' sufficient to prevent the drawing of an inference of intent to mislead." *Critikon*, 120 F.3d at 1257. Here, Doyle knew—or, at a bare minimum, should have known—that, based on the wealth of information that that Doyle admits receiving and review about Viola, the Viola browser had a high degree of materiality to the patentability of the alleged '906 technology. Consequently, there is at least a genuine issue of material fact that Plaintiffs' withholding of all information about Viola was intended to deceive the PTO.

## VI.    PLAINTIFFS' ACTIONS DURING THE REEXAMINATION DID NOT CURE THE INEQUITABLE CONDUCT DURING THE ORIGINAL PROSECUTION.

Plaintiffs' actions during the reexamination cannot and did not cure or remove their inequitable conduct during the original prosecution of the '906 patent. The Federal Circuit has rejected the proposition that inequitable conduct based on failure to disclose a reference during the original prosecution can be removed or cured by disclosing that reference in a reexamination proceeding. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1179 (Fed. Cir. 1995). In *Molins*, the patentee failed to cite a material reference during the original prosecution, but later disclosed that reference in a reexamination proceeding. *Id.* The Examiner ultimately issued a reexamination certificate over the reference. *Id.* The patentee argued that because the claims were found patentable over the reference in the reexamination, the reference could not be material and there could be no inequitable conduct. *Id.* The Federal Circuit disagreed, finding inequitable conduct based on the failure to disclose the reference during the original prosecution. *Id. See also A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1397-99 (Fed. Cir. 1986) (finding inequitable conduct based on failure to disclose reference during prosecution even though examiner considered the reference during later interference and found some of the claims allowable); *Application of Clark*, 522 F.2d 623 (C.C.P.A. 1975) (reissue proceeding may not be used to cure patent obtained through inequitable conduct).

21

Plaintiffs also have no basis to argue that the decision in the reexamination shows that the Viola browser was not material or that it confirms Doyle's supposed belief that the Viola browser did not allow interactive objects to be displayed in the browser window. To the contrary, the record during the reexamination shows that information about the Viola browser was indeed something that the Examiner considered important in deciding whether to issue a patent. In his Notice of Intent to Issue a Reexamination Certificate, the Examiner included a discussion of DX 37 Viola browser code. (SOF ¶ 20.) In this discussion, the Examiner specifically noted that the Viola browser had the ability "to embed an interactive application object within the same window of the Viola browser." (*Id.*) This was the very feature that Doyle told the PTO was missing from the prior art in a sworn declaration during the original prosecution, in which he represented that:

> The claimed invention lifted the glass, so to speak, from the Web browser, making it possible to embed fully-interactive external applications within Web pages.

(*Id.*) In explaining an amendment to his claims, Doyle repeated his assertion to the PTO that "the claimed invention 'lifted the glass' of the browser display to allow interactive control of document elements while being displayed in the browser controlled window." (*Id.*) Even though the Examiner ultimately allowed the claims to issue based upon a claim construction different than the one applied in this case, his detailed analysis clearly shows that he considered the Viola browser to be important in assessing patentability.

Moreover, during the reexamination, Plaintiffs disclosed information about the Viola browser in a deceptive way. As explained in Microsoft's motion to amend its Answer to include additional inequitable conduct allegations (Dkt. No. 670), Plaintiffs disclosed a disk with over 1,000 source code files relating to the Viola browser, as well as selected documents from this litigation. (SOF ¶ 19.) Plaintiffs, however, withheld the litigation documents setting forth

Microsoft's contentions as to how the Viola browser invalidates the '906 claims. (*Id.*) As a result, the Examiner attempted to consider the information submitted about the Viola browser, but missed the key functionality that invalidates the claims. (*Id.*) Despite this, Plaintiffs never corrected the Examiner, pointed him to the key functionality, or disclosed the litigation documents on point. Far from curing the inequitable conduct, Plaintiffs' actions during the reexamination constituted additional acts of inequitable conduct in their own right.

## CONCLUSION

Plaintiffs base their motion for summary judgment on vacated findings, the wrong standard for materiality, and a total disregard for evidence contrary to their "undisputed facts." Under the proper standard of materiality, Plaintiffs had a duty to disclose information on the Viola browser and breached that duty in the prosecution of the '906 patent. Microsoft has alleged a legally sufficient claim of inequitable conduct and has presented, at a minimum, evidence creating a genuine issue of material fact as to whether the Viola browser was material and whether Doyle acted with intent to deceive the PTO. As such, Plaintiffs' motion for summary judgment on inequitable conduct must be denied.

Dated: July 9, 2007.                                Respectfully submitted,

                                                     ____/s/ David T. Pritikin_____
                                                     David T. Pritikin, I.D. No. 2256339
                                                     Richard A. Cederoth, I.D. No. 6185199
                                                     SIDLEY AUSTIN LLP
                                                     One South Dearborn Street
                                                     Chicago, IL 60603
                                                     (312) 853-7000

                                                     Dan K. Webb, I.D. No. 02954087
                                                     Bruce R. Braun, I.D. No. 06206628
                                                     WINSTON & STRAWN LLP
                                                     35 West Wacker Drive
                                                     Chicago, IL 60601-9703
                                                     (312) 558-5600

Of Counsel:

T. Andrew Culbert
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
(425) 882-8080

H. Michael Hartmann, I.D. No. 1146130
Brett A. Hesterberg, I.D. No. 6187619
Steven P. Petersen, I.D. No. 6196793
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
Chicago, IL 60601-6780
(312) 615-5600

Attorneys for Defendant
MICROSOFT CORPORATION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Defendant Microsoft's Opposition to Plaintiffs' Motion for Summary Judgment on Inequitable Conduct was served upon both Plaintiffs by the Electronic Case Filing (ECF) system on July 9, 2007.

/s/  David T. Pritikin